## I.    INTRODUCTION

This case is brought by three separate Plaintiffs against Pepperidge Farm, Inc.,

("Pepperidge Farm"), a subsidiary of Campbell Soup Company, Campbell Soup Company

("Campbell Soup"),[1] and the Plaintiffs' supervisor at Pepperidge Farm, Roberto Arocho ("Mr.

Arocho"). All three Plaintiffs worked on the production line at Pepperidge Farm's Norwalk,

Connecticut facility, a bakery that produces a variety of Pepperidge Farm products. The sum and

substance of Plaintiffs' allegations are that from approximately mid-July 2001 through August

2001, they were subjected to separate and sporadic incidents of alleged sexual harassment by Mr.

Arocho. Pepperidge Farm's Human Resource Manager and Employee Relations Manager

conducted a prompt and thorough investigation of each Plaintiff's allegations. In connection

with their investigations, they interviewed each Plaintiff, Mr. Arocho and all identified

witnesses. Additionally, they counseled Mr. Arocho regarding Pepperidge Farm's anti-

harassment policy, assured the Plaintiffs that Pepperidge Farm had a "zero tolerance" policy

towards sexual harassment of any kind, and informed Plaintiffs and Mr. Arocho that Pepperidge

Farm also had a "no retaliation" policy and that retaliation of any kind would not be tolerated.

The investigations resulted in no corroborating evidence of any of Plaintiffs' allegations, or

evidence of any kind that would support Plaintiffs' claims that Mr. Arocho harassed them.

Plaintiffs' fifteen-count Complaint alleges that the Defendants, in various capacities, are

liable for sex discrimination, intentional sex discrimination, sexual harassment, hostile work

---

1 There is no separate basis alleged by which Campbell Soup is liable on any of Plaintiffs' causes of action, except
that Plaintiffs' employer, Pepperidge Farm, is a subsidiary of Campbell Soup. Accordingly, the corporate
defendants hereinafter will be referred to together simply as "Pepperidge Farm."

environment,[2] retaliation for complaining about sexual discrimination and harassment, misrepresentation regarding the sexual harassment prevention policies, negligent and intentional infliction of emotional distress, assault and battery and civil conspiracy. All of Plaintiffs' claims, including the plethora of pendent common law state claims, are based upon the same facts and circumstances alleged in support of their sexual harassment claim. Because, as discussed below, there are no <u>material</u> facts in dispute and no reasonable person could find in Plaintiffs' favor, the Court should grant the Defendants summary judgment on all fifteen counts of Plaintiffs' Complaint.

## II.    STATEMENT OF FACTS

As noted above, at all times relevant to the Complaint, the Plaintiffs worked on the production line in the Pepperidge Farm bakery located in Norwalk, Connecticut. Defendant Roberto Arocho is also a Pepperidge Farm employee. Mr. Arocho has been employed consistently with Pepperidge Farm since 1979, and has been a supervisor for approximately ten years. Deposition Transcript of Roberto Arocho ("Arocho Depo.") at 14-15; 40-42 (relevant portions of the Arocho Depo. are attached hereto as Exhibit A). Each Plaintiff alleges in some instances, oddly identical facts, which she believes support her claim of sexual harassment. No Plaintiff alleges additional or different facts to support any of the other claims contained in their jointly filed Complaint.

### A.    Twanya Presley

Plaintiff Twanya Presley ("Presley") was hired by Pepperidge Farm on August 28, 1996. Deposition Transcript of Twanya Presley ("Presley Depo.") at 11 (relevant portions of the

---

2 It is unclear why Plaintiffs separated their Title VII sexual harassment claim into six separate counts, all of which rely on exactly the same facts. However, for purposes of this motion for summary judgment, each of the counts will be addressed separately.

2

Presley Depo. are attached hereto as Exhibit B). Presley resigned from Pepperidge Farm in February 1998, but reapplied and was rehired in June 1999, as a temporary employee in the Pepperidge Farm Bread Department. Id. at 12; 15, Exh. B. In December 1999, Presley became a fulltime employee as a Production Substitute in the Bread Department. Id. at 16, Exh. B. Sometime in early 2000, Presley switched from the night shift to the day shift, and Roberto Arocho became her supervisor. Id. at 16-17, Exh. B. During that same time frame, Mr. Arocho gave her the opportunity to work in the "mixing room." Id. at 24, ll. 8-13, Exh. B. While this job was predominantly held by men, it presented Presley the opportunity to make more money, expand her knowledge at Pepperidge Farm and potentially become eligible for higher positions within the plant. Id. at 25-26, Exh. B.

Presley testified that despite her almost daily contact with Mr. Arocho for two years, from June 1999 through mid-July 2001, Mr. Arocho did not say or do anything that she considered "inappropriate." Presley Depo. at 35, ll. 1-17; 260, ll. 17-21, Exh. B. However, Presley alleges that for no apparent reason, in mid-July 2001, Mr. Arocho began sexually harassing her. See Complaint at ¶ 21, A (i); Presley Depo. at 261, Exh. B. Presley's allegations of sexual harassment are as follows:[3] Sometime in July of 2001, Mr. Arocho placed his hand on top of hers and told her that she was attractive and that she had pretty hair. Complaint at ¶ 21, A (i); Presley Depo. at 278, Exh. B. Presley testified that she did not pull her hand away, nor did she find Mr. Arocho's behavior upsetting. Presley Depo. at 279, Exh. B. On another occasion in July, during quality assurance testing of the bread, Mr. Arocho told her that he liked the way she

---

[3] It should be noted that while Presley's allegations have not been consistent over time, i.e. Presley's allegations in her complaint to the Connecticut Commission on Human Rights and Opportunities ("CCHRO"), those contained in her Complaint to this Court and those to which she testified at her deposition differ significantly in many respects, none of her various iterations rises to the level of sexual harassment as a matter of law. See § III.B.2, infra. Moreover, Pepperidge Farm exercised reasonable care to prevent and promptly correct any harassing behavior. See § III.B.1, infra.

ate bread. Presley Depo. at 71, ll. 1-3, Exh. B. Presley testified that she believed that this comment was "innocent." Id. at ll. 20, Exh. B. On August 2, 2001, Mr. Arocho allegedly touched Presley's arm and told her that she had soft skin. Complaint at ¶ 21, A (ii); Presley Depo. at 279, Exh. B. On August 3, 2001, Mr. Arocho allegedly told Presley that she could "make a lot of money with her looks," Complaint at ¶ 21, A (iv), Presley Depo. at 286, Exh. B, and later that day, he gestured to and grabbed his genital area and asked "so Twanya, you don't want none of this?" Complaint at ¶ 21, A (vi), Presley Depo. at 286, ll. 25-289, ll. 9, Exh. B. Finally, Presley alleges that between August 3 and August 15, 2001, Mr. Arocho looked at her in a "menacing and flirtatious manner," Complaint at ¶ 21, A (xx) and that on August 15, 2001, he touched her shoulder and said "hello," which she testified did not offend her. Complaint at ¶ 21, A (xii); Presley Depo. at 302-303, Exh. B.

Back in February 2001, Presley was injured while working in the Bread Department when a metal rack that she was pulling fell, fracturing her left foot. As a result of her injury, she did not work from February 13, 2001 through April 1, 2001, during which time she received workers' compensation benefits. Presley Depo. at 33, ll. 20-25; 35, ll. 13-17, Exh. B. She returned to work at the plant on or about April 2, 2001, although she had a number of temporary physical restrictions imposed upon her by her physician. Id. at 35, Exh. B. Due to these restrictions, which changed over time, Presley was given a number of "modified" or "light duty" assignments depending upon the work available at the plant and her physical limitations. During the times relevant to Presley's allegations, she performed clerical work for the Quality Assurance, Production, Engineering, Human Resources and Medical Departments. Presley Depo. at 54, ll. 18-25, Exh. B. Nevertheless, she remained a Production Department employee on modified duty whose wages were attributable to the Production Department.

4

On or about August 31, 2001, Presley, along with two other employees, interviewed for a Quality Assurance ("QA") Technician position in the QA Department with Steven White, the Quality Assurance Manager at the time. Presley Depo. at 125, ll. 10-17, Exh. B; Affidavit of Steven White ("White Aff.") at ¶¶ 4, 7 attached hereto as Exhibit C. Presley wanted the QA job because it would allow her to perform office work, rather than work on the production line, which she preferred. Presley Depo. at 175, Exh. B. Prior to the interview, Presley spoke with a fellow employee and friend at Pepperidge Farm, Vanessa Diggs. Presley Depo. at 130, ll. 20-24, 131, ll. 1-2, Exh. B. Diggs was a supervisor in QA, and according to Presley, insinuated that Presley was a "shoe in" for the open QA position. Presley Depo. at 121, Exh. B. Despite the fact that Vanessa Diggs secretly provided Presley with the interview questions in advance, Presley Depo. at 133, ll. 3-12, Exh. B, based upon her performance during the interview, Mr. White did not believe that Presley was the best candidate for the job. White Aff. at ¶ 15, Exh. C. Mr. White's initial assessment was confirmed by his comparison of Presley's performance and productivity while on her light duty assignments working in the QA Department[4] to the other candidates' performance and productivity during a "day in the life," where each was asked to perform some of the functions of the QA job for a day. White Aff. at ¶¶ 9, 15, Exh. C.[5]

Presley testified that immediately following her interview with Mr. White, on Friday, August 31, 2001, she went to see Vanessa Diggs. Presley Depo. at 131, ll. 9-11, Exh. B. However, instead of discussing the interview, Presley told Diggs that Roberto Arocho had sexually harassed her, but also told her it was "all right" because she still thought that she would get the QA job because Diggs knew "what [Presley could] do ... and what [she's] capable of

[4] A portion of Presley's light duty time was spent performing clerical work in the QA office, and Mr. White was, therefore, familiar with her performance in the QA position. Presley Depo. at 57.
[5] Mr. White ultimately awarded the job to one of the other candidates. White Aff. at ¶ 13.

doing." Presley Depo. at 131, ll. 21-25, Exh. B. Vanessa Diggs told Presley that she ought to complain to the Human Resources ("HR") Department. Id. at 179, Exh. B. Ms. Diggs also shared Presley's allegations with Steve White, who was Digg's supervisor. As a result, Mr. White immediately called Paul Macionus, Pepperidge Farm's Human Resources Manager to discuss the allegations. See Deposition Transcript of Paul Macionus, Jr. ("Macionus Depo.") at Volume I, 106 (relevant portions of the Macionus Depo. are attached hereto as Exhibit D); see also Affidavit of Paul Macionus, Jr. ("Macionus Aff.") at ¶¶ 9, 10 attached as Exhibit E. That same day Mr. White and Ms. Diggs met with Mr. Macionus, whereby Ms. Diggs recounted her conversation with Presley. See Macionus Aff. at ¶ 10, Exh. E.

On Tuesday, September 4, 2001, the first day back at the plant after the Labor Day holiday weekend, Mr. Macionus, together with Maritza (Sanchez) Allende ("Allende"), Employee Relations Manager, commenced a full investigation of Ms. Presley's allegations. Presley Depo. at 179-178; 325, Exh. B; Macionus Depo. at 107-108, 111-112, Exh. C; Macionus Aff. at ¶ 14, Exh. E. In connection with their investigation, Mr. Macionus and Ms. Allende interviewed Presley, Arocho and all witnesses identified by Presley. Macionus Depo. at Vol. I, 131, Exh. D; see also Deposition Transcript of Maritza Allende ("Allende Depo.") at 79 (relevant portions of the Allende Depo. are attached hereto as Exhibit F). Following a full investigation, Macionus and Allende were unable to corroborate any of Presley's allegations, and found no evidence of sexual harassment. Macionus Depo. at Vol. I, 149, Exh. D; Allende Depo. at 131, ll. 13-16, Exh. F; Presley Depo. at 325, Exh. B; Macionus Aff. at ¶ 28, Exh. E.

Ms. Presley testified that once HR prompted and investigated her complaint, Mr. Arocho stopped allegedly sexually harassing her. Presley Depo. at 247; 325, Exh. B.

6

### B.   Sofia Tsharides

Sofia Tsharides ("Tsharides") was hired by Pepperidge Farm as a temporary employee in May 1999. See Deposition Transcript of Sofia Tsharides ("Tsharides Depo.") at 9 (relevant portions of the Tsharides Depo. are attached hereto as Exhibit G). She became a fulltime employee in February 2000.[6] Tsharides' allegations of sexual harassment are as follows: Between mid-July and August 2001, Mr. Arocho told her that she was sexy, that he wanted to take her out, asked her to dinner and told her that she had "pretty legs". See Complaint at ¶ 21, B (ii), (viii) & (ix). Tsharides also alleges that at the end of July 2001, Mr. Arocho touched her hand and told her that she "made him nervous," see id. at ¶21, B (iv) & (v); Tsharides Depo. at 21, ll. 15-24, Exh. G, and that on another occasion, he tried to touch her knee. Complaint at ¶21, B (iv) & (v). Finally, Tsharides alleges that in early August 2001, Mr. Arocho came up behind her, rubbed his foot against the back of her calf and mumbled something that she could not understand. Id. at ¶ 21, B (vi); Tsharides Depo. at 24, ll. 21-25, Exh. G. Tsharides spoke with plaintiff Giannakova and a male employee, Lefthesarios ("Terry") Kydes, about Mr. Arocho's alleged conduct. Tsharides Depo. at 42-44, ll. 4, Exh. G. Tsharides testified that Mr. Kydes told her that she should complain to Human Resources, but that she refused to do so. Id. at 42-44, Exh. G.

Following the conclusion of the investigation into Presley's allegations, Presley left a voice mail message for Ms. Allende in HR identifying Tsharides and Giannakova as additional witnesses to her allegations against Mr. Arocho. Macionus Depo. at 119, Exh. D; Allende Depo.

---

6 Mr. Arocho did not become Tsharides' immediate supervisor until approximately September 2, 2001 when she transferred from the Rolls Department to the Bread Department. According to Tsharides' testimony, she requested and subsequently accepted a transfer to the Bread Department, where Mr. Arocho would be her direct supervisor after the alleged harassment by Arocho started, because she could make more money. Tsharides Depo. at 87, ll. 10-21; 88, ll. 8-12.

at 144, Exh. F. As a result, Ms. Allende immediately contacted Tsharides for an interview. Allende Depo. at 156, Exh. F. Once Allende realized that Tsharides appeared to be a complainant herself, rather than a witness to Presley's claims, she initiated an investigation into Tsharides' allegations. Allende Depo. at 175, ll. 5-7, Exh. F. Because Tsharides was extraordinarily reluctant to offer any details about her allegations, and refused to name any witnesses, Ms. Allende was only able to interview Tsharides and Mr. Arocho in connection with her investigation. Allende Depo. at 156-159, Exh. F. HR was unable to corroborate any of Tsharides' claims. Allende Depo. at 160, Exh. F. However, Tsharides testified that once HR prompted her complaint and fully investigated, Mr. Arocho's alleged conduct stopped. Tsharides Depo. at 59, ll. 17-60, ll.5, Exh. G.

### C.    Marina Giannakova

Plaintiff Marina Giannakova ("Giannakova") was hired by Pepperidge Farm as a temporary employee on May 16, 2000. See Deposition Transcript of Marina Giannakova ("Giannakova Depo.") at 11 (relevant portions of the Giannakova Depo. are attached hereto as Exhibit H). Giannakova became a fulltime employee in December 2000. At all times during Giannakova's employment with Pepperidge Farm, Roberto Arocho was her supervisor. Giannakova Depo. at 13, ll. 10-16, Exh. H. Giannakova's allegations of sexual harassment consist of the following: Between mid-July and August of 2001, Mr. Arocho told her that she was "sexy" and had "pretty legs," told her that he wanted to "take her out," and asked her if she wanted to "mess around" with him. Complaint at ¶ 21, C (ii) & (viii). Giannakova alleges that in July 2001 [sic], Mr. Arocho grabbed her hands and started rubbing them. Id. at ¶ 21, C (iv). Giannakova claims that in August 2001, Mr. Arocho made a lewd sexual comment to her "to the effect of he wanted to 'eat her,'" and that on August 31, 2001, Mr. Arocho told her that if she

8

gave him a kiss, he would give her a requested day off. Id. at ¶ 21, C (vii). She did not give him a kiss, and he gave her the requested day off. Giannakova Depo. at 57, ll. 1-20, Exh. H.

Giannakova did not make a complaint to Pepperidge Farm regarding Mr. Arocho's alleged behavior. Giannakova Depo. at 81, ll. 1-6, Exh. H. However, HR also commenced an investigation into Giannakova's claims as a result of Presley's voice mail message. Giannakova Depo. at 81, Exh. H; Allende Depo. at 152, Exh. F; Macionus Depo. at 119, Exh. D; Macionus Aff. at ¶ __, Exh. E. Like Tsharides, Giannakova also refused to provide the names of any witnesses, refused to allow HR to use her name in its investigation, and was only able to provide vague information regarding Mr. Arocho's alleged conduct. Allende Depo. at 149; 159, Exh. F. Again, the investigation was prompt and thorough under the circumstances, and resulted in no corroborating evidence of sexual harassment. Allende Depo. at 175, ll. 2-4, Exh. F. Giannakova also testified that once HR prompted her complaint and investigated, Mr. Arocho's alleged conduct stopped. Giannakova Depo. at 107, ll. 8-22, Exh. H.

## III.    LAW AND ARGUMENT

### A.    Standard for Summary Judgment

The Federal Rules of Civil Procedure provide that a party is entitled to summary judgment "if pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When the moving party is a defendant, summary judgment should be entered "against a [plaintiff] who fails to make a showing sufficient to establish the existence of an element essential to [plaintiff's] case, and on which [plaintiff] will bear the burden of proof at trial." Celotex Corp.v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Caldwell v. American Basketball Assn., Inc., 825

9

F. Supp. 558, 565-66 (S.D.N.Y. 1993). Thus, if the plaintiff's evidence of essential elements of its claims is "merely colorable" or "not significantly probative," summary judgment must be granted for defendants. Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986). A plaintiff may not successfully oppose a summary judgment motion by relying "upon mere speculation or conjecture as to the true nature of the facts." Knight v. U.S. Fire Ins. Co., 804 F. 2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987). Rather, the non-moving party must "bring to the district court's attention some affirmative indication that his version of the relevant events is not fanciful." Quinn v. Syracuse Model Neighborhood Corp., 613 F. 2d 438, 445 (2d Cir. 1980). Thus, to survive a motion for summary judgment, a plaintiff cannot rely on conclusory allegations and/or unsupported assertions. See Celotex, 477 U.S. at 325.

The Second Circuit has repeatedly stressed the availability and virtue of summary judgment. In Knight, 804 F.2d 9, then Chief Judge Feinberg made it clear that the Second Circuit looks with favor upon summary judgment motions and expressed regret over any misperception that it does not. Id. at 12. This District has recognized that disfavor of summary judgment has been "jettisoned," and views the procedure as an "effective and correct method of avoiding protracted trials." Nichols v. Planning & Zoning Comm'n of Stratford, 667 F. Supp. 72, 74 (D.Conn. 1987).

Applying these principles, this Court should grant Defendants' motion for summary judgment on the Plaintiffs' Complaint, in its entirety.

## B. Summary Judgment Should be Granted as to Counts Three, Four and Seven – Plaintiffs' Sexual Harassment/Hostile Work Environment Claims

In their Complaint, Plaintiffs allege generally that "at various times" during their employment with Pepperidge Farm, they were "subjected to a sexually hostile or offensive environment in the workplace." Complaint at ¶ 24. Pepperidge Farm is entitled to summary judgment on Plaintiffs' claims because Pepperidge Farm exercised reasonable care to prevent and respond promptly to the allegations. In the alternative, summary judgment must enter because Plaintiffs' allegations, even if taken as true, fall far short of the type of "extremely serious" acts of harassment that Title VII was intended to proscribe and redress.

### 1. Pepperidge Farm Exercised Reasonable Care to Prevent and Respond Promptly to the Alleged Sexual Harassment

The Supreme Court addressed the question of employer liability for the harassing conduct of supervisory employees in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 2293 (1998). In Ellerth and Faragher, the Supreme Court indicated that courts should no longer use the labels "quid pro quo" and "hostile environment" to analyze whether an employer should be held liable on an employee's Title VII claim concerning a supervisor's sex-based harassment. Ellerth, 524 U.S. at 753; Faragher, 524 U.S. at 807. Instead, when analyzing whether an employer should be held liable for a supervisor's harassment, courts should separate these cases into two groups: (1) harassment which culminates in a "tangible employment action," such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions. Ellerth, 524 U.S. at 761-63, 765; Faragher, 524 U.S. at 790, 807.

11

Under this analysis, when the supervisor engages in harassment which results in an adverse "tangible employment action" by the harassing supervisor against the employee, the employer is automatically held vicariously liable for the harassment. Ellerth, 524 U.S. at 763; Faragher, 524 U.S. at 790; Caridad v. Metro-North Commuter Railroad, 191 F.3d 283, 294 (2d Cir. 1999). In contrast, in the absence of a tangible employment action, an employer can avoid liability for a supervisor's alleged harassment of a subordinate if it demonstrates "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 778. The Second Circuit has adopted this analysis. See, e.g., Caridad, supra, 191 F.3d 283.

### a.    The Plaintiffs did not suffer a "tangible employment action"

Plaintiffs Presley and Giannakova claim that Mr. Arocho's alleged sexual harassment subjected them to a "constructive discharge." See Complaint at ¶¶ A, (xxiii), C, 29, 32. Plaintiff Tsharides does not allege any tangible employment action as a result of the alleged harassment.

In determining when an employer may be held strictly liable for the discriminatory acts of its supervisory employees, and in analyzing the issue of constructive discharge, the Supreme Court and the Second Circuit focused on the following language of the Restatement (Second) of Agency: "[a] master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless: ... (d) the servant ... was aided in accomplishing the tort by the existence of the agency relation." Restatement (Second) of Agency § 219(2) (1957). In searching for a principled limitation of the "aided by the agency relation" concept, the Supreme Court concluded that the requirement of a tangible employment action by the harassing

12

supervisor would ensure that employer liability would be imposed without the possibility of an affirmative defense only where the employer is implicated in the harm visited upon the employee by his or her supervisor. Ellerth, 524 U.S. at 761-62; Caridad, 191 F.3d at 294. "Co-workers, as well as supervisors, can cause the constructive discharge of an employee. And, unlike demotion, discharge, or similar economic sanctions, an employee's constructive discharge is not ratified or approved by the employer." Caridad, 191 F.3d at 294.

Therefore, as the Second Circuit held in Caridad, where constructive discharge is found, an employee's resignation normally may be treated as if the employer actually discharged the employee. However, "constructive discharge is not a tangible employment action warranting the imposition of strict liability under the Ellerth/Faragher standard." Id. at 295 (emphasis added). Accordingly, because Presley and Giannakova are presumably alleging constructive discharge as the relevant "tangible employment action," and Tsharides alleges no "tangible employment action," Pepperidge Farm is entitled to the Ellerth/Faragher affirmative defense.

### b.   Pepperidge Farm is entitled to the Ellerth/Faragher affirmative defense

As noted above, in the absence of a tangible employment action, an employer can avoid liability for a supervisor's harassment of a subordinate if it demonstrates that (a) it exercised reasonable care in preventing and correcting any sexually harassing behavior and (b) the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities. There is no question of material fact that Pepperidge Farm exercised reasonable care to prevent, and promptly and successfully correct, Arocho's alleged behavior and that Plaintiffs unreasonably failed to take advantage of the opportunities provided to them.

13

(1)    **Pepperidge Farm had an effective anti-harassment policy in place**

"Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense." Caridad, 131 F.3d at 295; see also Faragher, 524 U.S. at 775. An employer is not required to prove "success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct." Caridad, supra. The Supreme Court further explained how the employer may establish this two-pronged defense as follows:

> While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

Faragher, at 524 U.S. at 778; see also Fierro v. Saks Fifth Avenue, 13 F.Supp.2d 481, 491 (S.D.N.Y. 1998) (noting that the existence of an anti-harassment policy with complaint procedure is "an important, if not dispositive, consideration").

At all times that the Plaintiffs worked at Pepperidge Farm, the company had a sexual harassment prevention policy with a complaint procedure in effect and posted in multiple locations in the Norwalk plant where the Plaintiffs worked. See Macionus Depo. at Vol. I, 65, ll.20-66, ll.4; 71, 14-24, Exh. D; Macionus Aff. at ¶ 4, Exh. E; Allende Depo. at 36, ll. 9-37, ll. 5, Exh. F. As well as being posted in various places, new hires were informed of the policy during their orientation. Macionus Depo. at Vol. I, 69, Exh. D. The policy expressly prohibited sexual

14

harassment and instructed employees to whom they could complain within the plant or at corporate headquarters. See attached policies, Exhibit I. Mr. Macionus and Ms. Allende also testified that they walked the plant floor on a daily basis in order to make themselves accessible to employees, and that employees knew they could contact Macionus or Allende as to HR issues and complaints. See, e.g., Macionus Depo. at Vol. II, p. 12, Exh. D. Moreover, Plaintiffs testified that they knew they could complain about sexual harassment to someone above Mr. Arocho, and were specifically told to complain to the Human Resources Department by multiple employees. For example, Plaintiff Presley testified that she knew that if she wanted to make a complaint, the procedure would be to tell the Human Resources Department. Presley Depo. at 97, ll. 16-19, Exh. B. Presley also testified that when she told fellow employee Vanessa Diggs about Mr. Arocho's alleged conduct, Diggs told her to "go to HR and make a complaint." Presley Depo. at 179; 299, ll. 1-7, Exh. B. Plaintiff Tsharides testified that while she "felt uncomfortable" talking about Mr. Arocho's alleged conduct, see Tsharides Depo. at 17, ll.4-5, Exh. G, she discussed her allegations both with Plaintiff Giannakova and with co-worker Terry Kydes, and that Mr. Kydes told her that she should complain to HR. Tsharides Depo. at 35-37, ll. 12, Exh. G. Plaintiff Giannakova testified that she was also present during that conversation, Giannakova Depo. at 78, ll. 20, Exh. H, and therefore knew to complain to HR. However, none of the Plaintiffs complained to HR.

> **(2)    Pepperidge Farm promptly and thoroughly investigated Plaintiffs' allegations**

The undisputed facts of this case indicate that Pepperidge Farm promptly and thoroughly investigated all complaints made by Plaintiffs. Mr. Macionus first learned of Presley's allegations against Mr. Arocho by fellow employee, and Presley friend, Vanessa Diggs.

15

Macionus Depo. at Vol. I, 106, ll. 1-4, Exh. D. Presley testified that she discussed Mr. Arocho's alleged conduct with Ms. Diggs on Friday, August 31, 2001. Presley Depo. at 179, Exh. B. Presley also testified that despite the fact that Ms. Diggs told her to complain to HR, she refused. Presley Depo. at 315, ll. 8-20, Exh. B. Despite Presley's refusal to make a complaint to HR on her own, Ms. Diggs, a supervisor, reported the discussion to her manager, Steven White, who reported it to Mr. Macionus, Pepperidge Farm's HR Manager, that same day. Macionus Depo. at Vol. I, 106, Exh. D; see also Macionus Aff. at ¶ ___, Exh. E. Mr. White and Ms. Diggs met with Mr. Macionus, whereby Ms. Diggs recounted her conversation with Presley. See id. In addition to instructing both Diggs and White to keep the conversation confidential, Mr. Macionus thought the situation serious enough to also call Rob Harrison, the Plant Manager, and Maritza Allende, the Employee Relations Manager, before going home for the weekend. Macionus Depo. at Vol. I, 107, ll. 17-25; 108, ll. 1-9, Exh. D. Since it was late on Friday of a holiday weekend, Mr. Macionus told them they would investigate on Tuesday, when they were all back at the plant after Labor Day.

Despite Presley's failure to complain, on Tuesday, September 4, 2001, the first day back after the Labor Day holiday weekend, Mr. Macionus and Ms. Allende commenced a full investigation of Ms. Presley's allegations. Presley Depo. at 179-178; 325, Exh. B; Macionus Depo. at Vol. I, 107-108, 111-112, Exh. D; Macionus Aff. at ¶ 14, Exh. E. In connection with their investigation, Mr. Macionus and Ms. Allende summoned Presley to HR to interview her. Macionus Depo. at Vol. I, 11, ll. 1-10, Exh. D; Allende Depo. at 58, Exh. F. During that meeting, Ms. Allende invited Presley to "tell [them] her story," Presley Depo. at 182, ll. 9-13, Exh. B, and Mr. Macionus told Presley that Pepperidge Farm had "no tolerance for sexual harassment," explained the anti-harassment policy to her, and assured her that they would

16

conduct a full investigation of her allegations and would "get back in touch with her." Presley Depo. at 188, Exh. B; Macionus Depo. at Vol. I, 111, ll. 22-25; 112, ll. 1-3, Exh. D.

Mr. Arocho was on vacation on September 4, 2001, but on the morning of September 5, 2001, when Mr. Arocho arrived at work, Mr. Macionus and Ms. Allende called him to the Human Resources office for an interview. Macionus Depo. at Vol. I, 129, ll. 1-5; 131-32, Exh. D. During the approximate forty-five minute interview, Mr. Macionus and Ms. Allende reviewed the anti-harassment policy, as well as the EEO policy and the violence in the workplace policy with Mr. Arocho. Id. at 120; 129, Exh. D. They reviewed each of the allegations with Mr. Arocho and told him that "under no circumstances" would Pepperidge Farm tolerate any type of harassing behavior towards Presley or any other employee. Macionus Depo. at Vol. I, 120-121; 129, Exh. D. Mr. Macionus also told Mr. Arocho that Pepperidge Farm had a "no retaliation" policy and that retaliation of any kind would not be tolerated. Macionus Depo. at Vol. I, 121, Exh. D. Finally, Mr. Macionus informed Mr. Arocho that if he was found to have violated any of Pepperidge Farm's policies, the consequence would be very severe, up to and including termination. Id. at 122, ll. 15-24, Exh. D. Mr. Macionus and Ms. Allende also removed Presley from Mr. Arocho's direct day-to-day supervision during the investigation. Allende Depo. at 133, ll. 13-15, Exh. F. Mr. Arocho was shocked by the allegations and affirmatively and credibly denied them. Macionus Depo. at Vol. I, 149, ll. 13-15, Exh. D.

Mr. Macionus and Ms. Allende also interviewed all witnesses named by Presley, including Donald Miller, Juan Martinez and Spencer Peeples. Macionus Depo. at Vol. I, 120, ll. 17-20; 131, ll. 20-25; Allende Depo. at 79, Exh. F. Ms. Allende testified that they asked Mr. Miller, a supervisor at the time, if he knew of any issues or incidents between Arocho and Presley. Allende Depo. at 63, ll. 22-25, Exh. F. Mr. Miller responded that he never saw

17

anything between Presley and Arocho. Id., Exh. F. Mr. Miller also stated that he did recall

Presley once telling him, as a friend, that she was "uncomfortable" around Mr. Arocho, but that

she said that she had "handled the situation." Macionus Depo. at Vol. I, 135, Exh. D. Presley

did not specify to Miller what exactly made her "uncomfortable," nor did she make any

allegations of sexual harassment. Id.

Macionus and Allende interviewed Juan Martinez, a co-worker of Presley. Allende

Depo. at 69-70, Exh. F. They questioned Mr. Martinez regarding whether he had any additional

information regarding Presley's allegations, or whether he had witnessed anything inappropriate

between Presley and Arocho. Id. at 70. Mr. Martinez said that he knew nothing about the

alleged situation and that he never saw anything between Presley and Arocho. Id. Ms. Allende

next interviewed Spencer Peeples, the only other witness identified by Presley.[7] Mr. Peeples

recalled that Presley had once told him that Mr. Arocho had made advances towards her, but he

also had no independent knowledge or information regarding Presley's allegations. Allende

Depo. at 73, Exh. F. Ms. Allende reported this information to Mr. Macionus. Macionus Aff. at

¶ 26.

Following a full investigation, Mr. Macionus and Ms. Allende compared their notes from

the various interviews and discussed the information that they had gathered. Macionus Depo. at

133-34, Exh. D. Based upon all of the information, including the fact that several of Presley's

"witnesses," including Mr. Miller and Mr. Martinez, flatly denied having seen any inappropriate

behavior between Mr. Arocho and Ms. Presley, Allende Depo. at 63, ll. 18-25; 70, ll.1-14, Exh.

---

7 Mr. Peeples was retired at the time and the interview was therefore conducted by telephone. Macionus Depo. at
Vol. I, 131-32.

F, [8] Macionus and Allende concluded that there was no corroboration of any of Presley's allegations, and no evidence of sexual harassment, otherwise. Macionus Depo. at Vol. I, 149, Exh. D; Allende Depo. at 131, ll. 13-16, Exh. F; Presley Depo. at 325, Exh. B. They then reported the results of the investigation to Presley. Presley Depo. at 325, ll. 2-22, Exh. B. Ms. Presley conceded that once HR prompted and investigated her complaint, Mr. Arocho stopped allegedly sexually harassing her. Presley Depo. at 247; 325, Exh. B.

Pepperidge Farm first learned of Tsharides' and Giannakova's allegations from Presley, following the conclusion of their investigation of her claims. Allende Depo. at 74, ll. 1-4, Exh. F. Presley left a voice mail message for Ms. Allende requesting that HR interview Tsharides and Giannakova. Allende Depo. at 145, ll. 11-14; 146, ll. 15-19, Exh. F. Ms. Allende immediately summoned Tsharides and Giannakova to HR expecting to interview them regarding additional information pertaining to Presley's claim. Id. Allende interviewed Tsharides and Giannakova separately. Upon speaking with each, Allende learned that the women appeared to be complaignants, rather than witnesses to Presley's allegations. Allende Depo. at 152, ll. 5-7, Exh. F. Once Allende realized this, she initiated an investigation of Tsharides' and Giannakova's allegations. Allende Depo. at 175, ll. 5-7, Exh. F.

Both Tsharides and Giannakova requested that their names not be used during any investigation, were vague and reluctant with their allegations, and refused to name any witnesses.[9] Allende Depo. at 174, ll. 18-19; 159, ll. 8-11, Exh. F. As a result, Ms. Allende was only able to interview the claimants and Mr. Arocho in connection with the investigation into

---

8 Mr. Martinez returned to HR sometime after his initial interview, but only to provide information that Presley provided to him, and which Presley had already shared with HR. For example, he reported that Presley had told him that she felt "uncomfortable" around Mr. Arocho, something he did not share when interviewed earlier in the day. Allende Depo. at 71, ll. 17-25 – 72, ll. 1-6.

9 In fact, to date, even after completion of discovery, nonetheless contemporaneously with their allegations and Pepperidge Farm's investigation, neither Giannakova nor Tsharides have identified individuals, besides each other, as witnesses to their allegations of sexual harassment.

19

Tsharides' and Giannakova's claims. Allende Depo. at 159, ll. 22-160, ll. 8, Exh. F. While Mr. Arocho admitted that he might "touch an employee, if he is trying to get their attention in the plant because it's loud," he denied touching anyone, including Plaintiffs, "in any improper body part," and denied all of Plaintiffs' other allegations. Allende Depo. at 160, ll, 4-8, Exh. F. Ms. Allende and Mr. Macionus reviewed the anti-harassment policy with Arocho and stressed that no sexual harassment would be tolerated. Allende Depo. at 161, Exh. F.

Ultimately, HR found no corroborating evidence of any of Tsharides' or Giannakova's claims. Allende Depo. at 162, ll. 1-6, Exh. F. Ms. Allende reported the results of the investigation to Tsharides and Giannakova. Id. Tsharides and Giannakova testified that once HR prompted their complaints and fully investigated, Mr. Arocho's alleged conduct stopped. Tsharides Depo. at 59, ll. 17-60, ll.5, Exh. G; Giannakova Depo. at 107, ll. 8-22, Exh. H.

Pepperidge Farm not only had an anti-sexual harassment policy in place at all times during Plaintiffs' employment, but Pepperidge Farm fully complied with that policy by conducting a prompt and thorough investigation of Plaintiffs' complaints, after which Plaintiffs concede the alleged harassmant ceased. Under these circumstances, no reasonable trier of fact could find that Pepperidge Farm failed to exercise reasonable care to prevent and correct sexually harassing behavior, and it therefore satisfies the first prong of the affirmative defense. See, e.g., Faragher, 524 U.S. at 807; Caridad, 191 F.3d at 295 (the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense); Fierro, 13 F.Supp.2d at 491-92 (existence of an anti-harassment policy with complaint procedure is "an important, if not dispositive, consideration" in satisfying the first prong of defense).

20

**(3)    The Plaintiffs unreasonably failed to take advantage of the preventive and corrective measures provided by Pepperidge Farm**

An employer meets the second prong of the affirmative defense when it shows the plaintiff unreasonably failed to take advantage of the employer's preventive and corrective measures. See, e.g., Caridad, 191 F.3d at 295 (second prong satisfied where plaintiff failed to make formal complaint); Fierro, 13 F. Supp.2d 481 (second prong met where employee failed to complain). "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." Faragher, 524 U.S. at 778. Here, the facts reveal that even though Plaintiffs knew that they could complain about sexual harassment to someone above Mr. Arocho, Presley Depo. at 97, ll. 16-19, Exh. B; Tsharides Depo. at 35-37, ll. 12, Exh. G; Giannakova Depo. at 78, ll. 20, Exh. H, they consciously chose not to until they were confronted by HR. None of Plaintiffs' various proffered reasons for failing to complain, even if true, is sufficient to preclude summary judgment in favor of Pepperidge Farm.

Plaintiffs testified that their reasons for not complaining were that they were hesitant or embarrassed to speak about Mr. Arocho's alleged conduct, they were afraid of "gossip," and they were afraid of perceived repercussions. See, e.g., Presley Depo. at 179-180, Exh. B; Tsharides Depo. at 44, ll. 14-21, Exh. G; Giannakova Depo. at 85, Exh. H. While courts have held that "there are many reasons why a victimized employee may be reluctant to report acts of workplace harassment, [ ] for that reluctance to preclude the employer's affirmative defense, it must be based on apprehension of what the employer might do, not merely on concern about the reaction

21

of co-workers." Caridad, 191 F.3d at 295. In Fierro v. Saks Fifth Ave., 13 F. Supp. 2d 481, the

court expressly rejected plaintiff's argument that he had not complained because he was "afraid

of repercussions":

> As a matter of law, this Court holds that such generalized fears can
> never constitute reasonable grounds for an employee's failure to
> complain to his or her employer. . . . At some point, employees
> must be required to accept responsibility for alerting their
> employers to the possibility of harassment. Without such a
> requirement, it is difficult to see how Title VII's deterrent purposes
> are to be served, or how employers can possibly avoid liability in
> Title VII cases. . . . To allow an employee to circumvent the
> reasonable complaint requirements. . . by making conclusory
> allegations of feared repercussions, would effectively eviscerate an
> affirmative defense which the Supreme Court clearly went to great
> effort to craft in order to stem the tide of a warranted lawsuits."

Id. at 492; Jones v. U.S.A. Petroleum Corp., 20 F. Supp.2d 1379, (S.D. Ga. 1998).

In Caridad, the employer had a sexual harassment policy and procedures for making

complaints. Id. 191 F.3d at 290. Plaintiff, however, did not report the alleged harassment until

she was called to a disciplinary hearing concerning her absenteeism, where she "became very

emotional, and complained of being sexually harassed." Id. The Court rejected plaintiff's

arguments that she was hesitant to complain because "she did not think that an investigation

would improve matters" and she "did not trust [the employer] or its equal employment office."

Id. The Court held that the plaintiff's reasons for not complaining "were not based upon any

credible fear that her complaint would not be taken seriously, or that she would suffer some

adverse employment action as a result of filing a complaint," and were therefore, insufficient to

preclude summary judgment for the employer. Id.

In Romero v. Carribean Restaurants, Inc., 14 F. Supp. 2d 185 (D.P.R. 1998), the Court

rejected the plaintiff's explanation that he was too ashamed to complain. "The fact that plaintiff

22

was too ashamed to tell anyone cannot stand as a valid reason for avoiding the Company's channels for dealing with sexual harassment." Id. at 192; see also Shaw v. Autozone, Inc., 1999 WL 371668, at *5 (7th Cir. June 8, 1999) ("[w]hile a victim of sexual harassment may legitimately feel uncomfortable discussing the harassment with an employer, that inevitable unpleasantness cannot excuse the employee from using the company's complaint mechanisms."); Scrivner v. Socorro Indep. Sch. Dist., 169 F. 3d 969 (5th Cir. 1999) (plaintiff acted unreasonably by failing to complain for almost a year of experiencing harasser's offensive behavior); Robinson v. Truman College, 1999 WL 33887 at *7 (N.D. Ill. Jan. 19, 1999) (no vicarious liability; plaintiff's failure to use complaint procedure provided by defendant within three months after the last allegation of harassment was unreasonable); Montero v. AGCO Corp., 19 F. Supp. 2d 1143, 1146 (E.D.Cal. 1998) (plaintiff's explanation that she feared retaliation was insufficient as a matter of law to justify waiting nearly two years to report alleged harassment).

Plaintiffs' proffered reasons for choosing not to complain are not based on a credible fear that their complaints would not be taken seriously or that they would suffer some adverse employment action as a result of making a complaint. In fact, all three Plaintiffs testified that once they did speak with HR, their allegations were promptly investigated and the alleged harassing behavior stopped. Their reasons for not complaining to their employer are therefore insufficient to preclude summary judgment in favor of Pepperidge Farm.

The facts are undisputed that Pepperidge Farm exercised reasonable care to prevent and correct promptly any sexually harassing behavior alleged by Plaintiffs and Plaintiffs unreasonably failed to take advantage of the preventive or corrective opportunities provided to them. Therefore, Pepperidge Farm has satisfied the elements of the affirmative defense and summary judgment must enter on Counts Three, Four and Seven of Plaintiffs' Complaint.

## 2.   In the Alternative, Plaintiffs' Allegations Fall Far Short of the Type of "Extremely Serious" Acts of Harassment that Title VII was Intended to Proscribe and Redress

To establish a hostile work environment claim under Title VII, a plaintiff must show (1) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of the victim's employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer. Alfano v. Costello, 294 F.3d 365 (2d Cir. 2002); Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (internal citations and quotation marks omitted). The same showings must be made in order for a plaintiff to prevail on a hostile environment sexual harassment claim under the Connecticut Fair Employment Practices Act ("FEPA"), Conn. Gen. Stat. § 46a-60(a)(1) et seq.   See, e.g., Perodeau v. City of Hartford, 259 Conn. 729, 792 A.2d 752 (2002) (Connecticut courts should be guided by the case law surrounding federal fair employment legislation in construing the Connecticut FEPA).

Noting that the phrase "'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the spectrum of disparate treatment of men and women in employment," the Supreme Court in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986), held that intangible forms of discrimination, such as being forced to work in a sexually hostile work environment, constitute actionable discrimination under Title VII. Id. at 64. The Supreme Court has made it clear, though, that "[n]ot all work place conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." Id. at 67. The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. Alfano, 294 F.3d at 373-74; Leibovitz v. N.Y. City Transit Auth., 252 F.3d

24