1    did ask me if I wanted to sleep with him, put it that

2    way.

3         Q.    Did Vanessa Diggs -- and Vanessa provided you

4    with the questions for the interview, right?

5         A.    Yes.

6         Q.    Was there also a written test or just the

7    interview?

8         A.    Just the interview.

9         Q.    And did Steve White pretty much ask you the

10   questions that Vanessa had told you he was going to ask

11   you?

12        A.    Basically, yes.

13        Q.    How did you think the interview with Steve

14   White went?

15        A.    I thought it went very well.

16        Q.    Had you also worked for Steve White?  Had you

17   ever worked directly for Steve White?

18        A.    Well, if Vanessa was out, I directed stuff to

19   him, like what I was doing in the office, like when it

20   came to the HAACP sheets or -- that's it.

21        Q.    So he would have had some opportunity to

22   review your work himself?

23        A.    Yes.

24        Q.    Okay.  Did Vanessa ever tell you that your

25   attendance had anything to do with your not getting the

1    they would be against you?

2          A.    That's how I was feeling, yes.

3          Q.    And again, the basis for this feeling was

4    your treatment as you've described it with respect to

5    your comp claim, and that one remark that you say that

6    Mr. Macionus made to you about working at Arnold,

7    right?

8          A.    That's correct.

9          Q.    And based on that, you believed that HR and

10   management would be against you if you filed a claim --

11         A.    That's correct.

12         Q.    -- or made a complaint?  Okay.  So you have

13   Labor Day weekend?

14         A.    Yes.

15         Q.    And then you come back to work on that

16   Tuesday?

17         A.    Yes.

18         Q.    Tuesday, September 4th?

19         A.    I believe, yes.

20         Q.    And what was your shift at that time that

21   day?

22         A.    I don't remember, recall the time.

23         Q.    So you went in, started your regular shift.

24   Where were you supposed to be working, where were you

25   supposed to report to?

1      A.    To QA.

2      Q.    So is that what you did, you went to QA?

3      A.    Yes.

4      Q.    And what happened?

5      A.    I was working, and then I think Paul called

6    or Maritza, I don't know who, but spoke to Vanessa.

7    And Vanessa said that they want to see me in the

8    office.  And I said, "Why, why in the office?"  And she

9    says, "Well, because I'm a supervisor, I had to go

10   tell."  And I was like, "Oh, Vanessa, I was just

11   telling you, you know, 'cause you're my friend."  I

12   said, "I don't want to start no problems."  I said,

13   "Oh, boy, it's gonna make it hard for me now."

14     Q.    Who said they're going to make it hard for

15   you?

16     A.    I said, "It's going to make it hard for me."

17   And she said, "No, no."

18     Q.    On Friday when you were talking to her, did

19   she say you should go to HR and tell them?

20     A.    I think she said did I speak to someone at

21   HR, I'm not sure, but I don't remember saying I need to

22   go to HR.

23     Q.    So she asked you if you had already spoken to

24   somebody and you said no?

25     A.    Right.

1       Q.    Did she ask you why you didn't speak with

2    somebody at HR?

3       A.    No, I think I was the one that said I wasn't

4    going to HR, no, no.

5       Q.    And did she ask you why won't you go to HR?

6       A.    No, we didn't get to that.  We were

7    basically, she was listening to my story, and then it

8    was like, "Oh, wow.  Have a great weekend."

9       Q.    What was her reaction to your story?

10      A.    Well, she sat down and was like, "Wow,

11   Twanya, I can't believe this.  Are you all right?"

12   That's it.  I said, "I'm fine."  So that was it.

13      Q.    Did she have any reaction -- did she say

14   anything about Mr. Arocho one way or the other, like I

15   can't believe he would do something like this or the

16   other way, like Victor Allers said, "Oh, it doesn't

17   surprise me."  Did she have any comment one way or the

18   other along those lines?

19      A.    No, she didn't.

20      Q.    And she didn't indicate to you that she knew

21   of any other cases in which Mr. Arocho had harassed

22   somebody or been inappropriate?

23      A.    No.

24      Q.    And so after she said to you, you know, I had

25   to tell because I'm a supervisor, then did you just go

1    happened?

2         A.    Yes.

3         Q.    So basically when you were sitting there, you

4    knew that they already knew everything anyway, right?

5         A.    About the --

6         Q.    About the incidents?

7         A.    Yes, yes.

8         Q.    Okay.  So then what happened?

9         A.    So Maritza said, "Tell us your story."  And I

10   was like, "Well, I handled it."  I kept telling her I

11   handled it 'cause I felt he hasn't bothered me, you

12   know, from the time that I was telling Vanessa about

13   it, so I was like it's handled.

14        Q.    He hadn't bothered you since August 15th was

15   the last incident, right?

16        A.    Exactly.

17        Q.    And you really believed that, didn't you?

18        A.    Yes, I did.

19        Q.    Okay.

20        A.    So she was like, "Well, this was brought up.

21   You need to talk to us."  And Paul said, "Well, you

22   know, you make accusations like this, you need to talk

23   and you have to tell us and it has to be reported to

24   us.  So you need to tell us what happened."

25        Q.    Let me ask you, how was Paul's behavior

1    everything that had happened to you?

2         A.    I believe I did give a full description.

3         Q.    What did they tell you about what was going

4    to happen now that this complaint had been made?

5         A.    Okay.  They said they are going to have to

6    talk to Roberto and they're going to have to start an

7    investigation, and that once they complete their

8    investigation, they will get back in touch with me.

9         Q.    Did they give you any indication about how

10   the company viewed this kind of behavior, like did

11   they -- well, that's the question:  Did they give you

12   any indication about how the company viewed this kind

13   of behavior?

14        A.    Well, Paul said that there's no tolerance of

15   sexual harassment.  We have to fully do an

16   investigation of it and that you -- he just explained

17   the policy and that just a complete investigation will

18   be done and that this is the policy, the policy will go

19   into full effect.  And once they find out everything,

20   they will definitely get back in touch with me.

21        Q.    Did they ask you to sign anything at that

22   meeting?

23        A.    No.

24        Q.    Okay.  Did they ever ask you to sign

25   anything?

238

1               T W A N Y A   P R E S L E Y,

2          recalled as a witness, having first been duly

3          sworn by Janet C. Phillips, a Notary Public in and

4          for the State of Connecticut, was examined and

5          testified as follows:

6   CONTINUED DIRECT-EXAMINATION

7   BY MS. REILLY:

8          Q.    Good morning, Ms. Presley.

9          A.    Good morning.

10         Q.    As you know, this is a continuation of your

11  deposition, and you're still under oath.  And if you

12  have any need to take a break, just let me know and we

13  can go ahead and take a break.  If you don't understand

14  my question, let me know and I'll try to rephrase it so

15  that you understand it, okay?

16         A.    Okay.

17         Q.    I want to go to your resignation from

18  Pepperidge Farm.  Do you recall when that was, when you

19  resigned?

20         A.    I think it was March 15th 2001.

21         Q.    Do you think it was 2002?

22         A.    2002, sorry.

23         Q.    And are you currently working?

24         A.    Yes, I am.

25         Q.    Where are you currently working?

1  in your mouth, but I think that there was a point at

2  which Mr. Arocho stopped basically speaking to you or

3  stopped having any, much interaction with you, is that

4  right?

5       A.    That's correct.

6       Q.    And that was about the time shortly after you

7  had made your complaint?

8       A.    That's correct.

9       Q.    And so how long was it between the time you

10  made your complaint, how many more weeks did you

11  continue working?

12       A.    I don't understand.

13       Q.    Well, how long -- do you know how many weeks

14  or how many months it was between the time you made

15  your complaint and the time you resigned?

16       A.    I made my complaint in September.  So I

17  resigned in March.  That's six months.

18       Q.    About six months, right?

19       A.    Uh-huh.

20       Q.    And during that six-month period after you

21  made your complaint when you resigned, Mr. Arocho

22  didn't say anything further to you, is that correct?

23       A.    He didn't say anything further to me.  But he

24  always gave me that, what I call is a 53 grin.

25       Q.    You call what grin?

1    because you filed a Workers' Compensation claim?

2         A.    I don't understand.

3         Q.    Okay.  Are you saying here in this -- do you

4    know if in this lawsuit you're saying that you were

5    treated differently in your employment because you

6    filed a Workers' Comp claim?

7         A.    Well, I'm just telling what happened, that's

8    all.  I'm just telling exactly what happened.  So I'm

9    just telling it how it happened.

10        Q.    Okay.  But you believe that you were treated

11   differently because you filed a Workers' Comp claim, is

12   that right?

13        A.    I believe that, yes.

14        Q.    Do you believe that Mr. Arocho had anything

15   against you because you filed a comp claim?

16        A.    No, I don't believe.

17        Q.    And I don't think I asked you this question

18   last time, but you know, you worked with Mr. Arocho for

19   a very long amount of time with him not bothering you

20   at all; is that fair to say?

21        A.    Yes.

22        Q.    Okay.  Do you have any belief about why all

23   of the sudden he started making inappropriate comments

24   to you?

25                    MR. BOLTON:  I'm going to object as to

1              form.   You can answer.

2         Q.    I'll withdraw it.

3              Let me just say it this way:   Do you have any

4    belief about why Mr. Arocho started making comments to

5    you?

6         A.    No, I don't know why.  I guess we just worked

7    together and as time was going on, having

8    conversations, I guess he just felt, okay, she's, you

9    know, cool to talk to or something.   I don't know what

10   he was thinking.

11        Q.    Had you and Mr. Arocho had conversations of a

12   personal nature before he started making inappropriate

13   comments to you?

14        A.    No, just like what I said, like in the

15   cafeteria or he'll talk about Julia, his wife, or how

16   they met, 'cause he knew that I told him how Julia, his

17   wife, used to babysit me, so personal like that.

18        Q.    Did you ever go into Mr. Arocho and ask him

19   for comments about your appearance?

20        A.    No.

21        Q.    Did you ever change your hair style and go in

22   to Mr. Arocho and say do you like my hair?

23        A.    No.

24        Q.    You never did that?

25        A.    I wore a hair net.

1    hair or anything, you never said that to him?

2         A.   No.

3         Q.   Now, he did not at that time touch your hand,

4    isn't that right?

5         A.   At this time, yes, he -- well, actually, it

6    was like, you know, you're a very attractive woman.

7                   MR. BOLTON:   Let the record reflect that

8              she just --

9                   MS. REILLY:   Touched Mr. Bolton's hand.

10                  MR. BOLTON:   To demonstrate.

11        Q.   So this was in the processing office?

12        A.   Yes.

13        Q.   And you're saying that he put his hand on

14   top -- rather, he put his hand on top of yours?

15        A.   Yes.

16        Q.   And at that time, at that same time, did he

17   make a comment to you or --

18        A.   That's when he said, you know, "You're a very

19   attractive woman."  And that's when he was like, "And

20   you have pretty hair."

21        Q.   And what did you do when he put his hand on

22   top of yours?

23        A.   I just looked at him.  I was listening to

24   what he was saying, but like I said, I at the time

25   didn't really look at it like he was behaving wrong,

1    but I didn't know what to think.  I didn't think

2    nothing real bad at that time.

3        Q.   Did you pull your hand away?

4        A.   I just looked at him like shocked, like okay,

5    thank you.

6        Q.   But you didn't pull your hand away?

7        A.   No.

8        Q.   Were you upset at that behavior or --

9        A.   No, I was just confused about it.

10       Q.   Now, the next incident, August 2nd, 2000, is

11   this an accurate description of when Mr. Arocho called

12   you to his office, is that what happened?

13       A.   Yes.

14       Q.   Did anything else happen in that incident on

15   August 2nd, 2000?

16       A.   He just told me I had soft skin and brushed

17   his hand.

18       Q.   And was this when you were working in QA and

19   he called you to pick up the papers?

20       A.   On August 2nd, yes.

21       Q.   And the message for you to go to the office

22   came through somebody else, right?

23       A.   That came through Juan Martinez.

24       Q.   Juan, right.  You know what I meant to ask

25   you, before I forget, did you ever tell Juan Martinez

1     A.   No, he didn't.

2     Q.   The next sentence, "August 3rd, Arocho

3 approached Presley and indicated to her that she was

4 frequently in the company of other male employees, she

5 could make a lot of money with her looks"?

6     A.   That's correct.

7     Q.   He did say that to you?

8     A.   Yes.

9     Q.   And on that occasion, where were you when he

10 said that?

11     A.   I was in the processing office.

12     Q.   And was anybody else there?

13     A.   No, just me and him.

14     Q.   And what did you say to him when he made that

15 statement?

16     A.   I looked at him and I couldn't believe what

17 he was saying 'cause I took it as he was trying to say

18 I can go make some money, be a hooker or something

19 since they all talk to you.  So that's how I took it.

20     Q.   Okay.  And so what did you say to him, if

21 anything?

22     A.   I didn't say nothing --

23     Q.   Okay.

24     A.   -- at all.

25     Q.   Okay.  And the next paragraph, on August 3rd,

1       Q.   After the incident, right, you went down and

2    talked to Donald about it?

3       A.   Yes.

4       Q.   And did he say, you know, it's too bad I

5    wasn't there earlier, I didn't see any of it?

6       A.   He just said, "You should go to HR and make a

7    complaint."  That's all he said.

8       Q.   But you knew he hadn't seen anything?

9       A.   I knew he didn't see anything, but me knew

10   like what I was telling him, by him using his key, I

11   figured he thought, he had to know something was

12   happening, something was going on.

13      Q.   Well, he knew the door was locked?

14      A.   Right.  So I said -- and said see, that's

15   what I'm saying, he calls me in the office, this and

16   that.  And he was like, "You need to go to HR."

17      Q.   How about your mother, when you told her

18   about this, I think you already testified about that?

19      A.   My mother was like, said, "They didn't call

20   me in the office to ask me any questions.  Why not?

21   'Cause I would tell them about it.  And you need to

22   tape him.  Just get a tape recorder and tape him."  And

23   I said, "I heard you can't do that.  It's illegal."

24   And she said, "Well, you need to do something with

25   him."

1        Q.   So he put -- let me make sure I understand

2    this because this allegation here says he grabbed and

3    rubbed your shoulders.   In my mind, that was like

4    giving you a massage.   That's not what he did?

5        A.   It's not a massage, he didn't give me a

6    massage, no.

7        Q.   So he took one hand?

8        A.   Yes.

9        Q.   And was he facing you or was he coming from

10   behind you?

11       A.   He was coming from behind me.

12       Q.   So he's coming from behind you and he took

13   one hand, do you remember if it was his right hand or

14   his left hand?

15       A.   I don't remember.   I just know it was on my

16   shoulder.

17       Q.   And he placed it on one shoulder and just

18   quickly said hello as he touched your shoulder?

19       A.   And a smile.

20       Q.   And a smile?

21       A.   Uh-huh.

22       Q.   All right.   So he's coming from behind you,

23   he puts his hands on your shoulder and says hello,

24   could you see his face when he said hello?

25       A.   I turned, I turned.   I don't know which way I

1    turned, but I looked at him.

2        Q.   So he had his hand on your shoulder, so was

3    it a pretty quick like place it, hello, and it comes

4    off?

5        A.   Yes.

6        Q.   Okay.  Let me just ask you this:  If that

7    other incident hadn't just happened with him grabbing

8    his genitals, right -- this came after him grabbing his

9    genitals, right --

10       A.   Exactly.

11       Q.   -- in and of itself, just the thing of

12    somebody putting your hand on your shoulder, quickly

13    going hello, do you think that in and of itself is

14    offensive?

15       A.   No, that would have been fine.

16       Q.   But it was because it came after that other

17    incident?

18       A.   Exactly.

19       Q.   I just wanted to make sure I understood that,

20    okay, 'cause that's the kind of thing I wanted to

21    clarify, 'cause that I didn't really -- so it's not

22    accurate to say he grabbed your shoulder?  He placed

23    his hand briefly on your shoulder?

24       A.   Right.

25       Q.   And he didn't rub your shoulders?

1    But then it wasn't like my daughter, it was very

2    firmly.  We talked.  She went outside and smoked

3    cigarettes.  We was speaking, but more now it wasn't

4    like we were.  Like she went to Niagara Falls, she

5    brought me a gift.  It was just basically hi, how are

6    you today, how's your foot, oh, that's great.  And then

7    she left.

8         Q.   Did you talk to Vanessa on the day that --

9    now, Vanessa told you to go to HR and report this,

10   right?

11        A.   Vanessa said, "Are you gonna go to HR and

12   tell?"  And I said, "For what?  They're not gonna help

13   me."  And I left for the day.  And she told.

14        Q.   Okay.  And did she go back to you and say I

15   told HR?

16        A.   No.  I learned that when I came back to work.

17        Q.   So you said Vanessa did tell you to go to

18   Human Resources, file a complaint, you told her you

19   weren't going to do it, right?

20        A.   That's correct.

21        Q.   Did you go back to Maritza and tell her you

22   never talked to my mother?

23        A.   I told her that.

24        Q.   Okay.  And what did she say?

25        A.   She just said, I said you asked everybody

1    sheet for?

2         A.    I did it for like four days, and then Kurt

3    told Maria don't let her do that no more.

4         Q.    Did Maria say why Kurt said not to do it

5    anymore?

6         A.    She just said Kurt said you don't have to

7    fill out no more times sheets.

8         Q.    Did Julia's threat make you resign from the

9    company?

10        A.    Julia's threat made me be cautious of my,

11   like walking in a parking lot and stuff like that,

12   'cause I didn't know what she was capable of doing.  So

13   everything just played a part on every -- making me

14   want to leave, my foot to the harassment to the

15   threats, things that was just happening.

16        Q.    Although the harassment itself, other than

17   the 53-people grin, as you call it, the 53-person grin,

18   everything else had stopped, the harassment by

19   Mr. Arocho had stopped, right?

20        A.    Yes.

21               MR. BOLTON:  I'm objecting to that

22            question, but you can answer.

23        Q.    You can answer.  You've already testified to

24   that, right?

25        A.    Yes.

1    complaints, well, -- well, first going up a paragraph,

2    when you made your complaint, Human Resources did

3    investigate the complaint, is that correct?

4         A.    Human Resources investigated the complaint,

5    yes.

6         Q.    And then did they report back to you after

7    they investigated it?

8         A.    Yes, they did.

9         Q.    And did they tell you that Mr. Arocho had

10   received a warning?

11        A.    Yes.

12        Q.    And that he was advised that sexual

13   harassment would not be tolerated at that time company,

14   right?

15        A.    Yes.

16        Q.    Okay.  Although they also told you there was

17   no evidence because it was kind of a he said/she said

18   situation, right?

19        A.    Yes.

20        Q.    And in fact, as you've testified, there was

21   no more harassment by Mr. Arocho after you made the

22   complaint, right?

23        A.    Well, just my tardiness and me writing that

24   time sheet, I felt that was harassment.

25        Q.    Okay.  Now, the next paragraph says that you

1    Q.    But you thought Kurt Selner was good, that he
2    provided the information that you needed?
3    A.    When it comes to your job, if you needed
4    something done, yes.
5    Q.    How's your foot now?
6    A.    My foot is all right.  It's -- I have my
7    days.  I have special shoes I wear.  I put orthotics in
8    every shoe that I wear.  That's about it.  I just have
9    my days.  Sometimes I'm all right, you know, but by me
10   working in a sit-down position, I have a little stand
11   that I put my foot up on.  When I have to go file or
12   whatever, I just kneel on a chair or something.
13   Q.    Do you work with computers in your current
14   job?
15   A.    Yes.
16   Q.    Which is something that you do like doing?
17   A.    Yes.
18   Q.    So generally, I mean you're just happier with
19   the work itself, right?
20   A.    Yes, and the people.
21            MS. REILLY:  Let's just take a minute.
22            (Pause in the proceedings.)
23   Q.    Okay.  I have nothing further.
24            (Time noted:  1:33 p.m.)
25       (Jurat follows on page 352, no omission.)

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                        *
TWANYA PRESLEY, MARINA                  *   CIVIL ACTION
GIANNAKOVA and SOFIA                    *
TSAHARIDES                              *   NO: 3:02CV2157(AVC)
                                        *
        Plaintiffs,                     *
                                        *
    v.                                  *
                                        *
PEPPERIDGE FARM, INC., a subsidiary     *
of THE CAMPBELL SOUP COMPANY,           *
THE CAMPBELL SOUP COMPANY and           *
ROBERT AROCHO, Individually             *
                                        *
        Defendants.                     *   JANUARY 30, 2003
* * * * * * * * * * * * * * * * * * * * * * * *
```

## AFFIDAVIT OF STEVEN WHITE

I, Steven White, being duly sworn, do hereby depose and say:

1.   I am over the age of eighteen and believe in the obligations of an oath.

2.   I was employed by Pepperidge Farm, Inc. ("Pepperidge Farm" or "the Company") as the Quality Assurance ("QA") Manager at the Company's Norwalk, Connecticut bakery from approximately October 2000 through October 2002.

3.   I am currently employed by Pepperidge Farm as a Purchasing Manager.

4.   In or about August 2001, there was an opening for a Quality Assurance Technician position within Pepperidge Farm's Quality Assurance Department at the Norwalk, Connecticut bakery.

5.   The job was posted at the Norwalk facility and interested applicants were required to fill-out a "bid form."

6.  All applicants were initially interviewed by one of my supervisors in Quality Assurance, Vanessa Diggs.

7.  Ms. Diggs selected who she believed to be the top three candidates, Andy Saltourides, Twanya Presley and Nick Savopoulos, each of whom I then interviewed.

8.  Each candidate had specific attributes. Mr. Savopoulos was working towards a college degree, was well-spoken, presented a very professional appearance, was polished professional and intelligent; Mr. Saltourides had some college education and well-developed technical computer skills, including familiarity with a mainframe database and Excel; Ms. Presley also had a professional appearance and had some experience with data entry through her modified/light duty assignment in the bakery's QA Department.

9.  I also requested that Mr. Saltourides and Mr. Savopoulos participate in a "day-in-the-life" exercise where they performed certain functions associated with the Quality Assurance Technician job so that I could evaluate their performance, while at the same time they could see some of what the job entailed and see if they were still interested.

10. I requested that Mr. Saltourides and Mr. Savopoulos enter data from documents called "receivers," which allowed for an objective evaluation of each individual candidate's skills.

2

11. Ms. Presley did not engage in the "day-in-the-life" exercise because she had performed the same functions while on her modified/light duty assignment in the QA Department.

12. Mr. Saltourides level of motivation and overall performance in the "day-in-the-life" exercise far surpassed that of the other two candidates. In addition to entering the data from the receivers with much more efficiency and ease than the other candidates, he discussed with me his ideas on how to improve the process to make it even more efficient for the Company.

13. I ultimately chose Mr. Saltourides for the position. My decision was based solely upon the skills he possessed and his performance in inputting the data from the receivers, and his motivation and enthusiasm during this very brief assessment period.

14. Mr. Savopoulos did not illustrate the level of motivation that I expected, did not enter the receivers data efficiently and did not appear enthusiastic about the job duties in general.

15. Based upon her prior performance in the QA position, as well as her lack of higher education, including lack of mathematical and computer skills, I was not confident that Ms. Presley would be able to perform all of the required job functions.

16. I did not speak with anyone at Pepperidge Farm, including supervisors, regarding any of the candidate's prior job performance, including Ms. Presley.

3

17. I ultimately selected Mr. Saltourides for the QA Technician position because in my opinion, he was the best overall candidate for the job.

18. The decision to hire Mr. Saltourides over Mr. Savopoulos or Ms. Presley was based solely on my interviews with each candidate and each candidate's performance.

Steven White

STATE OF CONNECTICUT ) 
 ) 
 ) ss: Norwalk, Connecticut 
 ) 
COUNTY OF FAIRFIELD ) January 22, 2004

Personally appeared, Steven White, who swore to and subscribed the above affidavit before me, this 22 day of January 2004.

Commissioner of the Superior Court/Notary Public

SUSAN CIARELLO
*NOTARY PUBLIC*
MY COMMISSION EXPIRES APR. 30, 2008

4