# EXHIBIT  D

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - -X
TWANYA PRESLEY, MARINA GIANNAKOVA  :
AND SOFIA TSAHARIDES               :
                                   :  NO. 3:02CV2157 (AVC)
                 VS                :
                                   :  AUGUST 7, 2003
PEPPERIDGE FARMS, INC. a subsidiary:
of THE CAMPBELL SOUP COMPANY,      :
THE CAMPBELL SOUP COMPANY          :
- - - - - - - - - - - - - - - - -X


DEPOSITION OF PAUL MACIONUS


APPEARANCES:

        FOR THE PLAINTIFFS:

                JOHN BOLTON, ESQ.
                360 FAIRFIELD AVENUE, SUITE 200
                BRIDGEPORT, CONNECTICUT 06604


        FOR THE DEFENDANTS:

                TYLER, COOPER & ALCORN, LLP
                PATRICIA E. REILLY, ESQ.
                ELIZABETH ANDREWS, ESQ.
                205 CHURCH STREET
                NEW HAVEN, CONNECTICUT 06509-1910

                MARTIN D. CHAZIN, ESQ.
                IN HOUSE COUNSEL
                THE CAMPBELL SOUP COMPANY


            SHIRLEY SAMBROOK - LICENSED COURT REPORTER
                        203   259-5903

1    A    Yes.

2    Q    What was that?

3    A    I became employment labor relations manager.

4    Q    And what did that entail?

5    A    Handling all the labor issues for the plant,

6    all grievances, preparation for negotiations, any potential

7    arbitrations.

8    Q    And the client, being Bridgeport Brass?

9    A    Yes.

10    Q    What was the union in there?  What was the name

11    of that union?

12    A    It was a local union, local brass workers'

13    union.

14    Q    Okay.  And you represented management?

15    A    Correct.

16    Q    And when did you start doing that specific task?

17    A    1976.  Excuse me.  19, yes.  1976.

18    Q    Okay.  Did you hold another position at

19    Bridgeport Brass after labor relations in 1976?

20    A    No.  No.

21    Q    And when did you leave Bridgeport Brass?

22    A    1980.

23    Q    Now, you said in 1975 you went and started doing

24    some post-graduate work, is that right?

25    A    Yes.

1          MR. BOLTON: Okay. Why don't we mark this

2     number 4.

3          (Whereupon anti harassment policy, CS, was

4     marked as Plaintiffs' Deposition Exhibit 4 for

5     Identification.)

6     Q    In the one that's been marked number 3, it's

7 your recollection, Exhibit number 3, it's your recollection

8 that that was the one that was posted at the time of the

9 acts complained of in this lawsuit?

10    A    This was posted in the HR office.

11    Q    At the time of the acts complained of in this

12 lawsuit?

13    A    When was the date of the suit?

14    Q    Not when the suit was brought.  When certain

15 allegations were made.

16    A    You mean Twanya's complaint September, September

17 of 2001?

18    Q    Right.

19          MR. CHAZIN:  September of 2001?

20          THE WITNESS: September of 2001.  This was

21     posted in the HR office.

22    Q    That was one of the prevailing --

23    A    It was one of the postings that was in the plant.

24

25    Q    One of the prevailing harassment policies that

66

1   was published or posted?

2        A    Posted in the plant.

3        Q    At different locations, correct?

4        A    Multiple locations.

5        Q    Okay.  Now, do you have number 4?

6        A    Correct.

7        Q    Okay.  Take a look at that.  Do you recognize

8   that document?

9        A    Absolutely.

10       Q    And, what is that document?

11       A    Anti harassment policy.

12       Q    And was that the one that was in effect, that

13  draft or version, at the time of the acts complained of in

14  this lawsuit?

15       A    Yes.  It was.

16       Q    And was that posted?

17       A    Multiple locations.

18       Q    Okay.

19       A    Yes.

20       Q    Were there any other policies posted?

21       A    Oh, yes.

22       Q    At multiple locations?

23       A    Yes.

24       Q    What were those?

25       A    Violence in the work place, EEO.  There were a

1    and they would go through a ninety day probationary
2    period.  During that process, they were, again, put
3    through, whether you were a temporary or a permanent hire,
4    go through the same process.   They go through a couple
5    hours for sign up procedures with paperwork, getting a copy
6    of the handbook.   Temporary employee was not given a copy
7    of the handbook.  Okay.  Only permanent employee.  So, if
8    you came in as a temporary, we would briefly go through
9    policies and procedures in the plant, etc.   And, then,
10   when they became permanent employees or there was an
11   opportunity to hire them on a permanent basis, they go
12   through this process.  A couple of hours with Beth DeCarlo,
13   who used to -- was the HR assistant, used to orient
14   employees, paperwork, go over the policy, go other the hand
15   book, etc.  There was a check sheet that went off with all
16   of these employees that they signed off to review those
17   policies, to review those procedures with the employee.
18   The medical department, nurse,  spent time with them
19   relative to safety and policies governing the medical
20   department -- when to report an accident, when to contact
21   your supervisor concerning an accident, what was involved
22   in the accident investigation, what your responsibilities
23   were relative to an accident, if you were out sick or
24   worker's comp case.  And then the quality department came
25   in and they did the HACCP and GMP training.  This is all

1       A    I think we are doing a more effective job.

2       Q    With regard to what?    Effective job in what?

3   Training your employees?

4       A    Un-huh.  Letting them know what to expect.

5   Letting them know what our procedures are, policies.

6   Preparing them better for the work environment, the work

7   place.

8       Q    Who made the determination to change that

9   training?  Was that yourself?

10      A    I led that initiative in conjunction with the

11  plant manager in conjunction with the operations manager.

12  Feedback from the rest of the staff.  What we needed to do

13  a little better.

14      Q    After the second time that a permanent hire is

15  showed the harassment policies, are they led through those

16  policies at any time again?

17      A    No.  To my knowledge, they are posted in the

18  plant.  Employees are directed to go to the bulletin boards

19  to read the information that's disseminated.

20      Q    Who directs them to do that?

21      A    We share that with employees.  As a matter of

22  fact, we even have quarterly meetings where employees are

23  advised to read the boards, take a look at them.  The

24  information is there.

25      Q    Well, how do you say it?  Go look at the boards?

1    Q    When you first learned of Twanya's issue with

2    Mr. Arocho, you were informed by Vanessa Diggs, is that

3    correct?

4    A    Right.

5    Q    What was her title at that time?

6    A    Quality assurance supervisor.

7    Q    And, so, she met your expectation?  She heard

8    about it and she contacted you?

9    A    It is my understanding that she had heard about

10   it, had shared it with her supervisor, who was the manager

11   of quality assurance, Steven White, and Steven called me.

12   As a matter of fact, called me into the QA office at about

13   four-thirty p.m. On Friday, September 31, 2003.   Excuse

14   me.  Not 2003, 2001.

15   Q    You mean --

16   A    Friday, August 31.  August 31, 2001.

17   Q    What did he tell you?

18   A    He waved me into the quality assurance office and

19   said, "I think you should be involved in this.  I think we

20   have a problem."  I said, "What seems to be the problem?"

21   He referred to Vanessa Diggs who was also standing in the

22   room with him.  And she went on to explain that Twanya

23   shared some rather disturbing issues with her concerning a

24   supervisor in the plant.  I said, "Well, sit down and talk

25   about it."

1       Q     So, the training that you gave to Miss Diggs and

2   to Mr. White paid off because they did what you told them

3   to do?  They came and told you and immediately made you

4   aware of the situation?

5       A     Un-huh.

6       Q     And what was your first reaction to that, in

7   terms of responding?

8       A     I listened to what she had to share with me.

9       Q     On that date, on Friday?

10      A     On that Friday evening.

11      Q     Okay.  When you say she, Miss Diggs?

12      A     Vanessa Diggs.

13      Q     You spoke with her?

14      A     Un-huh.

15      Q     And did you plot a plan of action or what was

16  your determination that Friday afternoon?

17      A     I instructed both Steven and also Vanessa, I

18  said, "This is strictly confidential information.  Please

19  keep it to yourselves."  I said, "I will share this with my

20  superiors," and I said, "The HR department will do an

21  investigation."  Recognizing it was Friday before the

22  holiday,  most people were leaving, plant was going to be

23  down because of our operations, Friday afternoon before a

24  holiday, most of our operations were shutting down, so I

25  said, "We'll start this on Tuesday."  I said.  "Right now,

1    you people don't do anything with this. It's the

2    responsibility of the HR department." I thanked them,

3    both of them, for calling, waved me into the office, got

4    back to my office and I believe made a phone call to Rob

5    Harrison, who was the plant manager, to notify him and also

6    to share it with my employee relations manager, Maritza, to

7    say that first thing Tuesday I advised her as to what was

8    shared with me and going forth, effective Tuesday, first

9    thing, that takes precedence.  That takes priority.

10        Q    Setting aside whether or not the allegations that

11   you heard were truthful or not, did the allegations

12   themselves come within the parameters of what you -- how

13   you would define sexual harassment?

14        A    Yes.

15        Q    Did you consider sexual harassment to be --

16   withdrawn.  Can sexual harassment be something other than

17   physical harassment?

18        A    Yes.

19        Q    Can sexual harassment be something other than

20   verbal and physical harassment?

21        A    Correct.

22        Q    What would that be?

23        A    Could be gestures.  Could be unsolicited

24   touching.

25        Q    I mean, other than physical or verbal, is there

111

1    going to be, after the preliminary investigation was

2    completed, what was your action plan after that?  To let it

3    sit while you were on vacation or?

4         A    Depending on the findings.  If we felt that the

5    allegations were proven, take immediate action to confer

6    with my plant manager.  See what we would do.

7         Q    Would you have been on call for something like

8    that, even if you were on vacation?

9         A    No.

10        Q    Who would have taken over?

11        A    Not on a vacation.  Maritza would have taken over

12   at the direction of Rob Harrison, the plant manager, or Pat

13   Folan, in his absence.

14        Q    Either one of them would have sort of stepped

15   into your shoes to fill-in the gap while you were on

16   vacation?

17        A    Un-huh.

18        Q    So Twanya comes in on Tuesday, September 4?

19        A    Un-huh.

20        Q    At that time you explained to hear the sexual

21   harassment policy?

22        A    First off, we stated the reason why we had callen

23   (sic) her into the office.  That's because we overheard

24   through the supervisor, okay, and manager, there were

25   issues, there were some harassment issues. We'd like to sit

1    down with her and go through those in considerable detail

2    as to what had occurred and what happened.  She was rather

3    apprehensive, initially.

4         Q    You understood why, though, right?

5         A    Did I understand?

6         Q    Why she was apprehensive?

7         A    No.

8         Q    No?

9         A    No.

10        Q    Were you ever taught during the CBIA or the other

11   seminars you went to that sometimes it's difficult for a

12   victim of sex harassment to come forward or want to be

13   cooperative?  Was that something that you were --

14        A    Well, I understood what potentially can be

15   barriers or obstacles but what was going on in her mind,

16   no.  Not until we sat down and talked to her.  And then

17   what we did, Maritza and I, both went through the anti

18   harassment policy.  Here's the process and here's the

19   procedures.

20        Q    Okay.  Let me just backup for one second.    I

21   want to make sure that I got what you say is accurate.  She

22   was apprehensive, you said.  And you understood that

23   there's barriers, sometimes, to the investigation.  What

24   barriers are you referring to?

25        A    Anything that could be humiliating or personally

1       A    There was disciplinary action but it had nothing

2    to do with any type of harassing behavior.  It was

3    basically other performance issues, when he was hourly

4    employee, he first joined the company.

5       Q    Now I think you said you were going away on the

6    8th, so at least you wanted to get a preliminary

7    investigation done on this.  And during that time,  did

8    you or Maritza ever consider placing Mr. Arocho on any kind

9    of administrative leave?

10      A    No.

11      Q    When did you find out about the other two women,

12    Marina and Sofia?

13      A    September 18, when Maritza came into my office

14    and informed me she was left a voice mail concerning

15    both -- both of the individual employees.

16      Q    Did that trouble you?

17      A    Oh, yeah.

18      Q    When Twanya was voicing her concerns and you were

19    aware of the barriers and there was issue of retaliation

20    she was worried about, did you ever consider putting her on

21    administrative leave until preliminary investigation was

22    completed?

23      A    No.

24      Q    Did you think the obligations -- allegations

25    were serious at the time that you spoke with Twanya?

Sept 2

120

1          A      Of course.   Otherwise we would never have

2     conducted any investigation.

3          Q      Did you transfer her, during that week, out of

4     Mr. Arocho's supervision?

5          A      Again, let's revert back to actually what was

6     shared with us.

7          Q      I just want to know if you transferred her.

8     That's all.

9          A      No.   Simply because she said she had handled it.

10    This had occurred in the past.

11         Q      Okay.   That's fine.   So, acting on that

12    information, while the investigation was pending, you felt

13    that despite what she said or --  withdrawn.   At any time

14    during the investigation, during that short window of like

15    the 4th to the 8th of September,  did you tell Mr. Arocho,

16    if you are doing anything, stop it?

17         A      After we talked to Twanya, we talked to

18    Mr. Arocho.   Both Maritza and myself called him in the

19    office and we sat down with him.   He knew of these

20    allegations.   Okay.

21         Q      Before you called him in?

22         A      And we reviewed the policy with him, the anti

23    harassment policy.   We reviewed the EEOC policy with him.

24    We reviewed the violence in the work place policy with him

25    and we told him under no circumstances would we, you know,

1  tolerate any type of activity by him against Twanya or any

2  other employee and the consequences of that would be

3  suspension pending termination.

4     Q    And while you were trying to find out or

5  determine the veracity of these allegations, did you take

6  any steps to eliminate his supervisory role over Twanya,

7  while this was pending?

8     A    I don't know if she was currently --   I believe

9  she was working in the quality assurance lab and that was

10 outside of his direct area of responsibility.  So, she was

11 not working directly with him at that point in time.  And,

12 again, it was repeated by Twanya during the investigation

13 that, oh, I handled it.  It was taken care of.  I just hope

14 it doesn't happen again.

15    Q    But by her saying that, that didn't relieve you

16 from the obligation of investigating the allegations,

17 right?

18    A    The investigation continued through the week.

19    Q    Did it, in your opinion, though, those comments

20 relieve you or Maritza the obligation to take interim or

21 remedial steps, such as removing her from his supervision?

22    A    Again, I don't know.  It's been awhile.  But I

23 think that she was outside of his area of responsibility.

24 I think she was still in the quality lab.  I don't know.

25    Q    Had she been within the purview of his

1    supervision,  just because she said that she handled it,

2    do you feel that that gives you the obligation or that

3    relieves you of the obligation of taking any kind of

4    interim remedial steps?

5               MS. REILLY: Objection.  Hypothetical.

6               Assumes facts not in evidence.

7       Q    You can't recall whether or not he was her

8    supervisor, is that right?

9       A    At the time the complaint was made, overall

10   responsibility was charged to his budget but I don't recall

11   at the time that if he was, I didn't think it was -- I

12   didn't think that type of action was necessary.

13      Q    Why not?

14      A    My opinion, again, based on the conversation

15   these things happened a month before,  she didn't want them

16   to happen again, she didn't want to bring charges, she

17   didn't want anything to happen to this gentleman.  She was

18   concerned about the her relationship with him.  He just

19   made her uncomfortable.  We put him on notice and said,

20   look, under no circumstances would that be tolerated.  If

21   he was found in violation of these policies, he would be

22   automatically discharged.  We felt, in my opinion, I will

23   have to take the responsibility for that, because I was the

24   senior HR person.  I didn't think that was necessary.

25      Q    Even though you felt that the allegations were

1    Tuesday.  I believe Roberto was off on Tuesday.  We met

2    with Roberto on Wednesday, the following day, which was

3    September -- I think it was the 5th.  Okay?  In the

4    morning.  We brought it to his attention, regarding the

5    allegations.

6         Q    But you didn't bring up her name?

7         A    He was shocked.  No.  He brought her name up.

8         Q    Did you confirm to him that that is who was

9    making the allegations?

10        A    I don't recall.

11        Q    Over the course of forty-five minutes, did you

12   ask him about any of the alleged events that Twanya told

13   him about?

14        A    Very specific.

15        Q    And you were able to do that without mentioning

16   her name?

17        A    Again, we didn't mention her name until Roberto

18   said, "It's Twanya.  I know it's Twanya because I shared

19   some information with Vanessa and it's Twanya Presley."

20   So, then we went over the specific events of August 1st, I

21   believe it was August 2nd, I also believe it was August

22   4th, and went over each and everyone of those.  He sat

23   there quite stunned, quite shocked.

24        Q    Who shared what with Vanessa Diggs?  I'm sorry.

25   You were paraphrasing.  Said I shared something with

1    or on going forward basis, if he is found to be retaliatory

2    or to violate any of these policies, he would be

3    immediately suspended, possibly discharged.

4        Q    Or if there was a repeat of the situation,

5    repeat offender, something like that?

6        A    But he was put on notice.

7        Q    Okay.  And that was all oral?

8        A    Yes.

9        Q    So you didn't do a written warning?

10        A    Well, as part of our internal investigation, the

11    documents that are with that investigation.

12        Q    You consider the -- withdrawn.  You took notes of

13    both meetings with Twanya that morning and then later with

14    Mr. Arocho?

15        A    Well, again, as I recall the dates in its proper

16    order, I believe Roberto was off on that Tuesday.  We

17    talked to Twanya on Tuesday, the witnesses, and then we

18    talk to Roberto Arocho the following day, which I believe

19    was Wednesday, the 5th of September.

20        Q    Which witnesses are you referring to?

21        A    Let me see.  Donald Miller, Juan Martinez.   And

22    there was a another witness but that was a phone

23    conversation that Maritza had with --   his name is

24    Peeples.  That was the quality assurance technician who had

25    retired in August.

132

1    Q    So I understand the sequence of events, then, was

2    to talk to Twanya and then talk to three witnesses?

3    A    Correct.

4    Q    And then talk to Mr. Arocho?

5    A    Since Mr. Arocho was not available.  He was on

6    vacation that day.  We couldn't talk to him.  Otherwise I

7    would have had him come in next.  We knew he was coming to

8    work the following day so we scheduled him for the first

9    thing for the morning.

10    Q    Okay.  And the three witnesses were Peeples,

11    Miller and Martinez?

12    A    The two that were actively working at the plant

13    were Martinez and Miller.  Again, the one that was not at

14    the plant, he had retired, I believe on August 8th, he had

15    left, was Mr. Peeples.  I believe he was --  I think

16    either in the Carolinas or in Florida.

17    Q    Any other witnesses?

18    A    There were no other witnesses.  No other names

19    that were provided.

20    Q    Those were the only three during the entire

21    investigation?  Preliminary investigation or otherwise?

22    A    For this.

23    Q    For this?

24    A    For this.  Yes.

25    Q    After you spoke to Mr. Arocho, what was the next

133

1    phase of the investigation, if any?

2        A    Well, we wanted to reduce it to writing.  I

3    believe Maritza was going to share with Twanya, basically

4    everything that was shared at our initial meeting, to make

5    sure it was correct and accurate.

6        Q    I am sorry.  With respect to her statements?

7        A    Un-huh.

8        Q    Okay.

9        A    Maritza had preliminarily met with Twanya as a

10   result of the conversations that we had with the alleged

11   witnesses to these events, to these occurrences, and she

12   met with her on Friday, the 7th of September.

13       Q    So, on Thursday there was no overt activity with

14   respect to interviews or other than maybe just compiling

15   the documents or the notes?

16       A    Notes.  Data.

17       Q    That you got in the prior forty-eight hours or

18   so?

19       A    Correct.

20       Q    And, did you guys compare notes with each other,

21   you and Maritza?

22       A    Correct.

23       Q    Did you confer in that twenty-four hour period

24   often about this situation?

25       A    Un-huh.

134

1    Q    And, what did you -- withdrawn.  How were you and

2  Maritza able to sift out the facts and adjudge credibility

3  to everybody you spoke to?  Was there something that you

4  were looking for in each of these people?

5    A    We were looking for an eye witness and,

6  unfortunately, according to Twanya's statements, she made,

7  again, some allegations, and it was our task to interview

8  each and everyone of these people to see what did you see,

9  what did you hear, when did it occur, when did it happen.

10  But, unfortunately, based on the conversations with each of

11  the individuals,  they did not see any improprieties or

12  anything that would constitute harassment or any touching.

13  Anything like this.

14    Q    What did Donald Miller tell you?

15    A    Donald Miller told us that Twanya shared with him

16  that she was uncomfortable around Roberto.

17    Q    When did she share that with him?

18    A    I believe she shared that with him sometime in

19  August.

20    Q    And did he know why she felt uncomfortable around

21  Roberto Arocho?

22    A    Based on our conversations with Donald, no.

23    Q    So she just said it to Donald Miller, I feel

24  uncomfortable around him?

25    A    Right.

135

1      Q    And that was it?  There was no further follow-up

2  from Donald Miller or no further specific details coming

3  from Twanya to Donald Miller, as you understand?

4      A    Only in the conversation Donald had with Twanya

5  Donald recalls that if there's, you believe, there's a

6  ongoing problem, Donald's conversation was, during the

7  interview, he indicated that Twanya said, "No.  I think I

8  have handled it.  It stopped."  Donald said, "If it

9  continues, you should be reporting it."  And I believe he

10  said that she should probably go to HR with these issues.

11      Q    But consistent with your testimony of, like

12  twenty minutes ago, just because something stops doesn't

13  mean that it releases you from the obligation to

14  investigate, right?

15      A    Correct.

16      Q    Nor would it releases Donald Miller, as a

17  supervisor, from acting in a way that he was trained to act

18  by you, with regard to your expectations?

19      A    My personal expectations?

20      Q    Whatever your expectations were?

21      A    My professional expectations.  But, again, I

22  reverted the consistent theme throughout the interview and

23  the consistent theme through my conversation with Donald.

24  Our conversation with Donald was, it was handled.  It was

25  taken care of.  I don't want there to be an issue.

1      Q    Fair.  Withdrawn.  Because Donald Miller had told

2   you she said she took care of it in August and Twanya had

3   told you that she was worried about retaliation and it was

4   over and put an end to it, whatever, you never went to --

5   whether or not it really ever happened, that was never a

6   concern of yours at that point, is that right?

7      A    We started to think whether or not it happened

8   but we had, no -- no specific facts or any witnesses or any

9   interviewing any of our, any of the people that Twanya

10  brought forward, that in fact this occurred.  So, we had

11  no proof.  So the result of the investigation, as of

12  Thursday, when we got together, they were inconclusive.

13  Mr. Roberto denied the allegations.  I mean, he was

14  shocked.  He was stunned by the allegations and he denied

15  them.

16     Q    So, what you had was you had Twanya Presley and

17  you have Roberto each taking polar positions?

18     A    Correct.

19     Q    And you didn't know what to believe, is that

20  right?

21     A    We believed, based on the information that was

22  derived through conversation with Twanya, on Tuesday,

23  conversation with want Donald Miller, Mr. Peeples, on

24  Tuesday, and also, an interview with Roberto Arocho on

25  Wednesday,  that it was, again, inconclusive.  We couldn't

1

UNITED STATES DISTRICT COURT

2

DISTRICT OF CONNECTICUT

3

4

5  - - - - - - - - - - - - - - - -X

TWANYA PRESLEY, MARINA GIANNAKOVA,      :
6  SOFIA TSAHARIDES                        :

7                VS                        :  NO. 3:02CV2157 (AVC)
                                           :
8  PEPPERIDGE FARMS, INC., subsidiary  :  AUGUST 8, 2003
   of THE CAMPBELL SOUP COMPANY and      :
9  THE CAMPBELL SOUP COMPANY              :
   - - - - - - - - - - - - - - - - - -X

10

11

12        DEPOSITION OF PAUL MACIONUS
                  VOLUME II

13

APPEARANCES:

14

15     FOR THE PLAINTIFFS:

16          JOHN BOLTON, ESQ.
            360 FAIRFIELD AVENUE, SUITE 200
17          BRIDGEPORT, CONNECTICUT 06604

18

19     FOR THE DEFENDANTS:

20          TYLER, COOPER & ALCORN, LLP
            PATRICIA E. REILLY, ESQ.
            ELIZABETH ANDREWS, ESQ.
21          205 CHURCH STREET
            NEW HAVEN, CONNECTICUT 06509-1910

22
            MARTIN D. CHAZIN, ESQ.
23          IN-HOUSE COUNSEL, CAMPBELL SOUP COMPANY
            CAMPBELL PLACE
24          CAMDEN, NEW JERSEY 08103-1799

25     SHIRLEY SAMBROOK - LICENSED COURT REPORTER
                    203   259-5903

12

problem, you have an open door policy. We understand that
not only problems but any misunderstandings, and you can
read it, as noted on page five, under complaints and
problems, what the process is. It just says if you feel
dissatisfied, you have any concerns or issues, talk it over
with your manager, the manager of operations, or go
directly to manager of HR. Again, the HR department has
responsibility for protecting the employee's interest. If
you take, if Twanya is kind enough to let us tape her
complaint, I believe that, specifically stated, we were an
advocate for the employee, when any employee comes in with
any issues.

    Q    Okay. Good. When you referenced page five,
with regard to the complaint and we discussed this
yesterday, the one over one philosophy, what is written in
that handbook, is that consistent with the anti harassment
policy and/or the sexual harassment policy that were
identified as numbers 3 and 5, the Exhibits, yesterday?

          MS. REILLY: Could we see 3 and 5?

          MR. BOLTON: Yes. They are right in front
of you. I'm sorry. Right there.

    A    I mean, if you want to split hairs, is it
identical to the language in the book? I'd say, it's
identical. The language is not identical but it gives you,
basically, direction that you can -- report can be made to