# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| TWANYA PRESLEY, MARINA GIANNAKOVA and SOFIA TSAHARIDES | * * * * | CIVIL ACTION NO: 3:02CV2157(AVC) |
| Plaintiffs, | * * | |
| v. | * * | |
| PEPPERIDGE FARM, INC., a subsidiary of THE CAMPBELL SOUP COMPANY, THE CAMPBELL SOUP COMPANY and ROBERT AROCHO, Individually | * * * * * | |
| Defendants. | * | JANUARY 30, 2003 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### AFFIDAVIT OF PAUL MACIONUS, JR.

I, Paul Macionus, Jr., being duly sworn, do hereby depose and say:

1. I am over the age of eighteen and believe in the obligations of an oath.

2. I am currently employed as the Human Resources Manager at Pepperidge Farm, Inc.'s ("Pepperidge Farm" or the "Company) Bloomfield, Connecticut bakery. I have held that position since the bakery opened in or around July 2003. Before that, and since April 2001, I was the Human Resources Manager at the Company's Norwalk, Connecticut bakery, which closed when the new Bloomfield facility opened.

3. I have been, in various capacities, in the field of Human Resources ("HR") management for approximately twenty-nine years.

4. At all times that I have been a Human Resource Manager at Pepperidge Farm, both Pepperidge Farm and Campbell Soup Company had sexual harassment prevention and Equal Employment Opportunity ("EEO") policies (the "Policy") in place. The policies in effect during the time period relevant to Plaintiffs' Complaint are attached to the Motion for Summary Judgment as Exhibit G. The Policy had a complaint procedure in effect and was posted in multiple locations in the Norwalk plant where the Plaintiffs worked, in compliance with federal and state rules, regulations, and policies. Specifically, the Policy was posted outside the plant's Human Resources office, which employees passed daily when entering

and exiting the plant, in the employee cafeteria, and in the administrative offices upstairs from the cafeteria.

5. As well as posted in various places, newly hired employees were informed of the Policy during their orientation.

6. The Policy expressly prohibited sexual harassment and instructed employees to whom they could complain within the plant or at corporate headquarters.

7. In addition to the Policy, Maritza (Sanchez) Allende, the plant's Employee Relations Manager at the time, and I, personally walked the plant floor on a daily basis in order to make ourselves visible and accessible to employees, and employees knew that they could contact me or Ms. Allende regarding any Human Resources-related issues and/or complaints.

8. In fact, employees frequently contacted me regarding a variety of Human Resources issues and complaints.

**Investigation of Twanya Presley's Allegations**

9. I first learned of Twanya Presley's ("Presley") allegations against Roberto Arocho by two other Pepperidge Farm employees, Vanessa Diggs and Steven White, on Friday, August 31, 2001.

10. Ms. Diggs, a supervisor, reported to her manager, Mr. White, that earlier that afternoon, Presley told her that Mr. Arocho had been harassing her. Mr. White then called me with this information.

11. Mr. White, Ms. Diggs and I met and Ms. Diggs recounted her conversation with Presley.

12. In addition to instructing both Ms. Diggs and Mr. White to keep the conversation confidential, I thought the situation serious enough to also call Rob Harrison, the Plant Manager, and Maritza Allende, the Employee Relations Manager, before going home for the weekend

13. Since it was late on Friday of a holiday weekend, I told them we would investigate on Tuesday, when we were all back at the plant after Labor Day.

14. On Tuesday, September 4, 2001, the first day back after the Labor Day holiday weekend, Ms. Allende and I commenced a full investigation of Presley's allegations.

15. In connection with our investigation, Ms. Allende and I summoned Presley to HR to interview her.

2

16. During that meeting, Ms. Allende invited Presley to tell us her version of the events, and I informed Presley that Pepperidge Farm had no tolerance for sexual harassment, explained the anti-harassment policy to her, and assured her that Ms. Allende and I would conduct a full investigation of her allegations and we would personally inform her regarding our findings.

17. Mr. Arocho was on vacation on September 4, 2001, but on the morning of September 5, 2001, when Mr. Arocho arrived at work, Ms. Allende and I called him to the Human Resources office for an interview.

18. During the approximately forty-five-minute interview, Ms. Allende and I reviewed the anti-harassment policy, as well as the EEO policy and the violence in the workplace policy with Mr. Arocho. We also reviewed each of Presley's allegations with Mr. Arocho and told him that under no circumstances would Pepperidge Farm tolerate any type of harassing behavior towards Presley or any other employee.

19. I also informed Mr. Arocho that Pepperidge Farm had an anti-retaliation policy and that retaliation of any kind would not be tolerated.

20. Finally, I informed Mr. Arocho that if he was found to have violated any of Pepperidge Farm's policies, the consequence would be very severe, up to and including termination of his employment.

21. Ms. Allende and I also removed Presley from Mr. Arocho's direct day-to-day supervision during the investigation.

22. Mr. Arocho was shocked by the allegations and affirmatively and credibly denied them.

23. Ms. Allende and I also interviewed all witnesses identified by Presley, namely, Donald Miller and Juan Martinez. Additionally, Ms. Allende interviewed Spencer Peeples, who was retired, by telephone and reported the results of that interview to me.

24. We asked Mr. Miller, a supervisor at the time, if he knew of any issues or incidents between Mr. Arocho and Presley. Mr. Miller responded that he never saw anything between Presley and Arocho. Mr. Miller recalled that Presley once told him, as a friend, that she was "uncomfortable" around Mr. Arocho, but that she had "handled the situation." Presley did not specify to Miller what exactly made her "uncomfortable," nor did she make any allegations of sexual harassment.

25. We then interviewed Juan Martinez, a co-worker of Presley. We asked Mr. Martinez whether he had any additional information regarding Presley's allegations, or whether he had witnessed anything inappropriate between Presley

3

and Mr. Arocho. Mr. Martinez said that he knew nothing about the alleged situation and that he never saw anything between Presley and Mr. Arocho.

26. Ms. Allende also interviewed Spencer Peeples, the only other witness identified by Presley. Mr. Peeples recalled that Presley told him that Mr. Arocho had once asked her out, but he also had no independent knowledge or information regarding Presley's allegations.

27. Following a full investigation, Ms. Allende and I compared our notes from the various interviews and discussed the information that we had gathered.

28. Based upon all of the information, including the fact that several of Presley's "witnesses," including Mr. Miller and Mr. Martinez, flatly denied having seen any inappropriate behavior between Mr. Arocho and Presley, Ms. Allende and I concluded that there was no corroboration of any of Presley's allegations, and no evidence of sexual harassment, otherwise.

29. We then reported the results of the investigation to Presley. We explained to her that no retaliation would be taken against her or tolerated for making a complaint or cooperating with our investigation. We also informed Presley that if she had any further concerns, or if she experienced any harassment or retaliation of any kind, she should come back and speak with Ms. Allende or me.

30. Ms. Presley did not report any further alleged harassment or make any complaints of retaliation after the conclusion of HR's investigation of her allegations.

### Investigation of Sofia Tsharides' and Marina Giannakova's Allegations

31. Pepperidge Farm first learned of Sofia Tsharides' ("Tsharides") and Marina Giannakova's ("Giannakova") allegations from Presley, following the conclusion of the Company's investigation of Presley's claims.

32. Presley left a voice mail message for Ms. Allende requesting that HR interview Tsharides and Giannakova.

33. Under my instruction and supervision, Ms. Allende immediately summoned Tsharides and Giannakova to HR expecting to interview them regarding additional information pertaining to Presley's claim.

34. Ms. Allende interviewed Tsharides and Giannakova separately. Upon speaking with each, Ms. Allende learned that the women appeared to be complainants, rather than witnesses to Presley's allegations.

35. Once Allende realized this, she initiated an investigation of Tsharides' and Giannakova's allegations.

4

36. Both Tsharides and Giannakova requested that their names <u>not</u> be used during any investigation, were vague and reluctant with their allegations, and refused to name any witnesses.

37. Therefore, Ms. Allende interviewed the claimants and Mr. Arocho in connection with the investigation into Tsharides' and Giannakova's claims. I attended the depositions of both Tsharides and Giannakova in the instant litigation, and neither Plaintiff named any other witnesses to the alleged harassment.

38. While Mr. Arocho admitted that he might touch an employee on the shoulder or arm if he is trying to get their attention in the plant because it's loud, he denied touching anyone, including Plaintiffs, in any improper or inappropriate way, and denied all of Tsharides' and Giannakova's other allegations.

39. Nevertheless, Ms. Allende and I reviewed the anti-harassment policy with Arocho and stressed that no sexual harassment would be tolerated.

40. Ultimately, Ms. Allende and I found no corroborating evidence of any of Tsharides' or Giannakova's claims.

41. Ms. Allende reported the results of the investigation to Tsharides and Giannakova, explained to them that no retaliation would be taken against them or tolerated for making their complaints. Ms. Allende also told Tsharides and Giannakova that if they had any further concerns, or if they experienced any harassment or retaliation of any kind, they should come back and speak with Ms. Allende or me.

42. Tsharides and Giannakova did not report any further alleged harassment or make complaints of retaliation after the conclusion of HR's investigation of their allegations.

43. Pepperidge Farm not only had an anti-sexual harassment policy in place at all times during Plaintiffs' employment, but Pepperidge Farm fully complied with that policy by conducting a prompt and thorough investigation of Plaintiffs' complaints, as soon as HR became aware of them.

_____
Paul Macionus, Jr.

5

| | |
|---|---|
| STATE OF CONNECTICUT | ) DLW |
| | ) Bloomfield |
| | ) ss: ~~Hartford~~, Connecticut |
| COUNTY OF HARTFORD | ) January 29, 2004 |

Personally appeared, Paul Macionus, Jr., who swore to and subscribed the above affidavit before me, this 29 day of January 2004.

_____
~~Commissioner of the Superior Court~~/Notary Public

DELORES LAMAR WILLIAMS
NOTARY PUBLIC
MY COMMISSION EXPIRES SEPT 30, 2006

# EXHIBIT F

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - -X
TWANYA PRESLEY, MARINA GIANNAKOVA  :
and SOFIA TSAHARIDES               :
                                   :  NO. 3:02CV2157 (AVC)
            VS                     :
                                   :  AUGUST 28, 2003
PEPPERIDGE FARMS, INC, a subsidiary:
of THE CAMPBELL SOUP COMPANY, THE  :
CAMPBELL SOUP COMPANY              :
- - - - - - - - - - - - - - - - -X

DEPOSITION OF MARITZA ALLENDE

APPEARANCES:

    FOR THE PLAINTIFF:

        JOHN BOLTON, ESQ.
        360 FAIRFIELD AVENUE, SUITE 200
        BRIDGEPORT, CONNECTICUT 06604

    FOR THE DEFENDANT:

        PATRICIA E. REILLY, ESQ.
        TYLER, COOPER & ALCORN
        205 CHURCH STREET
        NEW HAVEN, CONNECTICUT 06509-1910

        MARTIN CHAZIN, ESQ.
        IN HOUSE COUNSEL
        THE CAMPBELL SOUP COMPANY
        CAMPBELL PLACE
        CAMDEN, NEW JERSEY 08103-1799

SHIRLEY SAMBROOK - LICENSED COURT REPORTER
203   259-5903

1        MR. BOLTON: Do you need copies?
2        MS. REILLY: If you have them, sure.
3        MR. BOLTON: Why don't we call this package
4    Plaintiffs' 1.
5        MS. REILLY: Let's go offer the record for a
6    minute.
7        (Whereupon the deposition was in recess from
8    11:08 a.m. until 11:15 a.m.)
9        MR. BOLTON: So, we are marking number 1, a
10   total of four pages, two dated January of 02.
11   One, January 97. The other is January 2000.
12       (Whereupon EEO policy, CS, 1-02,
13   anti-harassment policy, CS, 1-02, sexual
14   harassment policy, PF, 1-97 and anti-harassment
15   policy, PF, 1-00 were marked collectively as
16   Plaintiffs' Deposition Exhibit 1 for
17   Identification.)
18   Q   I'm going to show this to you and ask you if you
19   have seen those documents before.
20   A   I have seen these policies posted but I'm not
21   sure if it's the exact posting, if the words are the same,
22   but I know I have seen the letterhead, the policy, before.
23   Q   Okay. So, you saw the one that said Campbell
24   Soup Company, Equal Employment Opportunity Policy?
25   A   Yes.

1   Q   Where was that posted?
2   A   I have seen this at the plant.
3   Q   Do you remember where?
4   A   Human resource office.  And we post it in the
5   cafeteria.
6   Q   Okay.  Anywhere else?
7   A   Not that I can recall.
8   Q   Okay.  And do you recall seeing the Campbell
9   Soup Company Anti-harassment Policy?
10  A   Yes.
11  Q   Do you remember where you saw that?
12  A   Both locations, cafeteria and human resource
13  office.
14  Q   Okay.  And on the third page, there's one signed
15  by David Albright, Janaury 97, date.  Do you recall seeing
16  that one?
17  A   Yes.
18  Q   Okay.  Do you know where that one was posted?
19  A   I can't remember if it was in the cafeteria, in
20  the HR department, but I do remember it posted.
21  Q   And the last one is Pepperidge Farms
22  Anti-harassment Policy, January 2000?
23  A   I don't remember this one.
24  Q   This one, you don't recall?
25  A   I can't recall.

```
 1      Q    Was she summoned or come in voluntarily?  Was she
 2   asked to go there?
 3      A    We asked her to come.  Correct.
 4      Q    Did she come?
 5      A    Yes.
 6      Q    Okay.  And when she came, did she answer your
 7   questions and cooperate with you?
 8      A    Yes.
 9      Q    And did she tell you what was bothering her
10   or what the allegations were?
11      A    We asked her.
12      Q    Okay.
13      A    We asked her to tell us.
14      Q    And, she gave consent for you to pursue this
15   investigation, correct?
16      A    Yes.
17      Q    Okay.  Go ahead.
18      A    Ask that question again.
19      Q    She gave you consent?  She didn't tell you, don't
20   ask me questions, did she?
21      A    Oh, no.  No.  No.
22      Q    And she cooperated?
23      A    Yes.
24      Q    Okay.  And she allowed you to tape her?
25      A    Yes.
```

```
 1        Q    Did -- strike that question.  Are these notes
 2   that you are referring to earlier that were taken in
 3   combination with listening to the tape?
 4        A    Yes.
 5        Q    Okay.  And you said you interviewed Spencer
 6   Peeples, correct?
 7        A    Yes.
 8        Q    Okay.  And why did you interview him?
 9        A    He was named as one of the witnesses.
10        Q    By whom?
11        A    By Twanya.
12        Q    Okay.  Who else did you interview?
13        A    We interviewed Donald Miller.
14        Q    Okay.  Who is Donald Miller?
15        A    One of the supervisors at that time.
16        Q    Management?
17        A    Part of management, yes.
18        Q    Okay.  What did Donald Miller tell you?
19        A    Can I refer --  I can't remember ver batim.
20        Q    I don't want you to.  As best you can recall,
21   what he told you?
22        A    I -- I remember when I met with him, I had asked
23   him if he knew anything about Roberto, any issues or any
24   incidents, between Roberto and Twanya.  And he couldn't
25   remember if he was -- sorry.  He did not witness any.  He
```

1  anything other than, I guess, he heard that she felt
2  uncomfortable around him, is that right? Around Mr.
3  Arocho?
4      A    Yes.
5      Q    Did you ask her -- ask her! Did you ask Juan
6  Martinez why she said that?
7      A    I don't remember if we asked. We asked if he
8  knew -- did he witness anything.
9      Q    Well, let me ask you this. Were you only
10 interested in whether or not he witnessed or Donald Miller
11 witnessed or Spencer Peeples witnessed or were you
12 interested in what Twanya told them, as well?
13     A    We had spoken to Twanya. We had gotten all the
14 information from Twanya. These are witnesses she named.
15 We wanted to hear from the witnesses, did you actually see
16 something. We didn't want to hear what they heard from
17 her, third party.
18     Q    Even if she communicated to them at the time that
19 something was bothering her? Did you find that that was
20 part of the investigation?
21         MS. REILLY: Objection. Assumes facts not
22     in evidence.
23     Q    You can answer that.
24     A    Can you explain? Can you rephrase that,
25 bothering?

```
 1     Q   With regard to whatever Twanya said or anything
 2   that could be attributed to Twanya, if I understand your
 3   testimony correctly, you are saying that was already
 4   covered by interviewing her and taping her, correct?
 5     A   Some of the information that they were providing,
 6   was given by Twanya. Twanya named them. We were speaking
 7   with them to discover, do some fact finding if they knew
 8   anything more than what we had or did they witness
 9   anything. And, Juan, when we were questioning him, he said
10   he knew nothing.
11     Q   Okay.
12     A   That he saw nothing.
13     Q   Sorry. What was that last?
14     A   That he saw nothing.
15     Q   Was that all you were concerned about, was
16   whether or not Donald Miller saw or, or Juan, saw
17   something?
18     A   No. No. Not if they only saw something. If
19   they had other information that can help us in the
20   information investigation we wanted to know, of course.
21     Q   Give me an example. What is other information
22   that would help you?
23         MS. REILLY: Objection.
24     Q   What kind of other information would you be
25   looking for?
```

73

| | | |
|---|---|---|
| 1 | A | I would have to look. |
| 2 | Q | Did Juan Martinez tell you that she was uncomfortable around Roberto Arocho? |
| 4 | A | Yes. |
| 5 | Q | Did Spencer Peeples tell you that Twanya told him Roberto made advances on her? |
| 7 | A | Repeat that. |
| 8 | Q | Did Spencer Peeples tell you that Twanya told him at some point that Roberto made some advances towards her? |
| 10 | A | I don't recall. I, what I recall, what -- Spencer is about a phone call. |
| 12 | Q | And do you remember what he told you? |
| 13 | A | I don't. I don't remember. |
| 14 | Q | Nothing sticks out? |
| 15 | A | What sticks out is a phone call. |
| 16 | Q | Would it help, if you looked at that part? |
| 17 | A | Yes. |
| 18 | | MS. REILLY: 467. |
| 19 | Q | 467? |
| 20 | A | Okay. |
| 21 | Q | Do you recall whether or not Spencer Peeples told you that Twanya told him Roberto made advances? |
| 23 | A | Yes. |
| 24 | Q | Did you interview any other witnesses? |
| 25 | A | Well, Roberto. |

```
 1    Q    Other than the complainant, the person who is
 2  complaining, and the person who is being accused, did you
 3  interview anybody else?
 4    A    Sofia and Marina.
 5    Q    Okay.  I'm talking about now just with respect to
 6  Twanya's allegations?
 7    A    That was altogether.
 8    Q    Turn to page, Juan Martinez' statement, 469.  Who
 9  is it referring to there, Bengie?
10    A    That was Benjamin Bracetty.
11    Q    Okay?
12    A    One of the employees there.
13    Q    He was a team leader?
14    A    Yes.
15    Q    And that was on Arocho's crew?
16    A    Yes.
17    Q    Do you know whether he and Arocho were friends?
18  .cq 15 10 0
19  MR. CHAZIN:  Who's "he"?
20  MR. BOLTON: Bracetty.  Bengie.
21    Q    Do you know whether or not Bengie and Arocho were
22  friends?
23    A    If they were friends outside of work?
24    Q    In or out of work.
25    A    In work, we work pretty much as family at
```

```
 1   it's more of because you want to be focused on them.
 2        Q    Right.  Okay.  Did you always -- Was there a
 3   tape recorder in your office at all times or did you go out
 4   and --
 5        A    I had that from my previous job.
 6        Q    So you carried that?
 7        A    Yeah.  That was something I brought with me from
 8   my last job.
 9        Q    Okay.  After Twanya gave you the statement, the
10   next thing you did was you went and sought out the
11   witnesses?
12        A    Correct.
13        Q    Okay.  And pursuant or, as your report, Exhibit
14   3, you reference the three people that you interview --
15   Spencer Peeples.  Is it Peeples or Peebles?
16        A    I think it's Peeples.
17        Q    Juan Martinez and Donald Miller?
18        A    Correct.
19        Q    And then there was some substantiation of
20   Roberto's version of a couple of things that he said,
21   obviously, with Mr. Bracetty and Kurt Selner, right?
22        A    Yes.
23        Q    Okay.  Did you interview Twanya's mother?
24        A    No.
25        Q    Why?
```

114

1          Actually, slows us down.
2               MR. BOLTON: My brain is slowing down.
3     Q    Well, what was Vanessa's attitude about this?
4     A    I know, what I remember, I know Vanessa, who's
definitely concerned. I mean, she was definitely not
taking this lightly. That's why she immediately reported
it.
8     Q    Okay. And you had no reason to doubt that she
was sincere in being concerned about this? Right?
10    A    I don't doubt anyone who brings a claim in like
this. We take them serious.
12    Q    Let me say this. Vanessa was obviously
concerned and was following company policy and treating
this matter seriously, as far as you could observe, right?
15    A    Yes.
16    Q    You had not reason to think otherwise, that she
was taking this very seriously and did what she was
supposed to do?
19    A    Correct.
20    Q    Okay. On September 5, Mr. Arocho comes in, I
guess at eight a.m., to your office? That would be P00470.
22    A    Okay.
23    Q    And, unfortunately, this one isn't taped but I
guess it started by saying Paul asked Roberto what he knew
about the allegations. And, did Roberto walk in there and