1  he made reference to it and explained it to him.
2      Q    Okay. Defined it for him and also the
3  consequences?
4      A    If he was to violate that policy.
5      Q    And, then, in the afternoon you were given -- you
6  were delegated the responsibility to inform Twanya of what
7  was going on?
8      A    Correct.
9      Q    And it says here that you explained to her or
10 detailed how you came up with this decision, the factors.
11 Did you explain to her the factors in how you came up to
12 the decision?
13     A    I told her we would follow-up with her. Once I
14 gave her the information, I told Twanya that we didn't have
15 enough information to substantiate her allegations and I
16 told her that we would have a follow-up meeting, when Paul
17 returned, so he can give her more detail on how we came to
18 that conclusion. And then I explained to her, too, that
19 we had met with Roberto and told him the same thing about
20 not having enough information or evidence, witnesses, to
21 substantiate her allegation. And I also told her that we
22 did tell Roberto pretty much what the policies were and the
23 consequences. We warned him of the consequences, if this
24 was to occur, if he was to violate the company policy, what
25 the consequences were. She got upset and I remember her

1  Twanya, I'm sorry, on the 24th because Paul was the head of
2  human resources and you wanted to go through it by detail
3  and tell her why you came up to the conclusions you did?
4      A    I wanted to follow up with her because when I
5  gave her the information and the update and gave her the
6  results of the investigation, she was upset.  And I felt
7  that it would be good for us, for her, to meet with Paul
8  and myself again and so he can explain to her in more
9  detail, how did we come to that conclusion.
10     Q    Did you ever ask her what she wanted out of the
11 investigation?
12     A    I don't remember.
13     Q    Did you take any steps to remove her from
14 Roberto's area or control during the investigation?
15     A    Yes.
16     Q    Where was she transferred to, if you know?
17     A    I know we had her in different areas.  We had her
18 working with our nurse in the medical department and I
19 remember her working in our office, human resources.  We
20 had her working in the engineering department, QA, quality
21 assurance.  That's all I can remember right now.
22     Q    Okay.  And was she doing those various jobs
23 around the plant because of the investigation?
24     A    In part because of the investigation and she was
25 also in transitional duty, light duty.

```
 1   forth one day after Twanya comes in and gives you a
 2   statement, would not have made a difference in the way the
 3   investigation was conducted?
 4              MS. REILLY: Objection.  Assumes facts not in
 5         evidence.  Hypothetical.  She said the tape is
 6         wrong.  She says that she got that information
 7         from them on September 25th.  And stopped
 8         beating her up about it.
 9      Q    How could that possibly have been wrong, that
10   tape?
11      A    Like I said, we got that information right
12   after, after we met with Twanya, and told her any
13   additional information, let us know.  The day after, that
14   is when we received that information.  And I give it to
15   Paul and had him hear it.
16      Q    You said you listened to this tape in preparation
17   for today's deposition, right?
18      A    Yes.
19      Q    Did you listen --  Did you hear that part at the
20   end?
21      A    No.  This is the first time I hear it.
22      Q    This is the first you have heard of it?
23      A    No.
24      Q    So you have no explanation as to how Wednesday,
25   September 5 is attributed to that message?
```

1    A    No.
2    Q    Okay. So the day after, you say, is the 25th and
3 it says the 5th. If it's the 25th the two ladies came into
4 your office, Marina and Sofia --
5    A    I called them.
6    Q    Okay. So you followed up on the message Twanya
7 left?
8    A    Yes.
9    Q    Now, what was the status of the investigation at
10 that point?
11    A    Which investigation?
12    Q    Was Twanya's closed?
13    A    It was after Twanya's, correct.
14    Q    So, were two new investigations opened up?
15    A    No. I heard this information from Twanya on the
16 voice mail. I expected, okay, there are two additional
17 witnesses. That is what I was expecting to hear, two more
18 witnesses. So, Twanya was pretty much providing us
19 additional information in her case.
20    Q    Okay. If Marina came in and said to you the
21 things that you -- Take a look on Exhibit 3, page P00473.
22    A    Okay.
23    Q    You don't have to read the entire page. But she
24 came in and said some things and gave you some information
25 about Mr. Arocho, didn't she?

1  She just didn't want her name to come out. She wanted to
2  keep it pretty much anonymous.
3      Q    Okay. Did you reassure her in anyway?
4      A    Yes. I told her I would not reveal her name.
5      Q    Did you tell her that she shouldn't be scared and
6  she should tell you everything she knows?
7      A    Of course. That's how I got the information from
8  her. I said, "Don't worry about it. I won't -- I will
9  try my best to keep your name confidential and not reveal
10 it. But I need to know what happened so then I can
11 investigate." So she told me that, she explained a couple
12 of incidents that happened. And I told her that, you
13 know, I explained to her what the sexual harassment policy
14 is and her rights and went over some of the sexual
15 harassment policy and the verbal, the physical, and it
16 doesn't matter who it is, be it supervisor, manager, you
17 have every right to say stop, no. Come to human resource.
18 But the complaint process was -- but I was going to go
19 ahead and investigate it without -- without revealing her
20 name and that's what I did.
21     Q    So, it was basic like a redo of what you did with
22 Twanya?
23          MS. REILLY: Objection.
24     Q    Did the investigation for Marina's allegations
25 have the same procedure as was used in Twanya's

152

1   see us.
2       Q    Which she did?
3       A    Which she did and left me that voice mail with
4   these two witnesses.
5       Q    But, as it turns out, they weren't witnesses?
6   They were complainants, right?
7       A    They turned out to be that.  Correct.
8       Q    Did you open up a separate file, internal
9   complaint, Marina Giannakova or Sofia Tsaharides?
10      A    No.  It was put altogether with Twanya's case.
11      Q    Why was it lumped altogether?
12      A    That was just the way we chose to do it.  No
13  specific reason.
14      Q    It's three different people, isn't it?
15      A    Yes.  But it was all one person.  The allegations
16  were against Roberto.  He was the accusee.
17      Q    But the file doesn't say that?  The file says
18  Twanya Presley internal complaint?
19      A    Your folder.  That was not on my folder.
20      Q    Okay.  And did you meet with Sofia?
21      A    Yes.  I did.
22      Q    And that was on the same day, right?
23      A    Yes.
24      Q    5th, 25th, whatever it was?  The same day you saw
25  Marina?

1  said, okay, Maritza, these are two claimants on sexual
2  harassment, let's take out the recorder and do this
3  together.
4      Q    He would have spelled it out like that?
5           MS. REILLY: Objection. Hypothetical.
6      A    I'm sorry?
7      Q    He would have spelled it out like that?  The
8  message from Twanya wasn't clear enough?
9      A    Problems with Roberto, that could have been any
10 type of problem.
11     Q    Even though, for the last three weeks, she had
12 been working with you on a sexual harassment investigation?
13     A    Yes.  That could have --  Again, that could have
14 been -- I did not -- It did not say they had sexual or
15 there was other issues like that.  I took it as they were
16 witnesses to her allegation.
17     Q    Okay.  So after you interview the two ladies,
18 Marina and Sofia, you start, obviously, you started an
19 investigation?
20     A    Yes.
21     Q    What did you do next?
22     A    After I met with them, I talked to Paul and
23 explained to him what I had gathered and the information
24 that the girls had given me.  And that's when we decided
25 well, let's meet with Roberto.  Get some- find out

1  exactly what happened.
2      Q   Okay.  Let me ask you a question.  At that point
3  do you or Paul say whoa, here's three people now saying
4  unflattering things about, unbecoming behavior, about
5  Roberto Arocho?  Did that in anyway color your opinion or
6  lead you to conclude that maybe he was doing this?
7      A   I couldn't come -- I'm not going to come and
8  assume or conclude but it does alert you.  It concerns
9  you.  It concerned us.
10     Q   Were you, was your concern, heightened after
11 these two women came forward or was it the same level as
12 Twanya?
13     A   It does.  It did heighten it.
14     Q   Okay.  So, is it fair to say that you were
15 being, you and Paul, now, were really scrutinizing this
16 situation and you wanted to get to the bottom of it now?
17         MS. REILLY: Objection.
18     A   Can you explain?
19     Q   Your awareness was heightened now, right, about
20 the potential problem with Roberto Arocho?
21     A   It gave us more of an alert, yeah.  It's like
22 there's a bigger concern now.
23     Q   Okay.
24     A   Now we have another issue.  Now there's two
25 other claimants.

1  Q    Now that you had that bigger concern, what did
2  you do, next?
3  A    We met with Roberto.
4  Q    Okay.  Now, let me ask you this.  Did you
5  attempt to find any witnesses on the plant floor or
6  anywhere in the area where he supervised to see if anybody
7  could corroborate what the three women had said?
8  A    The two women didn't name any witnesses.
9  Q    Do you believe that you had an obligation to try
10 to find witnesses, if they didn't want to name them?
11 A    How do you do that?  How would we do that?  You
12 just don't go out on the floor and start questioning
13 employees.
14 Q    Why not?
15 A    Who are you going to question?  You have hundreds
16 of employees.  Are you going to go to each employee -- do
17 you know something?  This is, again, this was --  these
18 reports were given to us or, at least to me, and
19 anonymously.  I was supposed to keep it confidential.
20 Confidential when I --  I had told them their name was not
21 going to be revealed.  How would I go into the floor and
22 start trying to get information on these incidents when I
23 can't even say the person's name?
24 Q    The person being whom?
25 A    Sofia, Marina, Roberto.  Or pretty much Sofia

159

```
 1  and Marina.
 2       Q    You couldn't ask general questions like you did
 3  with Twanya?
 4       A    With Twanya, she named the witnesses.  Twanya was
 5  cooperative.  She gave us information.  We were able to
 6  talk to witnesses based on the information she supplied
 7  us.  Sofia and Marina did not provide any witnesses names.
 8       Q    Did they refuse to provide witnesses' names or
 9  did they not know whether or not there was witnesses?
10       A    When asked, they wouldn't give.  They pretty much
11  just gave me information on the incidents.
12       Q    Did you ask them if there were people around?
13       A    Yes.
14       Q    What was their answer?
15       A    No.
16       Q    Of the incidents with -- between them and
17  Roberto?  So, now that you have a larger concern, you bring
18  Roberto back into the office.  Or did you bring him into
19  the office?
20       A    Yes.  We did.
21       Q    Okay.  And what did you say?
22       A    We questioned him.  We, without revealing the
23  ladies' names, we informed him that we had received
24  complaints from other employees that -- of some improper
25  behavior on his side and if he recollected any of these
```

1  incidents where he, I can't remember exactly the words, but
2  pretty much touched the employee. Or we just pretty much
3  started questioning him without revealing any names and he
4  denied them. He said any time that he would touch an
5  employee, if he is trying to get their attention in the
6  plant because it's loud, but not that he touched them in
7  any improper body part. So pretty --  He denied any of
8  the allegations.
9      Q    And did he -- withdrawn. Marina and Sofia, they
10 work in his team or his area? Was he their supervisor?
11     A    I can't remember. I think one of them worked in
12 the roll department. So, I can't remember which one worked
13 where.
14     Q    Okay.
15     A    But I think Marina worked with him and Sofia
16 worked in the roll department.
17     Q    Did he --  I'm sorry.
18     A    No.
19     Q    Did he know who these two -- well, withdrawn.
20 Were you specific with him as to what was complained of in
21 terms of what was done but not saying to whom?
22     A    No. We didn't -- I mean, because then he would
23 know exactly. What we did was give him incidents but, did
24 you --  We try to be general. Did you ever touch someone
25 in this way or, without revealing names, did you ever do

this?  Based on what they told us, we try to generalize
it.  Did you ever do this with employees?  So, that he knew
we were focusing on the behavior.  The question was based
on his behavior without naming employee names.

Q   Did he ask you why you were asking these
questions again?

A   We told him in the beginning we had received
complaints from employees of improper behavior.

Q   What was his reaction?

A   He was like, who?  Natural, who, reaction.  Who?
He was shocked.  Who said -- who said that?  We couldn't
reveal the name.  He didn't learn about the name until he
saw the complaint, the complainants and complaint, through
the human resource report or EEOC.  That's when he actually
learned of who they were.  Because we kept it confidential
until then.

Q   So he didn't know Marina and Sofia had made
complaints about him until CHRO?

A   As far as I know.

Q   Okay.  And did there come a point when the two
investigations for Marina and Sofia were concluded?

A   Well, when I met with them and explained to them,
I was going to talk to Paul.  Then we met with Roberto.
After we went with Roberto, pretty much told, he denied all
the allegations, that he had ever done any of that to an

1  employee. We reiterated the policy again. And once we
2  concluded with him, I met with the girls but it was on the
3  floor. Pretty much I didn't bring them into the office
4  but on the floor I met with them individually and just
5  pretty much met them on the floor and followed up with them
6  in that manner.
7      Q    Let's backtrack. When you interviewed Roberto,
8  you questioned him in general terms because you had to
9  because of the confidentiality?
10     A    Correct.
11     Q    Okay. Did you then, when you finished
12 questioning him about the incidents that were alleged, did
13 you then let him go and say, okay, Paul, I have to do a
14 report on this now? I have to come up with a conclusion?
15     A    No. I don't remember that. No.
16     Q    Okay. Let's go back to Twanya for a second.
17     A    Okay.
18     Q    You met with Twanya to get information on
19 September 4. You met with her again on September 7th?
20 You did, without Paul?
21     A    Correct.
22     Q    To tell her that it was -- the investigation was
23 inconclusive?
24     A    Correct.
25     Q    That same morning you also met with Roberto to

174

of people complaining about him on allegations that can't be substantiated, it would make our investigation more difficult.

    Q    And what would happen?

        MS. REILLY: Objection. Hypothetical. She's already testified what happened in this case.

        MR. BOLTON: I know. She wasn't --

        MS. REILLY: We are wasting time. In this case, the allegations were unsubstantiated. What did she do? She said what they did. She went back to Arocho twice and read him the policies. We know what happened. I don't know what you are getting at here, John, but it's getting late and it seems like it's wasting time.

    Q    So, if twenty people come in and make allegations against Roberto Arocho and you can't prove one of them, then you have to come up with an inconclusive finding, correct?

        MS. REILLY: Objection.

    A    I am not in that situation. I -- I can't answer that. I don't know. Again --

    Q    Okay. Do you think you did a thorough investigation on Twanya?

175

1   A   Yes.
2   Q   And do you think you did a thorough investigation
3   on Marina's allegations?
4   A   Based on the information I had to go by, yes.
5   Q   And do you think you did a thorough investigation
6   of Sofia's?
7   A   Yes.
8   Q   And, according to your notes, the latter two,
9   Sofia, Marina's investigation, were less than a day, is
10  that right?
11  A   I can't remember the dates.  But, yes.
12         MR. CHAZIN: Could we go off the record for
13         a minute?
14         (Record note the departure of Mr. Chazin at
15         5:19 P.M.)
16         MR. BOLTON: I apologize.  I can't remember
17         the last question.
18         (Whereupon the last question and answer were
19         read by the reporter.)
20  Q   And you set, you and Paul, set time aside to meet
21  with Roberto and to advise him of the conclusion or the
22  results of this second and third investigations?
23  A   We met with him to find out --  We were
24  questioning him.
25  Q   Okay.  And --

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT 

- - - - - - - - - - - - - - - - - - - - - x
                                           :
TWANYA PRESLEY, MARINA GIANNAKOVA,
SOFIA TSAHIRIDES,                          :

            Plaintiffs,                    :
                                                    Civil Action
      vs.                                  :        No. 302CV2157
                                                        (AVC)
PEPPERIDGE FARMS, INC., a subsidiary       :
of THE CAMPBELL SOUP COMPANY,
ROBERTO AROCHO, Individually,              :

            Defendants.                    :

- - - - - - - - - - - - - - - - - - - - - x


            Deposition of SOFIA TSAHIRIDES, taken

      pursuant to the Federal Rules of Civil

      Procedure, at the law offices of Tyler

      Cooper & Alcorn, 205 Church Street,

      New Haven, Connecticut, before Janet C.

      Phillips, License #00124, a Registered

      Professional Reporter and Notary Public in

      and for the State of Connecticut, on

      Wednesday, June 4, 2003, at 9:50 a.m.


                    SCRIBES, INC.

```
 1        Q.   How was he related?
 2        A.   He's married with a first cousin of my
 3   husband's.
 4        Q.   Okay.  Did you know anybody else besides
 5   those three people?
 6        A.   No.
 7        Q.   What position did you have when you started
 8   working at Pepperidge Farm in 1999?
 9        A.   Yes, they put me to work at the dry
10   department, and afterwards they put me in the rolls.
11        Q.   Do you know, were you called a production sub
12   when you were working, production substitute,
13   production sub?
14             MS. REILLY:  She'll know that word so
15             you can say it in English.
16        A.   Yes, that's what they had.
17        Q.   When you started in May of 1999, who was your
18   boss?
19        A.   I think they call him Chris Plantamunia,
20   something like that.
21        Q.   Did you have, after Chris Plantamunia, did
22   you have another boss?
23        A.   Yes.  Somebody Freddie, I don't remember his
24   last name.
25        Q.   How about after Freddie?
```