# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT



- - - - - - - - - - - - - - - - - - - - - x

TWANYA PRESLEY, MARINA GIANNAKOVA,
SOFIA TSAHARIDES,

        Plaintiffs,

    vs.
                                 Civil Action
                                 No. 302CV2157
PEPPERIDGE FARMS, INC., a subsidiary     (AVC)
OF THE CAMPBELL SOUP COMPANY,
ROBERTO AROCHO, Individually,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - x

        Deposition of MARINA GIANNAKOVA,

taken pursuant to the Federal Rules of

Civil Procedure, at the law offices of

Tyler Cooper & Alcorn, 205 Church Street,

New Haven, Connecticut, before Janet C.

Phillips, License #00124, a Registered

Professional Reporter and Notary Public in

and for the State of Connecticut, on Tuesday,

April 22, 2003, at 9:40 a.m.

SCRIBES, INC.

1   A.  I was an accountant at a small factory, a
2   small factory.
3   Q.  Did you work in Greece?
4   A.  Yes.
5   Q.  And what did you do in Greece?
6   A.  A salesperson. Shoes, a shoe salesperson.
7   Q.  Have you had any other jobs?
8   A.  In Greece?
9   Q.  Anywhere.
10  A.  In Greece, I worked as a seamstress.
11  Q.  You began working at Pepperidge Farm in about
12  May 16th of 2000, is that right?
13  A.  Yes.
14  Q.  How did you find out about a job at
15  Pepperidge Farm?
16  A.  While working at Cosmo's, I was told that
17  there was hiring at Pepperidge Farm.
18  Q.  Do you speak any other languages besides
19  Greek?
20  A.  I speak five languages.
21  Q.  What are they?
22  A.  Russian, Georgian, Turkish, it's a dialect of
23  Greek. I'm not sure if that's considered a language.
24  And some English.
25  Q.  Did you take any English classes ever in your

```
 1        A.    Wherever they needed me, wherever they placed
 2   me.
 3        Q.    Did you start out as a temporary employee?
 4        A.    Temporary or part-time at first.
 5        Q.    And then you became full-time in December of
 6   2000?
 7        A.    Not December.
 8        Q.    Okay.  When?
 9        A.    After four months.
10        Q.    Between May of 2000 when you started, and
11   four months later, when you became a full-time
12   employee, who was your supervisor?
13        A.    Roberto Arocho.
14        Q.    Was Roberto Arocho your only supervisor at
15   Pepperidge Farm?
16        A.    That's the one that I know.
17        Q.    Okay.  Do you know the names of any of your
18   team leaders at Pepperidge Farm?
19        A.    The only one I knew.
20        Q.    Do you know who Roberto's supervisor was?
21        A.    His name is Kurt, but I don't know his last
22   name.
23        Q.    Would you see Kurt on the production floor?
24        A.    Very rarely.
25        Q.    Did Kurt have an office in the plant?
```

1    A.    It was August 31st.  He asked me to work on
2  Saturday.  It was Labor Day, the day before Labor Day.
3  I think it was Sunday.  He asked me to work on
4  Saturday.  I said "I can't."  I wanted a day off.  He
5  said to me, "If you give me a kiss," and then I said
6  why or what, and he said, "Not here, outside of here."
7         And then I wanted to scare him and I said,
8  "Look, I'm gonna tell your wife what you're saying to
9  me."  And he said, "Don't say anything to my wife
10  'cause she'll kill me.  And what I'm telling you is
11  between me and you."
12    Q.    And what did you say?
13    A.    What would I say?  What could I say?  I was
14  in shock.  Then he said, "I'll see what I can do."  And
15  then he was still smiling.  And he left.
16    Q.    What did you think he meant when he said
17  "I'll see what I can do"?
18    A.    He left.
19    Q.    Did he give you the day off?
20    A.    Yes.
21    Q.    Was that the first time that you threatened
22  to tell his wife?
23    A.    Yes, because I was trying to scare him.
24    Q.    Now, this was about just almost a year after
25  the cake comment, right, 'cause you said the cake

1   A.   That I have nice legs, that I'm pretty, that
2   I have nice eyes, nice face, everything.
3   Q.   Okay. What other -- anything else specific?
4   I know you're saying everything, but tell me what you
5   remember, if he made any other comments about you.
6   A.   I don't remember anything else.
7   Q.   Okay. Do you remember when Terry Kydes said
8   that Sofia had made a complaint?
9           MR. BOLTON:   Objection.
10          MS. REILLY:   That's not the testimony?
11          MR. BOLTON:   No.
12  Q.   Was it your testimony that Terry Kydes told
13  you that Sofia --
14          MS. REILLY:   Thank you.
15  Q.   -- that Twanya had made a complaint, do you
16  remember when?
17  A.   Kind of. It was before we made the
18  complaints. Before they called us. Sorry, wrong.
19  Before they called us.
20  Q.   Did you say anything to Terry Kydes about
21  your problems with Mr. Arocho?
22  A.   Sofia said things. Sofia said, "Good thing
23  somebody said something because we don't talk and we're
24  afraid." And Terry said, "Why, why, what happened?"
25  And Sofia said, "He bothered us, too." That was it.

1   A.  No.
2   Q.  Okay. Now, do you remember when -- Maritza
3   Sanchez called you, is that correct?
4   A.  Yes.
5   Q.  You did not call her?
6   A.  No.
7   Q.  Okay. Do you remember when she called you?
8   A.  It was before my birthday.
9   Q.  So September 19th -- when is your birthday?
10  A.  8th.
11  Q.  September 8th it was before September 8th?
12  A.  Before my birthday the 4th, the 2nd, the 3rd,
13  I'm not sure.
14  Q.  And did she call you on the telephone? How
15  did she contact you?
16  A.  I think they came to tell me that I have to
17  go to the office. I was on the line.
18  Q.  Who told you that you had to go to the
19  office?
20  A.  I don't remember.
21  Q.  What did you think when you were told that
22  you had to go to the office?
23  A.  I wasn't thinking anything.
24  Q.  Were you afraid when you were told that you
25  had to go to the office?

1  you outside and harm you?
2      A.    'Cause when you make complaints, that's what
3  I think, they'll find you and kill you if you complain.
4      Q.    Find you and kill you if you complain?
5      A.    That's what I think.
6      Q.    That's what you think?
7      A.    Yes.
8      Q.    Based on other experience that you have in
9  life?
10     A.    You never know what happens. If you make a
11 complaint, somebody could get really mad.
12     Q.    Did you have any experience in your life in
13 which you knew of someone who made a complaint and then
14 was hurt as a result, physically hurt?
15     A.    No. I just think if you complain about
16 people, they might get mad and do things.
17     Q.    Did anybody make a threat, when you were
18 talking to Maritza, up until the time you met with
19 Maritza, had anybody made a threat to physically injure
20 you?
21          THE TRANSLATOR: You said up to the
22     time.
23          MS. REILLY: Yes, in September of '01.
24          THE TRANSLATOR: No, no one ever
25     threatened her, but she's saying if he loses

1   A.   Yes.
2   Q.   Okay.
3        (Discussion off the record.)
4        (Luncheon recess taken.)
5   Q.   Marina, when did you learn that the Norwalk
6   plant was going to close?
7   A.   I'm not sure exactly when I learned about it,
8   but I knew that year. I'm not sure exactly when.
9   Q.   Okay. But you knew that it was going to
10  close at some point, is that right?
11  A.   Yes, they warned us that it would.
12  Q.   Okay. Did you have an understanding of when
13  it would close or about when it would close?
14  A.   They definitely told us what month and year.
15  Q.   You left Pepperidge Farm in about -- well,
16  your testimony I think is you believe it was sometime
17  in April of 2002, April or May, is that what you think?
18  A.   Yes.
19  Q.   Okay. But it could have been at the very end
20  of March as well?
21  A.   I don't remember.
22  Q.   Okay. Do you remember being called in for a
23  meeting with Beth DeCarlo?
24  A.   Who is that?
25  Q.   She was the woman who sat behind the desk in

1  A.  I'm not sure what my status is right now
2  exactly. The lawyer will tell me.
3  Q.  Do you have a work authorization?
4  A.  The IRS gave me a tax number, working tax
5  number, and I'm authorized to work.
6  Q.  Okay. Do you know when you received the tax
7  number?
8  A.  In 2000 they sent the tax number or 2001.
9  Q.  Okay.
10 A.  I'm not sure.
11 Q.  Did you ever consider moving to the
12 Bloomfield plant?
13 A.  If the Norwalk plant closed, I would have
14 went to Bloomfield. They pay good money.
15 Q.  When you quit your job, how did you notify
16 the job that you were quitting?
17 A.  I called them and told them that I wouldn't
18 go back.
19 Q.  Who did you call?
20 A.  You can leave a message on the machine if no
21 one picks up.
22 Q.  And what did you say about why you were
23 quitting?
24 A.  I didn't give them a reason. I just said --
25 I don't remember exactly. I either said I'm just

1    leaving, there's no reason, or I might have said I
2    found another job.
3        Q.    Had you found another job at the time you
4    quit?
5        A.    I was part-time.
6        Q.    At Victoria's Secret?
7        A.    Yes.
8        Q.    Now, you testified before lunch that
9    Mr. Arocho's behavior improved after September, after
10   you made the complaints, is that correct?
11       A.    Yes.
12       Q.    So in October of 2001, he did not make any
13   improper -- he did not engage in any improper behavior
14   toward you, correct?
15       A.    Yes.
16            THE TRANSLATOR:    She said he was still
17       my boss, but he did not.
18       Q.    And so from October until the time you quit,
19   which was either end of March or April, he did not
20   engage in any improper behavior?
21       A.    Yes, he didn't continue his behaviors, but I
22   didn't feel good about it.  I didn't feel good.
23       Q.    And you didn't feel good because you wanted
24   him fired, right?
25       A.    No, I didn't want him fired, necessarily.  I

1    help us.
2        Q.    Okay.  Who is we?
3        A.    Me and Sofia.
4        Q.    Okay.  Did Sofia suggest to you that you
5    should go to a lawyer?
6        A.    No, together.  We decided together.
7        Q.    When did you decide to seek a lawyer?
8        A.    After we complained and nothing happened.
9    After awhile.  I can't remember exactly how long.
10       Q.    Well, when you say nothing happened, what do
11   you mean, nothing happened?
12       A.    That he wasn't punished.
13       Q.    Meaning he wasn't fired?
14       A.    No.  That wasn't necessary, but they could
15   have punished him.
16       Q.    What other kind of punishment did you think
17   would have been appropriate?
18       A.    They could have punished him, for example, by
19   making him not work for a month or something.  That's
20   just an example.
21       Q.    Did you talk with Sofia about the kind of
22   punishment that you thought would be appropriate?
23       A.    That's not in my power.
24       Q.    But did you talk with her about what you
25   wanted to have done?

# EXHIBIT I



Pepperidge Farm, Incorporated • Norwalk, Connecticut 06856 • Telephone (203) 846-7000

## POLICY ON SEXUAL HARASSMENT

Sexual harassment in the employment relationship or related to conditions or terms of employment is a violation of the laws against employment discrimination. Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Accordingly, it is the policy of Pepperidge Farm, Inc. that all employees have a right to work in an environment free from any type of sexual harassment, and that any conduct in violation of this policy results in appropriate disciplinary action up to and including dismissal.

Any employee or applicant for employment who believes that he or she has been subjected to acts of sexual harassment should inform a member of management, preferably the resident human resources executive who will assure that prompt and appropriate action is taken to relieve the situation. All information provided in connection with a complaint of sexual harassment will be kept strictly confidential. No employee or applicant will be penalized for complaining or cooperating in an investigation of alleged incident of sexual harassment.

David L. Albright
President

January 1, 1997
PERMANENT NOTICE
DO NOT REMOVE

**PEPPERIDGE FARM INCORPORATED • NORWALK, CONNECTICUT 06851 • TELEPHONE (203) 846-7000**

# ANTI-HARASSMENT POLICY

Pepperidge Farm, Incorporated will not tolerate any form of harassment, including sexual harassment, in its workplace, or directed at its employees wherever they may be working. It is the Policy of Pepperidge Farm, Incorporated that all employees have a right to work in an environment free from any type of harassment, and that any conduct in violation of this Policy will result in appropriate disciplinary action up to and including dismissal. Harassment in the employment relationship or related to conditions or terms of employment is also a violation of federal and state laws that prohibit employment discrimination.

Sexual harassment includes, but is not limited to, unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual or gender-focused nature when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting the individual; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance, or creating an intimidating, hostile or offensive working environment. Some examples of what may constitute sexual harassment are: threatening or taking adverse employment action if sexual favors are not granted; demands for sexual favors in exchange for preferential treatment; unwelcome flirtations, proposition or advances; unwelcome physical contact; whistling, leering or improper gestures or offensive remarks; sexual jokes or other inappropriate use of sexually explicit or offensive remarks and language; the display in the workplace of sexually suggestive objects, photographs, cartoons, and pictures; and making comments that have the intent or effect of calling attention to gender differences or demeaning others based on their gender. This list is not intended to be all-inclusive. Harassment on the basis of any other protected characteristic, such as race or national origin, is also strictly prohibited.

Any employee or applicant for employment who believes that he or she has been subjected to acts of harassment is strongly encouraged to report it promptly, before the conduct becomes severe or pervasive. A report can be made to the employee's supervisor or manager, the senior Human Resources Department executive at the employee's location. Individuals should not feel obligated to file their complaints with their immediate supervisor first before bringing the matter to the attention of one of the other designated representatives identified above.

When a report is received, Pepperidge Farm, Incorporated will undertake a prompt, thorough and impartial investigation as appropriate under the circumstances. Confidentiality will be maintained throughout the investigation process to the extent practical and consistent with the Company's need to undertake an appropriate investigation. Upon completion of the investigation, Pepperidge Farm, Incorporated will take appropriate action required by the situation and communicate the outcome of the investigation to the reporting employee or applicant.

Individuals found to have engaged in misconduct constituting workplace or sexual harassment will be disciplined as appropriate, up to and including dismissal. Discipline imposed under this Policy may include, but is not limited to, written reprimands, referrals to counseling, withholding of compensation or promotion, reassignment, suspension, and/or the termination of employment.

Pepperidge Farm, Incorporated will not retaliate against any individual who makes a report of harassment or cooperates in an investigation, nor will it permit any of its employees to do so. Any incident of retaliation against a person making a complaint of workplace or sexual harassment should be promptly reported, and will be investigated using the procedures outlined in this Policy. Any person found to have engaged in any retaliatory conduct will be subject to appropriate disciplinary action as described in this Policy.

January 2000

**PERMANENT NOTICE
DO NOT REMOVE**

David L. Albright
President

P 00462



WORLD HEADQUARTERS
1 Campbell Place
Camden, New Jersey 08103-1799

## ANTI-HARASSMENT POLICY

Campbell Soup Company will not tolerate any form of harassment, including sexual harassment, in its workplace, or directed at its employees wherever they may be working. It is the policy of Campbell Soup Company that all employees have a right to work in an environment free from any type of harassment, and that any conduct in violation of this Policy will result in appropriate disciplinary action up to and including dismissal. Harassment in the employment relationship or related to conditions or terms of employment is also a violation of federal and state laws that prohibit employment discrimination.

Sexual harassment includes, but is not limited to, unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual or gender-focused nature when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting the individual; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance, or creating an intimidating, hostile or offensive working environment. Some examples of what may constitute sexual harassment are: threatening or taking adverse employment action if sexual favors are not granted; demands for sexual favors in exchange for preferential treatment; unwelcome flirtations, propositions or advances; unwelcome physical contact; whistling, leering or improper gestures or offensive remarks; sexual jokes or other inappropriate use of sexually explicit or offensive remarks and language; the display in the workplace of sexually suggestive objects, photographs, cartoons, or pictures; and making comments that have the intent or effect of calling attention to gender differences or demeaning others based on their gender. This list is not intended to be all-inclusive. Harassment on the basis of any other protected characteristic, such as race or national origin, is also strictly prohibited.

Any employee or applicant for employment who believes that he or she has been subjected to acts of harassment is strongly encouraged to report it promptly, before the conduct becomes severe or pervasive. A report can be made to the employee's supervisor or manager, the senior Human Resources Department executive at the employee's location, the Manager of Diversity programs located at World Headquarters, or the Vice President - Human Resources. Individuals should not feel obligated to file their complaints with their immediate supervisor first before bringing the matter to the attention of one of the other designated representatives identified above.

When a report is received, Campbell Soup Company will undertake a prompt, thorough and impartial investigation as appropriate under the circumstances. Confidentiality will be maintained throughout the investigation process to the extent practical and consistent with the Company's need to undertake an appropriate investigation. Upon completion of the investigation, Campbell Soup Company will take appropriate action required by the situation and communicate the outcome of the investigation to the reporting employee or applicant.

Individuals found to have engaged in misconduct constituting workplace or sexual harassment will be disciplined as appropriate, up to and including dismissal. Discipline imposed under this policy may include, but is not limited to, written reprimands, referrals to counseling, withholding of compensation or promotion, reassignment, suspension, and/or the termination of employment.

Campbell Soup Company will not retaliate against any individual who makes a report of harassment or cooperates in an investigation, nor will it permit any of its employees to do so. Any incident of retaliation against a person making a complaint of workplace or sexual harassment should be promptly reported, and will be investigated using the procedures outlined in this Policy. Any person found to have engaged in any retaliatory conduct will be subject to appropriate disciplinary action as described in this Policy.

Douglas R. Conant
President and Chief Executive Officer

February 2001

# Campbell SOUP Company

\* \* \* \*  WORLD HEADQUARTERS  \* \* \* \*
1 Campbell Place
Camden, New Jersey 08103-1799

## EQUAL EMPLOYMENT OPPORTUNITY POLICY

Campbell Soup Company, an equal opportunity employer, prohibits discrimination against applicants for employment and employees on the basis of race, color, sex, sexual orientation, national origin, marital status, veteran status, disability, age, religion or any other characteristic protected by law. The Company is committed to equal opportunity in all aspects of the employment relationship including, but not limited to, recruiting, hiring, training, promotion, compensation, transfer, layoff, recall and all other terms, conditions and privileges of employment.

Campbell Soup Company will employ and advance people in accordance with their individual abilities and make reasonable accommodation for disabilities and religious needs.

The principles of equal employment opportunity and diversity in the workforce correlate with "Our Guiding Values" of Campbell Soup Company. We want to attract and retain bright and talented people from diverse backgrounds and experiences, producing and complementing an effective and productive Campbell team. Shared successes and growth of the Company result from enhancing and utilizing the talents and abilities of our employees, giving them opportunities to work to their fullest potential. I have personally directed management personnel to establish appropriate means of informing applicants and employees of this policy to ensure effective dissemination and implementation of programs and processes to everyone.

Donna J. Smith, Director of Diversity Programs, under the direction of the Vice President – Human Resources, has been designated as the Company coordinator of Equal Employment Opportunity Programs and activities established under my authority.

I encourage all applicants or employees to seek opportunities for employment or advancement within Campbell Soup Company. Every request will receive fair and equitable consideration. Relevant portions of the Affirmative Action Plan may be reviewed during normal business hours by contacting your Human Resources Representative.

February 2001

Douglas R. Conant
**President and Chief Executive Officer**



\* \* \* \*  WORLD HEADQUARTERS  \* \* \* \*
1 Campbell Place
Camden, New Jersey 08103-1799

## EQUAL EMPLOYMENT OPPORTUNITY POLICY

Campbell Soup Company, an equal opportunity employer, prohibits discrimination against applicants for employment and employees on the basis of race, color, sex, sexual orientation, national origin, marital status, veteran status, disability, age, religion or any other characteristic protected by law. The Company is committed to equal opportunity in all aspects of the employment relationship including, but not limited to, recruiting, hiring, training, promotion, compensation, transfer, layoff, recall and all other terms, conditions and privileges of employment.

Campbell Soup Company will employ and advance people in accordance with their individual abilities and make reasonable accommodations, which do not create an undue hardship for the Company, for disabilities and religious needs.

The principles of equal employment opportunity and diversity in the workforce correlate with the overall concept of 'Campbell Valuing People'. We want to attract and retain bright and talented people from diverse backgrounds and experiences, producing and complementing an effective and productive Campbell team. Shared successes and growth of the Company result from enhancing and utilizing the talents and abilities of our employees, giving them opportunities to work to their fullest potential. I have personally directed management personnel to establish appropriate means of informing applicants and employees of this policy to ensure effective dissemination and implementation of programs and processes to everyone.

Donna J. Smith, Corporate Director - Diversity, under the direction of the Rick Pogue, Senior Vice President – Human Resources, has been designated as the Company coordinator of Equal Employment Opportunity Programs and activities established under my authority.

I encourage all applicants or employees to seek opportunities for employment or advancement within Campbell Soup Company. Every request will receive fair and equitable consideration. Relevant portions of the Affirmative Action Plan may be reviewed during normal business hours by contacting your Human Resources Representative.

January 2002

Douglas R. Conant
**Douglas R. Conant**
**President and Chief Executive Officer**



WORLD HEADQUARTERS
1 Campbell Place
Camden, New Jersey 08103-1799

## ANTI-HARASSMENT POLICY

Campbell Soup Company will not tolerate any form of harassment, including sexual harassment, in its workplace, or directed at its employees wherever they may be working. It is the policy of Campbell Soup Company that all employees have a right to work in an environment free from any type of harassment, and that any conduct in violation of this Policy will result in appropriate disciplinary action up to and including dismissal. Harassment in the employment relationship or related to conditions or terms of employment is also a violation of federal and state laws that prohibit employment discrimination.

Sexual harassment includes, but is not limited to, unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual or gender-focused nature when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting the individual; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance, or creating an intimidating, hostile or offensive working environment. Some examples of what may constitute sexual harassment are: threatening or taking adverse employment action if sexual favors are not granted; demands for sexual favors in exchange for preferential treatment; unwelcome flirtations, propositions or advances; unwelcome physical contact; whistling, leering or improper gestures or offensive remarks; sexual jokes or other inappropriate use of sexually explicit or offensive remarks and language; the display in the workplace of sexually suggestive objects, photographs, cartoons, or pictures; and making comments that have the intent or effect of calling attention to gender differences or demeaning others based on their gender. This list is not intended to be all-inclusive. Harassment on the basis of any other protected characteristic, such as race, religion, disability status or national origin, is also strictly prohibited.

Any employee or applicant for employment who believes that he or she has been subjected to acts of harassment is strongly encouraged to report it promptly, before the conduct becomes severe or pervasive. A report can be made to the employee's supervisor or manager, the senior Human Resources Department executive at the employee's location, the Corporate Director - Diversity located at World Headquarters, or the Senior Vice President - Human Resources. Individuals should approach one of these designated representatives with whom they feel most comfortable speaking, for whatever reason, and should not feel obligated to file their complaints with their immediate supervisor.

When a report is received, Campbell Soup Company will undertake a prompt, thorough and impartial investigation as appropriate under the circumstances. Confidentiality will be maintained throughout the investigation process to the extent practical and consistent with the Company's need to undertake an appropriate investigation. Upon completion of the investigation, Campbell Soup Company will take appropriate action required by the situation and communicate the outcome of the investigation to the reporting employee or applicant.

Individuals found to have engaged in misconduct constituting harassment will be disciplined as appropriate, up to and including dismissal. Discipline imposed under this policy may include, but is not limited to, written reprimands, referrals to counseling, withholding of compensation or promotion, reassignment, suspension, and/or the termination of employment.

Campbell Soup Company will not retaliate against any individual who makes a good faith report of harassment or cooperates in an investigation, nor will it permit any of its employees to do so. Any incident of retaliation against a person making a complaint of harassment should be promptly reported, and will be investigated using the procedures outlined in this Policy. Any person found to have engaged in any retaliatory conduct will be subject to appropriate disciplinary action as described in this Policy.

January 2002

_Douglas R. Conant_
Douglas R. Conant
President and Chief Executive Officer