UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| | \* | |
| TWANYA PRESLEY, MARINA | \* | CIVIL ACTION |
| GIANNAKOVA and SOFIA | \* | |
| TSAHARIDES | \* | NO: 3:02CV2157(AVC) |
|     \* | | |
|       Plaintiffs, | \* | |
| | \* | |
|   v. | \* | |
| | \* | |
| PEPPERIDGE FARM, INC., a subsidiary | \* | |
| of THE CAMPBELL SOUP COMPANY, | \* | |
| THE CAMPBELL SOUP COMPANY and | \* | |
| ROBERT AROCHO, Individually | \* | |
| | \* | |
|       Defendants. | \* | MARCH 5, 2004 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CORPORATE DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RULE 37 SANCTIONS

Pursuant to Rule 37(a)(2)(A) and (a)(4)(A) of the Federal Rules of Civil Procedure, the

Defendants Pepperidge Farm, Inc ("Pepperidge Farm" or the "Company") and Campbell Soup

Company (collectively the "Corporate Defendants") respectfully move that this Court order

Plaintiff Marina Giannakova and/or her attorney to pay the Corporate Defendants sanctions in

the amount of $22,441.48. In support of this Motion, the Corporate Defendants represent the

following:

1.        In the Complaint, Plaintiff Marina Giannakova affirmatively states that

she is a legal resident of the United States. See Complaint ¶ 15. Her

claim for damages includes "back pay, front pay, employee benefits,

1

social security benefits, and interest." Among other things, Ms. Giannakova also alleges that she was constructively discharged from her employment. See Complaint ¶ 15.

2.    The Corporate Defendants had a good faith belief that Plaintiff Giannakova was not a legal resident of the United States and that she was, in fact, an illegal alien. The basis for this belief was that just prior to Ms. Giannakova's resigning from Pepperidge Farm, the Company received a "mismatch" letter from the Social Security Administration indicating that Ms. Giannakova, along with some other employees, had used social security numbers that did not match their names. The Company asked Ms. Giannakova to report to the Social Security Administration ("SSA") with her card and to report back to the Company. Before reporting to the SSA, Ms. Giannakova quit her job.

3.    The issue of Ms. Giannakova's immigration status is relevant to her claim for economic damages. The Supreme Court has held that an undocumented alien who is not authorized to work in the United States is not entitled to back pay. Hoffman Plastic Compounds, Inc. v. National Labor Relations Board, 122 S.Ct. 1275, 1283-84 (2002). On or about May 12, 2003, Defendants filed their First Set of Requests for Production of Documents. Request Number 1 sought "any and all documents that support or relate to your claims of damages in this case." In response to

that request, Ms. Giannakova produced doctor's records and W-2 Forms. These documents were produced on or about August 25, 2003.

4.  The issue of Ms. Giannakova's immigration status is also relevant to her claim of constructive discharge, as well as her credibility as a witness. The Corporate Defendants believed she left the Company because of the Company's inquiries into her immigration status after receiving the SSA notice. If an employer unknowingly hires an unauthorized alien, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status. Hoffman Plastic Compounds, Inc. v. National Labor Relations Board, 122 S.Ct. 1275, 1283 (2002). The Company immediately terminated the other employees who admitted to having used fraudulent social security numbers to obtain employment with the Company. Ms. Giannakova left the Company before being terminated.

5.  At her deposition taken on April 22, 2003, Ms. Giannakova testified that she was not sure what her current immigration status was but that she was authorized to work in the United States. See Deposition of Marina Giannakova, dated April 22, 2003, at pp. 105-06, attached hereto as Exhibit 1.

6.  On September 8, 2003, Defendants filed a Second Set of Requests for Production, specifically seeking documents to support Ms. Giannakova's claim that she was a legal resident of the United States and that she was

authorized to work in the United States.  (These Requests also asked for Plaintiff Sophia Tsaharides' immigration records.  In response, she produced a legitimate work authorization document).

7.    Although Ms. Giannakova produced some documents in response to Defendants' requests, Ms. Giannakova never produced any documents to support her assertions that she was a legal resident and that she was authorized to work in the United States.  Yet she continued to assert that she was a legal resident, authorized to work in the United States, and that she was entitled to economic damages.

8.    On or about  October 24, 2003, Defendants filed a Motion to Compel in connection with discovery non-compliance by all three  plaintiffs.

9.    A telephone conference was scheduled with Judge Covello on Defendants' Motion to Compel on January 22, 2004.  Prior to the conference, undersigned counsel for Defendants, Patricia E. Reilly, and Plaintiffs' Counsel, John I. Bolton, discussed the outstanding discovery issues, and in particular the ongoing problem of Ms. Giannakova's immigration status and lack of documentation.  Mr. Bolton agreed to produce Ms. Giannakova for a deposition relating to her immigration status. In light of this agreement, Attorney Reilly agreed not to go forward on the Motion to Compel.

10.     Prior to the deposition, Defendants' counsel subpoenaed the records of
Ms. Giannakova's immigration counsel. Defense counsel had also
conducted its own independent investigation. After reviewing Ms.
Giannakova's immigration file and as a result of its own investigation,
defense counsel concluded that Ms. Giannakova was in fact an illegal
alien.

11.     At her deposition on February 12, 2004, faced with the overwhelming
evidence of her illegal status, Ms. Giannakova finally admitted that she is
an illegal alien. She also admitted to having a fraudulent social security
card and that she learned it was fraudulent in May 2002. She filed this
lawsuit in December 2002, when she knew her social security number was
false and that she was not a legal resident. She also used the social
security number when she knew it was fraudulent on her I-9 form for her
current employer, Victoria's Secret. She further admitted to lying on her I-
9 form for her current employer by affirmatively swearing under penalty
of perjury that she is a United States citizen. In addition, Ms. Giannakova
testified that at the instruction of her immigration attorney's assistant, she
destroyed her fraudulent social security card. She further testified that she
destroyed the card some time in January 2004. Thus, Ms. Giannakova
destroyed her fraudulent social security card after defendants had
explicitly requested that she produce it in their September 8, 2003 Second

Request for Production of Documents. <u>See</u> Deposition of Marina
Giannakova, dated February 12, 2004 (draft), pp. 30:1-31:16; 37:1-38:6;
38:23-40:9; 61:23-65:13; 79:8-80:15, attached hereto as Exhibit 2.

12.     Directly after the February 12, 2004, deposition, and at various points
thereafter, undersigned counsel communicated with Attorney Bolton about
how he was going to proceed in light of Ms. Giannakova's admission. At
some point, Mr. Bolton indicated that he would be filing a dismissal with
prejudice of Ms. Giannakova's claims. Attorney Bolton sent the
undersigned counsel a copy of a voluntary dismissal with prejudice
pursuant to Rule 41(a)(1). The dismissal indicated that Defendants agreed
to the dismissal. Undersigned counsel contacted Attorney Bolton to notify
him that Defendants had never specifically agreed to the voluntary
dismissal, although Defendants had no objection to the dismissal provided
the Court first consider this Motion for Sanctions. Thereafter, undersigned
counsel suggested to Attorney Bolton that he file a Motion for Dismissal
pursuant to Rule 41(a)(2). To date, undersigned counsel has not received
a motion for dismissal and upon information and belief, no motion for
dismissal has been filed.

13.     As illustrated in Exhibit A attached to the Affidavit of Patricia E. Reilly in
Support of Corporate Defendants' Motion for Rule 37 Sanctions, the
Corporate Defendants were required to expend thousands of dollars in fees

and costs to investigate Marina Giannakova's immigration status.  None of this would have been necessary had Ms. Giannakova not lied about her immigration status -- in her Complaint and during a year's worth of discovery.  It was only after thousands of dollars of attorney time and investigation, including a Motion to Compel dated October 24, 2003, that Ms. Giannakova finally admitted in her deposition on February 12, 2004 that she is an illegal alien.

**WHEREFORE,** pursuant to Rule 37(a)(2)(A) and (a)(4)(A) of the Federal Rules of Civil Procedure, the Corporate Defendants respectfully move that this Court order Plaintiff Marina Giannakova and/or her attorney to pay the Corporate Defendants sanctions in the amount of $22,441.48.

THE DEFENDANTS,

PEPPERIDGE FARM, INC., A SUBSIDIARY OF THE CAMPBELL SOUP COMPANY, THE CAMPBELL SOUP COMPANY AND ROBERTO AROCHO, INDIVIDUALLY

By: _____
Patricia E. Reilly ct08352
TYLER COOPER & ALCORN, LLP
205 Church Street
New Haven, Connecticut 06509-1910
Phone: (203)-784-8233
Fax:    (203) 865-7865
E-mail:  reilly@tylercooper.com

-- Their Attorneys --

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - x
:
TWANYA PRESLEY, MARINA GIANNAKOVA,
SOFIA TSAHARIDES,                        :

          Plaintiffs,          :

      vs.                               :   Civil Action
                            No. 302CV2157
PEPPERIDGE FARMS, INC., a subsidiary     :   (AVC)
OF THE CAMPBELL SOUP COMPANY,
ROBERTO AROCHO, Individually,            :

         Defendants.           :

- - - - - - - - - - - - - - - - - - - x


         Deposition of MARINA GIANNAKOVA,

taken pursuant to the Federal Rules of

Civil Procedure, at the law offices of

Tyler Cooper & Alcorn, 205 Church Street,

New Haven, Connecticut, before Janet C.

Phillips, License #00124, a Registered

Professional Reporter and Notary Public in

and for the State of Connecticut, on Tuesday,

April 22, 2003, at 9:40 a.m.

1    the office, behind the counter in the office?

2         A.    Yes, the accountant.

3         Q.    What did she call you in to talk about?

4         A.    She wanted my Social Security number.

5         Q.    And did you provide her with your Social

6    Security number?

7         A.    Yes, I gave it to her and she made a copy.

8         Q.    And then did anyone ask you for additional

9    documentation after that meeting?

10        A.    No.

11        Q.    Okay.  Did you have any concerns about your

12   meeting with Beth DeCarlo?

13        A.    No.  She just asked me for the paper.

14        Q.    And what is your current immigration status?

15   You had testified earlier that you were -- you had

16   applied for a green card in 1999, is that right?

17        A.    My lawyer is doing that now.

18        Q.    Okay.

19        A.    It's in the process.

20        Q.    Who is your immigration lawyer?

21        A.    It used to be Williams, and now -- Richard

22   Williams, and now I'm not sure what his name is.  I

23   changed my lawyer, but I'm not sure of his name.

24        Q.    Okay.  Do you know what your immigration

25   status is right now?

1          A.    I'm not sure what my status is right now

2      exactly.    The lawyer will tell me.

3          Q.    Do you have a work authorization?

4          A.    The IRS gave me a tax number, working tax

5      number, and I'm authorized to work.

6          Q.    Okay.   Do you know when you received the tax

7      number?

8          A.    In 2000 they sent the tax number or 2001.

9          Q.    Okay.

10         A.    I'm not sure.

11         Q.    Did you ever consider moving to the

12     Bloomfield plant?

13         A.    If the Norwalk plant closed, I would have

14     went to Bloomfield.   They pay good money.

15         Q.    When you quit your job, how did you notify

16     the job that you were quitting?

17         A.    I called them and told them that I wouldn't

18     go back.

19         Q.    Who did you call?

20         A.    You can leave a message on the machine if no

21     one picks up.

22         Q.    And what did you say about why you were

23     quitting?

24         A.    I didn't give them a reason.   I just said --

25     I don't remember exactly.   I either said I'm just

## C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _____ day of _____, 2003.


                                    _____
                                    Janet C. Phillips
                                    Notary Public
                                    CSR License #00124
My Commission expires:
October 31, 2006

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - -x

TWANYA PRESLEY, MARINA GIANNAKOVA,      :

SOFIA TSAHARIDES                        :

                                        :

                                        :

VS                                      : 3:02 CV

                                        : 2157(AVC)

                                        :

PEPPERIDGE FARM, INC., a subsidiary of :

THE CAMPBELL SOUP COMPANY, THE          :

CAMPBELL SOUP COMPANY, ROBERTO AROCHO   :

- - - - - - - - - - - - - - - - - - - -x

THIS IS A ROUGH DRAFT COPY

Deposition of MARINA GIANNAKOVA taken pursuant to

the Federal Rules of Civil Procedure, before Jacinda

A. Grigaitis, Licensed Shorthand Reporter #00381 and

Notary Public within and for the State of Connecticut,

held at the offices of Tyler, Cooper & Alcorn, 205

Church Street, New Haven, Connecticut, on February 12,

2004, at 10:36 a.m.

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CT 06443
HARTFORD          203 245-9583          STAMFORD

2

12    A.  It was 2002 in July when I prepared the papers.

13    Q.  And you went to the IRS and they issued you a

14    tax ID number?

15    A.  No.  They sent it to me.

16    Q.  They sent it.  Okay.  In October of 2002?

17    A.  When I went there in July, they told me that I

18    should receive it in about a month, maybe two months.

19    And I went there and I said I didn't receive anything.

20    And I had to refile all the papers again, and I went

21    back to the IRS.  And after that they sent me this.

22    Q.  Okay.  So by October of 2002 you had a tax ID

23    number?

24    A.  Yes.

25    Q.  Could you hand me that?  And is that your

30

1    signature at the bottom?

2    A.  Yes.

3    Q.  And can you read for me in English the line

4    above it?  Can you do it?

5    A.  This last line?

6    Q.  Just the line right before signature?

7    A.  This one here.  (In English) To be used for tax

8    purposes only.

9    Q.  Do you understand the word "tax"?

10    A.  This is what you pay.

11    Q.  And you understood you needed that number for

12    you to pay taxes?

13        A.   Yes.   They told me that too.

14        Q.   Did they tell you anything else?

15        A.   They told me that you cannot use this for

16    working purposes.

17        Q.   Okay.   In 1996 when you came to the United

18    States with your husband, did you go to work?

19        A.   He did.   Not me.

20        Q.   Okay.   I'm not interested in your husband.

21        A.   (In English) I'm sorry.

22        Q.   So you did not work in 1996?

23        A.   No.   I wasn't working.   But I took care of two

24    babies, and I worked a few months in -- I'll tell you

25    now, Pizza -- Pizza Bravo in Canton, Connecticut and

                                                          31


1    where he was working also because his sister owned

2    this business.

3              MS. BUCAR:   Could you mark this, please.

4         (Defendants' Exhibit 5 was marked for

5                     identification.)

6              MS. BUCAR:   The record should reflect that

7         the deponent was reading from what I've marked

8         now as Defendants' Exhibit 5.

9         A.   (In English)   Yes.   Uh-huh.

10    BY MS. BUCAR:

11        Q.   This piece of paper does not refer to you.

12    Social Security card?

13        A.   My husband brought this to my house.

14        Q.   And your testimony is he brought you a blank

15    Social Security card and you signed it then?

16                MR. BOLTON:   Objection.

17                MS. BUCAR:   It's noted.

18        A.   Yes.

19    BY MS. BUCAR:

20        Q.   What's the -- what are the two documents

21    underneath?   Is that your the driver --

22        A.   The European driver's license.

23        Q.   It's a European driver's license; that's not

24    your passport.   Correct?

25        A.   No.   That's my passport.

37

1        Q.   Okay.   When did you come to learn that your

2    Social Security card was a fake Social Security card?

3        A.   In 2002 when -- in 2002 when they returned my

4    income tax.

5        Q.   Who returned your income tax?

6        A.   I assume it was from Social Security office.

7    When I filed for income tax, in February I prepared

8    the income tax, in two months they came back.   And at

9    that time I learned -- and at that time I learned that

10    the number and the name don't match.

11        Q.   Did you ever -- did you also learn that your

12  Social Security card itself was a fake?

13      A.  Yes.  After they told me.  When I went to

14  Social Security office, they told me.

15      Q.  They told you your Social Security card was a

16  fake?

17      A.  No.  They told me that this is not your number

18  and your -- number and your name don't match.

19      Q.  Did you show them the card?

20      A.  Yes, I did.

21      Q.  And is it your testimony that they didn't tell

22  you you actually had a counterfeit card?

23      A.  They told me that it is not the proper number

24  or proper card.

25      Q.  When they told you that it wasn't a proper

                                                        38

1   number and a proper card, did you understand that to

2   mean it was a fake Social Security card?

3       A.  I understood.

4       Q.  And that was in February of 2002?

5       A.  No.  February when I prepared the income taxes.

6   It was May of 2002.

7       Q.  So as of May of 2002, just so I understand --

8       A.  In May I went and asked.

9       Q.  And you were told in May of 2002 that that

10  wasn't your number that your card was a fake?

11      A.  They didn't tell me exactly that it was a fake,

12    but I did understand that something was wrong.

13        Q.  Did they take your card away from you?

14        A.  No.  That's why I started thinking, What's

15    going on?

16        Q.  What Social Security office did you go to?

17        A.  In Norwalk.

18            MR. BOLTON:  Before you ask the next

19            question, I just need a two-minute break.

20            MS. BUCAR:  Okay.  Sure.

21    (There was a recess taken from 11:46 to 11:52 a.m.)

22    BY MS. BUCAR:

23        Q.  What did you actually do with the Social

24    Security card that you had?

25        A.  (In English)  The lawyer told me destroy it.

                                                    39

1    Sorry.

2            MS. BUCAR:  That's okay.  She answered in

3            English.  That's all right.

4            THE WITNESS:  (In English)  Sorry.  I'm

5            confused.

6    BY MS. BUCAR:

7        Q.  That's okay.  The lawyer is Brian Cotter?

8        A.  And the person that has my papers whose name

9    Fernando, Fernando is the one that's holding my files.

10        Q.  Is Fernando in Brian Cotter's office?

11        A.  Yes.

12      Q.  Whenever it's easier, if you'd prefer to answer

13  my question in English, you should go right ahead.

14      A.  If I don't understand I'll ask again.

15         (There was a discussion held off the record.)

16  BY MS. BUCAR:

17      Q.  Okay.  Back on the record.  So Attorney Cotter

18  is the one who told you to destroy the Social Security

19  card.  Correct?

20      A.  No.  Exactly it was Fernando who told me.

21      Q.  And Fernando is in Attorney Cotter's office?

22      A.  Yes.

23      Q.  Is Fernando an attorney?

24      A.  He's a helper.

25      Q.  Okay.  Did he tell you you should destroy it

                                                    40

1  because it was a counterfeit?

2      A.  Yes.

3      Q.  And when was this?

4      A.  It was about a couple weeks.

5      Q.  In January of 2004.  Correct?

6      A.  Yes, I think.

7      Q.  So sometime in January 2004 you destroy the

8  card?

9      A.  Yes.

10      Q.  Okay.  Because Fernando told you it was a

11  counterfeit?

12    working there?

13    A.  It is the right one.

14    Q.  I just wanted to make sure.

15    A.  It's the right one.

16    Q.  So 2002 is the right date.  And I'm sorry.  You

17    probably answered this question.  But is that your

18    signature on the line?

19    A.  Yes.

20    Q.  And this time under -- you gave that Social

21    Security number again, didn't you, 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?

22    A.  Yes.

23    Q.  And you gave that Social Security number on

24    this form in or around December 29, 2002.  Correct?

25    A.  Yes.

63

1    Q.  And you knew in December of 2002 that that

2    Social Security number wasn't a good Social Security

3    number?

4    A.  I knew that the number doesn't match, but I

5    didn't know that it was a fake.

6    Q.  And you've testified earlier in middle of 2002

7    you knew that this number was not a good number.

8    A.  Yes.

9    Q.  In fact of in May of 2002 you knew that.

10    A.  Yes.

11    Q.  And you testified earlier that you knew that

12    you shouldn't use that number again.

13         A.  I knew.

14         Q.  And in December of 2002, in order to get this

15    job, you used the number.  Correct?

16         A.  Yes.

17         Q.  And you knew that was a false number?

18         A.  I had to work in order to live.

19         Q.  I understand.  But you knew it was a false

20    number is my question.

21         A.  Yes.

22         Q.  And you knew -- I'm sorry.  And you knew when

23    you signed your name there Marina Giannakova that you

24    were aware that giving a false statement was -- was a

25    violation of the law?

                                                          64


1          A.  Yes, I understand that.

2          Q.  And if you look just at the box to the right of

3     where it says that, again, I attest under penalty of

4     perjury.

5          A.  Where is it?

6              MR. BOLTON:  Higher, go higher.

7              MS. BUCAR:  It's right next to the --

8              MR. BOLTON:  Above your signature.

9              MS. BUCAR:  To the right of that.

10         A.  Yes, I understand.

11    BY MS. BUCAR:

12    Q.  And there you checked off -- what did you check

13  off this time?

14    A.  I don't know what it says.  Shall I read it?

15    Q.  Yes.  You can't read the copy, is that what the

16  problem is?

17    A.  It's a little blurry.  Citizen or national of

18  the United States.  I thought that this number gave me

19  the right that I had to gain work.

20    Q.  That number you knew did not give you the right

21  to be called a citizen of the United States?

22    A.  I understand that.

23    Q.  Okay.  But you checked off citizen of the

24  United States?

25    A.  Well, yes.  But I had to do something in order

65

1  to work.  It's my mistake.

2    Q.  Okay.  But you knew that it was false when you

3  checked it off?  That's my only question.

4    A.  Yes.  It was my mistake.

5    Q.  Well, a mistake is something you do without --

6  because you don't know any better but you knew you

7  weren't a citizen of the United States.

8    A.  But if you're hungry and you have nobody, what

9  else can you do?

10    Q.  I understand that.  You needed to work.

11    A.  Exactly.

12      Q.  And so you gave a false statement on this form?

13      A.  Yes.  Exactly.

14          (Defendants' Exhibit 11 was marked for

15                      identification.)

16   BY MS. BUCAR:

17      Q.  I'm showing you Defendants' Exhibit 11.  Have

18   you seen this document before?

19      A.  Yes.  My lawyer has this.

20      Q.  Okay.  So you've looked at this document

21   before?

22      A.  Yes.

23      Q.  Okay.  And this is the document that actually

24   is applying for a green card for you.  Correct?

25      A.  Yes.

                                                    66

1       Q.  And if you look at the last page, it will tell

2    you the date of this document.  Can you read for the

3    record the date?

4       A.  (In English)  The last one over here?

5       Q.  Yes.  Well, they're both the same date.

6       A.  12/16/03.

7       Q.  Correct.  So this was just prepared very

8    recently for your green card application.  And if you

9    look at the front page, Ms. Giannakova, the very first

10   page, the information on Part 3 which refers to you,

11   you notice where the Social Security number goes, your

12    legal resident of the United States?

13         A.   Yes.   That's what I thought I was.

14         Q.   You knew that in 2002 you had stayed over your

15    visa?

16         A.   Yes.   I did know.

17         Q.   So you knew you overstayed your visa which

18    meant that you were not legal?

19         A.   I -- I thought that if you had this number, it

20    didn't mean that you were not legal.

21         Q.   In 2002, three years after your authorized

22    stayed by the INS is up, your testimony under oath is

23    that as long as you had a Social Security card, you

24    were here legally?

25         A.   That -- that it gives you the right to work and

                                                              79


1     you have permission to work.

2          Q.   That you're a legal resident of this country?

3          A.   That's what I think.

4          Q.   And you're also saying that you thought that

5     because you had a right to work, that made you a legal

6     resident?

7          A.   That's what I thought.

8          Q.   Would you look at the date of this complaint

9     please?   It's right at the first page, just the date.

10         A.   December 6, 2002.

11         Q.   December 6, 2002.   By December 6, 2002, you

12    knew your Social Security number was false?

13        A.  Yes.  I did know.

14        Q.  And when you told Attorney Bolton that you were

15    a legal resident of Connecticut and of the United

16    States, that you were a legal resident in December of

17    2002, you didn't tell him the truth?

18        A.  It's not -- it's not exactly like that.  That's

19    why I went to IRS to fix my papers.

20        Q.  Let's do this simply because this is the last

21    part of my questions to you.  Okay?  You testified a

22    zillion times under oath today that the reason you

23    thought you were here legally was because you had a

24    Social Security card.  Correct?

25        A.  I thought so, yes.

                                                              80

1         Q.  Okay.  I'm only asking you what you believed.

2     In February, March, or April, somewhere in there, your

3     taxes were returned?

4         A.  Yes.

5         Q.  And you learned that your Social Security

6     number was not correct?

7         A.  Yes.

8         Q.  In fact, that it was false?

9         A.  Yes.  It was wrong.

10        Q.  So by May, mid-2002 you knew that?

11        A.  Yes.

12    Q.  Okay.  And you already told us that when you

13  went to Victoria's Secret in order to work, you put

14  down the false Social Security number?

15    A.  Yes.  Yes.  Exactly.

16    Q.  When you went to see Attorney Bolton and he

17  filed a lawsuit for you in December of 2002, you knew

18  the Social Security number was false?

19    A.  That's why I said I'm trying to fix my papers.

20    Q.  I understand that, but what you told Attorney

21  Bolton was that you were a legal resident of the

22  United States?

23    A.  But I told him that I don't have a green card.

24    Q.  Well, we won't get into that.  Off the record.

25      (There was a discussion held off the record.)

                                                    81


1  BY MS. BUCAR:

2    Q.  We're on the record.  You didn't go to Attorney

3  Bolton for your green card, did you?

4    A.  No, I didn't.

5    Q.  Because you knew Attorney Bolton is not an

6  immigration attorney?

7    A.  Twanya Presley recommended him.

8    Q.  Recommended Attorney Bolton?

9    A.  Yes.  They introduced us.

10    Q.  So attorney -- I mean Twanya Presley introduced

11  you Attorney Bolton; she sent you to Attorney Bolton?

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been sent via first class mail, postage

prepaid to all counsel and pro se parties of record as follows:


John I. Bolton, Esquire
The Bolton Law Firm
360 Fairfield Avenue, Suite 200
Bridgeport, Connecticut 06604


on this 5th day of March 2004.


Patricia E. Reilly ct08352