UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT



FILED

2004 APR 23  P  4: 20

DISTRICT COURT
HARTFORD CT

| | | |
|---|---|---|
| TWANYA PRESLEY | : | CIVIL ACTION |
| MARINA GIANNAKOVA | : | |
| SOFIA TSAHARIDES | : | |
| (Plaintiffs) | : | NO.:3:02CV2157(AVC) |
| | : | |
| V. | : | |
| | : | |
| | : | |
| PEPPERIDGE FARMS, INC. | : | |
| a subsidiary of THE CAMPBELL | : | |
| SOUP COMPANY | : | |
| THE CAMPBELL SOUP | : | |
| COMPANY and ROBERTO AROCHO, | : | |
| Individually | : | |
| (Defendants) | : | APRIL 23, 2004 |

## PLAINTIFFS' MEMORANDUM OF LAW
## OBJECTING TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

This action was brought by TWANYA PRESLEY (hereinafter "Presley"), MARINA

GIANNAKOVA (hereinafter "Giannakova") and SOFIA TSAHARIDES ("Tsaharides"),

three (3) female employees formerly employed by Pepperidge Farm, Inc., ( hereinafter

"Pepperidge Farm"), a subsidiary of Campbell Soup Company, (hereinafter "Campbell

Soup"). All three (3) Plaintiffs were gainfully employed at Pepperidge Farm's industrial

bakery formerly located in Norwalk, Connecticut.[1]

As a result of certain acts which took place between 2000 and 2002, Plaintiffs

---

[1] Presently there is a Rule 41 Motion seeking a voluntary dismissal of Marina Giannakova's claims against all Defendants. To the extent that this individual's relevancy to this action is discussed herein, the facts pertaining to her claims are set forth for anecdotal purposes *only* rather than objecting to Defendants' Motion for Summary Judgment. In addition, for background purposes it is also noted that Pepperidge Farm relocated its industrial bakery to Bloomfield Connecticut approximately 9 months ago.

brought this suit in 15 counts alleging statutory and pendent claims arising from multiple and continual incidents of sexual harassment by their common supervisor, Defendant, Robert Arocho, (hereinafter "Arocho"). On January 30, 2004, Defendants brought a motion for summary judgment seeking to dismiss Plaintiffs' Complaint in its entirety. By way of this Memorandum of Law, Plaintiffs object to Defendants' Motion and seek a denial of the same with the exception Count Nine and Fourteen and Sofia Tsaharides' claim in Count Five for Title VII retaliation.

## II.    STATEMENT OF FACTS

For the sake of brevity and economy, Plaintiffs rely upon and direct and refer this Court to Plaintiffs Local Rule 56(a)1 Statement of Material Facts in Dispute attached to the front of this Brief in Opposition to Defendants' Motion for Summary Judgment.

## III.    ARGUMENT OF LAW

### A.    Standard of Review

In general, when deciding that summary judgment is appropriate, the Court must determine that there is no genuine issue of material fact, taking the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including, but not limited to, affidavits. Following such a finding, the moving party is entitled to judgment as a matter of law. See, Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994).

However, more specific to the case presently before this Court, the Second Circuit has recognized that summary judgment may be inappropriate in some sexual harassment cases where questions persist as to whether the conduct at issue amounts to sexual harassment. Distasio v.Perkin Elmer Corp., 157 F.3d 55, 64 (2d Cir. 1998).

Summary judgment should be used "<u>sparingly</u>" when, as is often the case in sexual

harassment claims, state of mind or intent are at issue. <u>Dister v. Continental Group, Inc.</u>

859 F.2d 1108, 1114 (2d Cir. 1988) (Emphasis added). "The dangers of robust use of

summary judgment to clear trial dockets are particularly acute in current sex

discrimination cases." <u>Gallagher v. Delaney</u>, 139 F.3d 338 (2d Cir. 1998).

    The Second Circuit's cautionary language relative to summary judgment in

sexual harassment cases has defined the applicable standard of review where a court

should examine the record as a whole, just as a jury would, to determine whether a jury

could reasonably find an invidious discriminatory purpose on the part of an employer.

<u>Howley v. Town of Stratford</u>, 217 F.3d 141, 151 (2d Cir. 2000); <u>Stern v. Trs. of</u>

<u>Columbia Univ.</u>, 131 F.3d 305, 314 (2d Cir. 1997). To this extent, this Court's scrutiny

must extend to "the entire record to determine whether the plaintiff could satisfy his

`ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff.' " <u>Schnabel v. Abramson</u>, 232 F.3d 83, 90 (2d Cir.

2000) (quoting <u>Reeves v. Sanderson Plumbing Prods.</u>, Inc., 120 S. Ct. 2097, 2106

(2000). Thus, "if there is any evidence in the record from any source from which a

reasonable inference could be drawn in favor of the nonmoving party, summary

judgment is improper." <u>Howley</u>, 217 F.3d at 151. (Emphasis added).

    Overall, this Court's function in weighing the merits of the Defendants' omnibus

Motion for Summary Judgment is not to reconcile any disputed issues of fact as set

forth herein. <u>Rule v. Brine, Inc</u>. , 85 F.3d 1002, 1011 (2d Cir. 1996). Rather the inquiry is

confined to a determination as to whether there are genuine issues to be tried. Id.

Assessments of the Plaintiffs' credibility, the weight of their evidence submitted and the

existence of the parties' conflicting versions of the events while employed at

Pepperidge Farm are matters, ultimately, for the jury, and not for a court on summary

judgment. Rodriguez v. City of New York , 72 F.3d 1051, 1061, 1063-64 (2d Cir. 1995).

Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for

the court on summary judgment. United States v. Rem , 38 F.3d 634, 644 (2d Cir.

1994).

In light of the clearly defined standards as set forth above, granting any portion

of the Defendants' Motion for Summary Judgment, under the set of facts unique to this

matter, would contradict and negate the established principles of this Court.

Accordingly, Defendants' motion must be denied.

**B.**    **Summary Judgment is Wholly Inappropriate in this Matter as Issues of Material Fact Remain in Dispute Relative to Plaintiffs' Hostile Work Environment Claims**

Paragraphs 26(A)(I), 27(B)(I) and 28(C)(I) of Plaintiffs' Complaint allege that

during their tenure of gainful employment with Pepperidge Farm they were subjected to

a continuing course of offensive and crude conduct perpetuated upon them by their

immediate supervisor, Defendant Arocho. Notwithstanding the ambiguous existence

and questionable dissemination of an established sexual harassment policy[2],

Defendants' deviations from their own established protocol, *inter alia*, in responding to

Plaintiffs' complaints deprives them of any claim for relief pursuant to the affirmative

---

[2] Defendants' submission to the CHRO dated February establishes confusion as to which policy was in effect at the time of the acts complained of by Plaintiffs. See **Exhibit B** wherein Defendants supplied the CHRO with a copy of an outdated Sexual Harassment Policy which was supposedly replaced by a revised policy appearing on both Campbell Soup letterhead, as well as Pepperidge Farm's.

defenses which have been interposed in this action. Furthermore, the acts of

harassment to which Plaintiffs were subjected while employed at Pepperidge Farm

exceeded the acceptable boundaries under which Title VII operates.

1.    **Corporate Defendants are not entitled to the benefit of the**
     ***Ellerth/Faragher* Affirmative Defense**

The Defendants accurately represent in their brief that the Supreme

Court's two holdings in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998)

and Faragher v. Cityof Boca Raton, 524 U.S. 775 (1998) redefined the standards

under which liability may be imputed to an employer relative To a supervisor's

act(s) of sexual harassment. Specifically, the Supreme Court coined new

terminology in Title VII lexicon  - "*tangible employment actions*" - to describe one

specific circumstance in which employers are automatically liable for supervisor

harassment. A tangible employment action constitutes a significant  change in

employment status, such as hiring, firing, failing to promote, effectuating

reassignment with significantly different responsibilities, or a decision causing

a significant change in benefits. Ellerth at 761. This new approach represents an

extension from previous Second Circuit holdings governing employer liability in *quid*

*pro quo* harassment cases requiring plaintiff to prove, as a core element, that

certain response to a supervisor's sexual demands was used as the basis for

decisions affecting a plaintiff's terms of employment. Jin v. Metro. Life Ins. Co., 310

F.3d 84,1592 (2d Cir. 2002) (quoting Ellerth, 524 U.S. at 761-62).

Notwithstanding the above, the Ellerth and Faragher cases further identify a

second class of cases where an existing agency relationship between an employer

and an offending supervisor imposes liability upon an employer from the creation of

a hostile work environment. Ellerth, at 763, Faragher, at 803.  Under this scenario a

supervisor may yet expose an employer with liability despite the absence of a

tangible employment action as a result of the perception that the supervisor has the

ability to impose unwelcome sexual conduct on subordinates all with the employer's

authority. Ellerth. at 763 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S.2557,

77 (1986).  Counteracting a seemingly lower standard of proof for plaintiffs, the

Supreme Court balanced the playing field by providing a defendant-employer with

an affirmative defense to liability or damages. Faragher, at 803, 807. The affirmative

defense comprises the two following necessary elements: "**(a)** that the employer

exercised reasonable care to prevent and correct promptly any sexually harassing

behavior, and **(b)** that the plaintiff employee unreasonably failed to take advantage

of any preventive or corrective opportunities provided by the employer or to avoid

harm otherwise." Ellerth, at765 (1998); Faragher, at 807.

> a.  **The "*Tangible Employment Actions*" taken against the Plaintiffs impose strict liability upon the Defendants and deprive them from obtaining summary judgment and further invoking the *Ellerth/Faragher* defense**

Plaintiffs each allege differing experiences concerning alteration in the terms

and conditions of their gainful employment resulting from Arocho's sexual

harassment. See, Complaint at ¶¶ 26(A)(xiii, xix, xxi, xxii, xxiii, xxiv), 27(B)(xi)(xii). To

the extent that the Defendants attempt to confine the definition of *tangible*

*employment action* to the claim(s) of constructive discharge and direct economic

harm, such a proposition is excessively exclusive and without merit. Specifically,

Presley alleges that **(a)** she was denied a promotion/reassignment to the Quality Assurance Department at the Norwalk Facility as a result of a poor evaluation given to the hiring supervisor of that unit by Arocho. She was subsequently not hired for the Quality Assurance opportunity despite her prior experience in that area of the plant;[3] **(b)** she was forced to interface with Arocho during the pendency, or immediately after the investigation and its immediate aftermath up through her constructive discharge in March 2002[4]; **( c )** she was given a tardiness designation without just cause by Arocho and further directed by him to log in writing for days her whereabouts in the Norwalk Plant some 2-3 months after her allegations surfaced; **(d)** no other employees were subjected to a similar disciplinary measure which was ultimately stopped when Pepperidge's Human Resources Manager became aware of this situation. See. e.g. Macionus Deposition, at Vol. I, page 164; **(e)** approximately four months after the allegations of sexual harassment were investigated she was the recipient of a threat of bodily injury from Arocho's wife - also a Pepperidge Farm employee - which was conveyed to Presley by a team leader working the same shift as Plaintiffs and Arocho.

---

[3] Nearly three (3) years after the fact, Defendants attach the Affidavit of Steve White as **Exhibit C** to their Motion for Summary Judgment in an effort to dispel any allegation that Presley was the recipient of a *tangible employment action*. However, conspicuously absent from the internal investigation Pepperidge *"thoroughly and promptly"* pursued in response to Presley's complaints was an inquiry into the substance of the negative recommendation provided by Arocho to S. White.

[4] Compare ¶ 21 of **Exhibit E** Affidavit of Paul Macionus to Deposition of Paul Macionus, pgs. 163 and 167. The incongruity of the two statements are patent and representative of the inadequacy of the corporate Defendants' response to Presley's complaints.

In broad terms, District Courts have interpreted <u>Faragher</u> and <u>Ellerth</u> to hold that "a tangible employment action constitutes a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Ellerth</u>, at 761. The tangible employment action is "the means by which the supervisor brings the official power of the enterprise to bear on subordinates." Id. at 762. Notwithstanding the Defendants' narrow application of this concept to the facts at hand in asserting "a tangible employment action in most cases inflicts direct economic harm," <u>Ellerth</u> At 762, there is no requirement that it must always do so. Both <u>Faragher</u> and <u>Ellerth</u> include examples of tangible employment actions that involve economic benefit, such as "hiring" and "promotion," or possibly no economic effect at all, such as "undesirable reassignment" and "reassignment with significantly different responsibilities." <u>Ellerth</u>, at 761,  <u>Faragher</u>, at 808; see also <u>Meritor</u>, 477 U.S. at 64 ("[T]he language of Title VII is not limited to 'economic' or 'tangible' discrimination."); <u>Durham Life Insurance Co. v. Evans</u>, 166 F.3d 139, 153 (3d Cir. 1999) (economic harm is not the "sine qua non" of a tangible employment action).

The Supreme Court's analysis of agency principles in <u>Ellerth</u> looms large in this case and illustrates why the facts at hand meet the *tangible employment action* threshold. <u>Ellerth</u> at 761-62. Arocho's good standing and reputation for efficiency, hard work and productivity at Pepperidge Farm since 1979 endowed this supervisor with the nearly unchecked ability to make decisions, some economic, that affected the terms and conditions of Plaintiffs' employment at the Norwalk plant. Specifically,

Arocho had the discretion to post schedules, and on one occasion failed to offer Tsharides the opportunity to report to work only months after she complained about his offensive conduct. During the Summer of 2001, Arocho also conditioned Giannakova's request for a day off by requesting a kiss from her before he would consider granting the same.[5]  However, more disturbing, that as Plaintiffs' direct supervisor, Arocho could require Plaintiffs to report to his private office where he could continue to perpetrate and carry on his abuses. The very fact that Arocho was Plaintiffs' direct supervisor only further supports the claim that his ability to behave in the manner he did resulted from his being Pepperidge Farms' agent.

Finally, it is worth noting in the context of analyzing Plaintiffs' claims of *tangible employment action*, the Supreme Court observed that requiring an employee to engage in unwanted sex acts is conduct that can only be characterized as "appalling" and "especially egregious". Harris v. Forklift Systems, Inc., 510 U.S. 17, 22 (1993).  Given the lack of ambiguity in Harris, Plaintiffs contend that Arocho's conduct, especially in Presley's claims, rose to the level of a quid pro quo for which courts have traditionally held employers liable clearly his behavior within the ambit of "tangible employment action" a articulated by the Supreme Court in Faragher and Ellerth.

As a result of the foregoing, the Defendants are precluded, as a matter of law, from invoking the *Ellerth/Faragher* Affirmative Defense.

> **b.    Even if this Court finds no existence of *tangible employment action*, the Defendants are not entitled to the *Ellerth/Faragher* Affirmative Defense**

---

[5] See, fn. 1.

Defendants seek to invoke a special defense consisting of a two-pronged test that provides a defending employer with relief and avoidance of liability for the sexually harassing conduct of a supervisor directed toward a subordinate if it can evidence the vitality of the following necessary elements: **(a)** that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and **(b)** that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Ellerth, at765 (1998); Faragher, at 807.

The facts germane to Plaintiffs' claims in this regard illuminate Defendants' failure to meet the requisite criteria to successfully benefit from this defense, let lone prevail on summary judgment. Each elemental component prong of the will be discussed, *infra.*

### 1.    Defendants' sexual/anti harassment policy was inadequate and set forth a protocol which Defendants failed to follow

In Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998), the Second Circuit held that when a direct supervisor who has the responsibility under established company policy to report or stop harassment, knew of and failed to act against it, the plaintiff has no further obligation to bring it to the employer's attention.

In this applying this principle to the case at bar, Defendants' remedial obligation to Plaintiffs was twofold. First, Pepperidge had to act both to end any ongoing harassment and deter future harassment in the workplace. Distasio, at 61. If the employer's remedial obligation ended when the victim quit or was fired, then cases of egregious harassment could go unpunished, sending the wrong message to the harasser and other employees. Id. In order for remedial action to be deemed

appropriate or adequate, the action must be reasonably calculated to prevent future harassment. Knabe v. Boury Corp., 114F.3d 407, 412 (3rd Cir. 1997).

Equally important to the reasoning in both Ellerth and Faragher, was the Supreme Court's emphasis on Title VII's intent to foster the implementation of anti-harassment policies and effective procedures for pursuing work related grievances. Ellerth, at 2270; Faragher, at 2292. Taken a step further, an effective sexual harassment policy will help diminish the incidence of sexual harassment in the workplace, and also help create an environment of dignity and respect in which individuals can succeed at their work. See, Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (quoting Henson v. Dundee, 682 F.2d 897, 902 (11th Cir. 1982));

Any limitations on employer liability that stem from Title VII's preventive goals must therefore result from genuine, effective workplace programs — not simply paper policies designed to thwart litigation. See, Derasmo v. Gainesville, 78 FEP Cases 384 (N.D. Fla. 1998). By the same token, that an employer exercised the core component of reasonable care to prevent and correct promptly any sexually harassing behavior under the *Ellerth/Faragher* Affirmative Defense such care directed at preventing prevent sexual harassment requires more than forcing all new employees to sign a policy or simply read an employee handbook . Lancaster v.Sheffler Enterp., 19 F. Supp. 2d 1000, 1003 (W.D. Mo. 1998).

Given the facts In the instant case, it remains clear that the Corporate Defendants failed in their obligations to the Plaintiffs to maintain and enforce an adequate policy under the law. Consider the following:

●Pepperidge Farm was on notice in early August 2001, from the moment

Donald Miller, a supervisor, was advised by Presley that Arocho was sexually harassing her. Yet this supervisor either violated company policy by not reporting the same as he was required or simply never received the requisite training from Human Resources to fully understand the mandates of the policy. See, **Exhibit D:** Macionus Depo. pgs 137, 138 and 143.

●In its response to the CHRO dated February 25, 2002, Defendants attached **Exhibit E** (1997 Pepperidge Farm, Inc. Sexual Harassment Policy) as evidence of the existence of an effective policy in place at the Norwalk Plant. Yet, as **Exhibit F** illustrates, there were clearly other versions of this policy in circulation at the same time Defendants represented **Exhibit E** as being the governing policy. To the extent that the evidence presented herein provides a question of ambiguity as to which of the multiple policies directed Defendants' employees, their assertion that they maintained an effective anti-harassment policy must fail as a matter of law. See, Derasmo, supra.

●For a policy to meet the threshold criteria of an effective policy "in place", it should designate at least one official outside the employee's chain of command to receive complaints. See Distasio, supra. Yet, Pepperidge's Manager of Human Resources conceded under oath that no established framework for the actual making of a complaint (formal v. informal complaint)(procedure for conducting investigation). See, See, **Exhibit D:** Macionus Depo. Vol. II pg. 81.

Given the existence of the ambiguous nature in which complaints were to be reported, the abject failure of a supervisor to follow policy protocol coupled with a question of fact as to which anti-harassment policy governed the Norwalk plant in 2001, Defendants are not entitled to claim the benefit of any recognized affirmative defense.

### 2.    Defendants' internal investigation of Plaintiffs' complaints were neither objective, prompt nor thorough

In sexual harassment actions, courts have shown a willingness to scrutinize the nature of the investigation process, as well as the actual investigators in assessing the merit of an employer's interposing the *Ellerth/Faragher* Special Defense. In Bennett v. Progressive Corp., 225 F. Supp.2d 190 (N.D.N.Y. 2002), the court found genuine issues of material fact as to whether the employer conducted its investigation in an ineffective and inadequate manner. Issues such as prior

relationships with management could have the appearance of undermining the overall integrity of the investigation itself. Bennett, supra.

One especially troubling aspect of Defendants' investigation centers on one investigators' personal relationship with a company employee who was especially cited in the Presley investigation as a corroborating witness to comments and conduct attributed to this Plaintiff. While the acts and events attributed to Presley bore no relationship whatsoever to the focus and purpose of the investigation, the very source and citation of the same cast further doubts on the objectivity and integrity of Defendants' purported investigation. See, Sanchez-Allende, Depo. **Exhibit I**, pgs.143, 144, 193,194 & 195.

Further to the above, Plaintiffs contend that the Defendants were acutely aware of the existence of two (2) other female employees also subjected to Arocho's abuse from the outset of Presley's investigation. See, **Exhibit C** -transcript of cassette. Tellingly, despite Pepperidge Farm's knowledge of the allegations brought by Giannakova and Tsaharides, no information or evidence was ever sought from these individuals for the purpose of investigating Presley's claims of harassment. Further eroding Defendants' credibility is the fact that some three (3) weeks had elapsed before Defendants' Human Resources department acted upon the information provided. While the Presley investigation was at least clothed with statements, notes, audible recordings, and some attempts at inquiry, the same cannot be said for whatever investigations were commenced on behalf of Giannakova and Tsaharides. The disparity between the investigatory process as

among the Plaintiffs is most noteworthy and represents a question of fact that is wholly inappropriate for adjudication by way of summary judgment.

If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate. <u>Richardson v. New York State Dept. of Corr. Serv.</u>, 180 F.3d 426, 438 (2d Cir. 1999).

**3.    To the extent that Plaintiffs maintained an obligation to report their complaints of harassment a second time to Defendants, at all times they cooperated and availed themselves to the preventative and remedial measures allegedly available to them**

As there is no dispute that a supervisor who had the responsibility under established company policy to report or stop Presley's harassment, yet failed to act against it, Presley had no further obligation to bring Arocho's conduct to Defendants' attention after August 3, 2001. Furthermore, given Defendants' patent failure to promptly respond to the awareness of Giannakova and Tsaharides as potential witnesses or complainant's it would be illogical under the remedial intent of Title VII to defeat Tsaharides' claim when, in fact, there was never legitimate preventative and remedial measures available to her in the first place.

**4.    Defendants' conduct rise to the level of seriousness proscribed by Title VII**

Determining whether harassment causes a hostile work environment involves an application of the facts--the specific discriminatory conditions alleged by the plaintiff--to the law. Such mixed questions of law and fact are "especially well-suited

for jury determination and summary judgment may be granted only where

application of the law to the undisputed facts reasonably supports only one ultimate

conclusion." See Richardson at 439).

        The Supreme Court has held that a Title VII hostile environment claim can

succeed only where the conduct at issue is so severe or pervasive that it creates an

objectively hostile or abusive work environment and where the victim subjectively

perceives the environment to be abusive. See Harris, at 21-22 (1993). To prevail on

summary judgment, an employer must establish that no reasonable jury could find

that the victim subjectively perceived her environment to be hostile and abusive and

that a reasonable person who was the target of such sexual harassment would find

the conditions so severe and pervasive as to alter the terms and conditions of

employment and create an abusive working environment. See Howley, at 153 (2d

Cir. 2000); Richardson, 180 F.3d at 4364 In other words, to establish a claim under

a hostile work  nature, a hostile environment analysis does not lend itself to a

mathematically precise test and there is neither a threshold magic number of

harassing incidents that give rise, without more, to liability as a matter of law, nor a

number of incidents below which a plaintiff fails as a matter of law to state a claim."

Williams v. Board of Hudson River/Black River Regulating Dist., No. 99cv-1282,

2001 U.S. Dist. Lexis 16124, at * 13 (N.D.N.Y. Sept. 23, 2001) (quoting Richardson,

180 F.3d at 439). "Although a continuing pattern of hostile or abusive behavior is

ordinarily required to establish a hostile environment, a single instance can suffice if

it is sufficiently egregious." Ferris v. Delta Air Lines, 277 F.3d 128, 135 (2d Cir.

2001).

As a general rule, the totality of the circumstances must be considered and the quantity, frequency and severity of the incidents must be evaluated. See Schwapp, 118 F.3d at 111. In addition, to obtain a realistic view of the working environment the court should also consider whether the conduct was physically threatening or humiliating, whether it unreasonably interfered with the plaintiff's work, and whether it caused any psychological harm. See, Quinn v. Green Tree Credit Corp., 159 F.3d 759, 767-68 (2d Cir. 1998).See Ferris at 135 (noting that a single incident of hostile or abusive behavior can suffice to create a hostile environment if it is sufficiently severe) (citing Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995)) ("Even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive environment for purposes of Title VII liability").

In viewing the allegations set forth in Plaintiffs' complaint in their its totality and in a light most favorable to them, coupled with the evidence as set forth in this objection, this Court cannot conclude as a matter of law that Arocho's conduct was not so severe and pervasive as to alter the terms and conditions of Plaintiffs' employment for the worse.


C.      **Sufficient Facts Exist to Maintain *Only* Presley's Claim for Retaliation Under The Rubric of Title VII**

Title VII prohibits an employer from discriminating against any of its employees in response to an employees opposition any practice made an unlawful employment practice under state or federal law, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing under 42 U.S.C. § 2000e-3(a). See, 42 U.S.C. § 2000e-3(a).

To establish a prima facie case of such retaliation, the plaintiff must show: **(1)** participation in a protected activity; **(2)** that the defendant knew of the protected activity; **(3)** an adverse employment action; and **(4)** a causal connection between the protected activity and the adverse employment action. Gordon v. New York City Bd. of Educ., 232 F.3d 111, 113 (2d Cir. 2000). Moreover, the plaintiff must have had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988).

Presley contends that the interpretation and applicability of a Title VII claim for retaliation as suggested by the defendants and adopted by the Second Circuit have a significant chilling effect on an employee's use of Title VII remedial.

Concurrent with Presley's participation in the protected activity of pursuing and exhausting her administrative remedies, she was disciplined in for being adjudged tardy when she was not and further directed by Arocho to document in writing for days her whereabouts in the Norwalk Plant some 2-3 months after her allegations surfaced. No other employees were subjected to similar disciplinary measures which was ultimately stopped when Pepperidge's Human Resources Manager became aware of this situation. See **Exhibit D:** Macionus Deposition, at Vol. I, page 164; However, given the fact that discipline is a tangible employment action allegedly within the purview of the Defendants' Human Resources Department, a legitimate material question in dispute exists with regard to the causal connection between the protected activity and the adverse employment action taken

against Presley.

**D.    Sufficient Evidence Exists to Establish a Prima Facie Case to sustain
Plaintiffs' Claims of Discrimination on the Basis of Sex**

To show that she was subjected to sex discrimination by virtue of a hostile

work environment, Presley must ultimately prove conduct on the part of Defendants

that **(1)** was objectively' severe or pervasive that created an environment that a

reasonable person would find hostile or abusive, **(2)** that the plaintiff subjectively

perceives as hostile or abusive and **(3)** that creates such an environment because of

plaintiff's sex.  Gregory v. Daly, 243 F.3d 687, 691-92 (2d Cir. 2001).

The level of inquiry this Court must assign to this specific attempt by the

Defendants to dispose Plaintiffs' Count Eight can be distilled to whether, as the

Supreme Court has consistently found that it is the use of an individual's sex or

race which sets the terms or conditions of employment that is within Title VII's

purview, regardless of whether such discrimination is part of a broader

discriminatory pattern. Connecticut v. Teal, 457 U.S. 440, 453-54 (1982).

Simply stated, what matters in the end is not how Pepperidge Farm treated

other employees of a different sex at the Norwalk plant, but how Pepperidge Farm

would have treated the Plaintiffs had they been of a different sex, race, or

nationality. Carson v. Bethlehem Steel Corp., 82 F.3d 157, 158 (7th Cir. 1996).

Any weighing of the evidence is the prerogative of the finder of fact, not an

exercise for the court on summary judgment. United States v. Rem, 38 F.3d 634,

644 (2d Cir. 1994).

**E.      Sufficient Evidence Exists to Establish a Prima Facie Case to sustain Plaintiffs' Claims of Misrepresentation**

Whether evidence supports a claim of fraudulent or negligent misrepresentation is a question of fact. Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 791-94 (1999). It is sufficient that the representations made to Plaintiffs contained false information. Citino v. Redevelopment Agency, 51 Conn. App. 262, 273–74, 721 A.2d 1197 (1998). In order to recover damages there must be a justifiable reliance on the misrepresentation for a plaintiff to recover damages. Id. More specifically, proof must be established that the Defendants supplied false information to Plaintiffs with regard to the existence of an effective harassment policy and that it would be implemented concurrent with a fair and objective investigation would be undertaken in response to their complaints against Arocho. Daley at 791-94; D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 217-219 (1987), citing 3 Restatement (Second) Torts § 552 (1979). Second, the Plaintiffs must prove that the Defendants failed to exercise reasonable care in obtaining or communicating the information. Id. Third, the plaintiff must prove that the defendant supplied the information to induce the plaintiff to act on it. Id. Fourth, the plaintiff must prove that the plaintiff justifiably relied on the information to his/her/its injury. Id.

Clearly, the Defendants represented to the plaintiffs, by way of the company handbook or the posting of the policy  that they had a policy prohibiting sexual discrimination and harassment in the workplace, and that plaintiffs could work in an environment free of such conduct. Defendants further represented that they had a policy in place setting forth procedures for complaints regarding harassment and

that such complaints would be taken seriously without reprisal or retaliation. To the extent that Pepperidge Farm's Human Resources department and/or its  or agents knew or should have reasonably have known that some or all of the above described representations were in fact untrue, false and misleading, Plaintiffs were damaged by participating in a process that, for all intents and purposes, were wholly inadequate and well below the bar of acceptable employment practices. By the same token, Plaintiffs justifiably and reasonably relied upon such representations in **(1)** working for the defendants and in **(2)** complying with requests for information relative to their complaints as alleged herein.

**F.**    **Claims Based Upon Assault and Battery**

Plaintiffs do not interpose any objection to this portion of Defendants' Motion for Summary Judgment and consent to the entry of an order disposing of claims brought under this theory.

**G.**    **Sufficient Evidence Exists to Establish a Prima Facie Case to sustain Plaintiffs' Claims of Negligent and Intentional Infliction of Emotional Distress**

**1.    Defendants' conduct relative to all of the acts complained rise to the level of intentional infliction of emotional distress**

A claim of intentional infliction of emotional distress requires a plaintiff to prove the following elements: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." <u>Campbell v. Plymouth</u>, 74

Conn. App. 67, 77, 811 A.2d 243 (2002). Conduct on the part of the defendant that

is merely insulting or displays bad manners or results in hurt feelings is insufficient

to form the basis for an action based upon intentional infliction of emotional

distress."Appleton v. Board of Education, 254 Conn. 205, 211, 757 A.2d 1059

(2000). Moreover, liability is found only where the conduct has been so outrageous

in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community. Generally, the case is one in which the recitation of the facts to an

average member of the community would arouse his resentment against the actor

and lead him to exclaim, 'Outrageous!' . . .Conduct on the part of the defendant that

is merely Liability for intentional infliction of emotional distress requires conduct that

exceeds all bounds usually tolerated by decent society." Appleton, at 310-311.

Bombalicki v. Pastore, 71 Conn. App. 835, 839–40, 804 A.2d 856 (2002).

Plaintiffs concede that as an initial threshold matter, whether the Defendants'

conduct is sufficient to satisfy the requirement that it be extreme and outrageous is

initially a question for the court to determine with the caveat that in instances where

reasonable minds differ, then does it become an issue for the jury. Bombalicki, at

839–40.

In this case an analysis of **(1)** Arocho's conduct must undertaken by the Court

to ascertain whether his conduct toward the Plaintiffs exceeded the bounds of what

is tolerable by our society and **(2)** whether the Corporate Defendants' in responding

to Plaintiffs' complaints and lack of follow up was extreme and severe. Given that

Plaintiffs, at one point, sought some form of treatment for the humiliation and

indignity they suffered at various points during the period covering the acts for which they complain, it is contended that this query should ultimately determined by the trier of fact.

> ### 2.    Defendants' conduct relative to all of the acts complained rise to the level of negligent infliction of emotional distress

To establish a claim of negligent infliction of emotional distress, the plaintiff must prove the following elements: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." Carrol v. Allstate Ins. Co., 262 Conn. 433, 444, 815 A.2d 119 (2003).

For the reasons set forth above  it is contended that any disposition of this cause of action should ultimately determined by the trier of fact.

### H.    Plaintiffs Have Ample Evidence to Submit to a Trier of Fact Claims Brought Under A Theory of Civil Conspiracy

The contours of a 'civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff.' Williams v. Maislen, 116 Conn. 433, 437, 165 A. 455 (1933)." Marshak v. Marshak, 226 Conn. 652, 665, 628 A.2d 964 (1993), overruled on other grounds, State v. Vakilzaden, 251 Conn. 656, 660, 742 A.2d 767 (1999).

Under Connecticut law, technically speaking, "there is no such thing as a civil

action for conspiracy. The action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself." Cole v. Associated Construction Co., 141 Conn. 49, 54, 103 A.2d 529 (1954); see also 16 Am. Jur. 2d 275–76, Conspiracy § 50 (1998). A claim of civil conspiracy, therefore, is "insufficient unless based on some underlying cause of action. Marshak v. Marshak, supra, 226 Conn. 665. Consequently, for a plaintiff to recover on a conspiracy claim, the court must "find the facts necessary to satisfy the elements of an independent underlying cause of action." Id. More specifically, where the plaintiff is unable to establish the underlying cause of action for fraud, the cause of action for conspiracy to defraud must also fail. Harrell v. 20th Century Ins. Co., 934 F.2d 203, 208 (9th Cir. 1991); McLemore v. Ford Motor Co., 628 So. 2d 548, 550–51 (Ala. 1993); Ray v. Atkins, 205 Ga. App. 85, 90 421 S.E.2d 317, 321, cert. denied, 205 Ga. App. 901 (1992).

    In Count Eight of Plaintiffs of Plaintiffs' Complaint an action invoking this Court's pendent jurisdiction has been brought alleging misrepresentation. It is Plaintiffs core theory that the act of misrepresentation to all Plaintiffs provided the genesis for the bringing of this specific count. In developing the relevant facts to this count (as well as the 8th Count), the existence of debilitating facts exist for which Defendants have yet to provide any response resembling a modicum of credibility. The issues are as follows:

    1. Despite assertions to the contrary, Defendants received timely and critical information concerning two (2) other female employees who were subjected to sexual harassment from Arocho. This information was highly material to the fledgling Presley investigation as Pepperidge Farm's HR investigators received the same within 24 hours of commencing this initial inquiry.

2. As a result of the foregoing, the entire process under which the Plaintiffs claims were responded to by Defendants was tainted from the outset. The ramifications of this development have been throughout this entire memorandum objecting to summary judgment.

3. However, to further conceal the taint under which this entire affair was handled at the initial investigatory level, certain representations were made to fact finding tribunals that continued to perpetuate the existence of valid defenses to (I) Arocho's conduct and (ii) the Corporate Defendants' internal handling of the Plaintiffs' claims at the Norwalk plant.

4. In turn, the misrepresentations that were initially made to Plaintiffs in the Fall of 2001, as set forth in Count 8, yielded a harvest of litigation culminating in not only Title VII claims, but the 15th Count sounding in misrepresentation.

5. In addition to information contained on the cassette tape, representations made to the CHRO relative to the Defendants' response to Plaintiffs' complaints contained significant omissions. See attached **Exhibit H** which was provided to Defendants during the discovery phase of this action.

As a result of the foregoing, Plaintiffs posit that there is sufficient evidence creating material facts and issues in dispute for which a jury must be allowed to absorb and assess.

## IV.    **CONCLUSION**

With the exception of Tsaharides' claim for retaliation and all Plaintiffs' claims brought under a theory of assault and battery, Plaintiffs respectfully request that this Court deny Defendants' Motion for Summary Judgment.

PLAINTIFFS

BY

John I. Bolton, Esq. Ct 08892
The Bolton Law Firm, P.C.
360 Fairfield Avenue, Suite 200
Bridgeport, CT 06604-3911
Telephone: (203) 362-1955
Facsimile: (203) 362-1954
Their Attorney

## CERTIFICATION

It is hereby certified that a copy of the foregoing was hand delivered this 26th day of April, 2004 to all counsel of record and pro se parties, as follows:

Patricia E. Reilly
Elizabeth K. Andrews
TYLER COOPER & ALCORN, LLP
205 Church Street
New Haven, CT 06509-1910

John I. Bolton, Esq. ct08892