UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TWANYA PRESLEY and | : | |
| SOFIA TSHARIDES, | : | |
|   Plaintiffs, | : | |
| VS. | : | Civil No.  3:02CV2157 (AVC) |
| | : | |
| PEPPERIDGE FARM, INC., a subsidiary | : | |
| of THE CAMPBELL SOUP COMPANY, | : | |
| THE CAMPBELL SOUP COMPANY | : | |
| and ROBERT AROCHO, individually | : | |
|   Defendants. | | |

**RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This is an action for damages and equitable relief brought pursuant to Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991 ("Title

VII"), and Conn. Gen. Stat. § 46a-60 et seq.  The plaintiffs, Twanya Presley and Sofia Tsharides,

allege that their former employer, Pepperidge Farm, Inc., and its supervisor, Robert Arocho,

subjected them to a gender hostile working environment and sexual discrimination.  In addition,

Presley alleges that the defendants retaliated against her for complaining of sexual harassment in

the workplace.  Both plaintiffs also allege violations of common law precepts concerning

negligent misrepresentation, civil conspiracy, intentional infliction of emotional distress, and

negligent infliction of emotional distress.

The defendants now move pursuant to Rule 56 of the Federal Rules of Civil Procedure

for summary judgment, arguing that there are no genuine issues of material fact, and that they are

entitled to judgment as a matter of law.  The issues presented are: 1) whether the plaintiffs have

raised a genuine issue of material fact that the defendants subjected them to a hostile work

environment; 2) whether Presley has raised a genuine issue of material fact that the defendants

retaliated against her for complaining of sexual harassment in the workplace; 3) whether the

plaintiffs have raised a genuine issue of material fact that the defendants subjected them to gender based discrimination; 4) whether the plaintiffs have raised a genuine issue of material fact that Pepperidge Farm's company handbook or anti-harassment policy contained negligent misrepresentations; 5) whether the plaintiffs have raised a genuine issue of material fact that Pepperidge Farm's actions amount to a civil conspiracy; 6) whether the plaintiffs have raised a genuine issue of material fact that the defendants intentionally inflicted emotional distress on them; and 7) whether the plaintiffs have raised a genuine issue of material fact that the defendants negligently inflicted emotional distress on them.

For the reasons set forth herein, the court concludes that: 1)(a) Presley has raised a genuine issue of material fact that the defendants subjected her to a gender hostile work environment; (b) Tsharides has failed to raise a genuine issue of material fact that the defendants subjected her to a gender hostile work environment; 2) Presley has failed to raise a genuine issue of material fact that the defendants retaliated against her for complaining of sexual harassment in the workplace: 3)(a) Presley has raised a genuine issue of material fact that the defendants subjected her to gender based discrimination; 3)(b) Tsharides has failed to raise a genuine issue of material fact that the defendants subjected her to gender based discrimination; 4) the plaintiffs have failed to raise a genuine issue of material fact that Pepperidge Farm's company handbook or anti-harassment policy contained negligent misrepresentations; 5) the plaintiffs have failed to raise a genuine issue of material fact that Pepperidge Farm's actions amount to a civil conspiracy; 6) the plaintiffs have failed to raise a genuine issue of material fact that the defendants intentionally inflicted emotional distress on them; and 7) the plaintiffs have failed raise a genuine issue of material fact that the defendants negligently inflicted emotional distress on them.  Accordingly, the defendants motion for summary judgment is granted in part and

denied in part.

## FACTS

Examination of the amended complaint, affidavits, pleadings, Local Rule 56(c)

statements and exhibits accompanying the motion for summary judgment, and the responses

thereto, disclose the following undisputed, material facts.  The defendant, Campbell Soup

Company, is a corporation authorized to transact business within the State of Connecticut

through its subsidiary, the defendant, Pepperidge Farm, Inc.  Pepperidge Farm employed the co-

defendant, Roberto Arocho, since 1979 in its Norwalk plant.  Arocho was a supervisor there for

approximately ten years.  At all relevant times, the plaintiffs, Twanya Presley and Sofia

Tsharides, were residents of the state of Connecticut and worked at Pepperidge Farm's facility in

Norwalk, Connecticut.

    A.    Pepperidge Farm's Anti-Harassment Policy

Throughout the time that Presley and Tsharides worked at Pepperidge Farm, the company

had an anti-harassment policy with complaint procedures.  All versions of the policy prohibit any

kind of sexual harassment, instruct employees to whom they can complain, assure the employees

that the company will take prompt and appropriate action, promise confidentiality, and ensure

that employees will not be penalized or retaliated against for filing a complaint.  The company

posted written copies of the policy in multiple locations in the plant where Presley and Tsharides

worked.  Human resource officials walked the floor of the plant to make themselves more

accessible to employees.  The company also informed newly hired employees of the policy

during their orientation.

    B.    Presley's Claim

On August 28, 1996, Pepperidge Farm hired Presley.  In February 1998, Presley resigned.

In June 1999, Pepperidge Farm rehired Presley as a temporary employee in the bread department. In December 1999, Presley became a full-time employee as a production substitute in the bread department.  In early 2000, Presley switched from the night shift to the day shift, and Arocho became her supervisor.  From June 1999 to mid-July 2001, Arocho did not say or do anything to Presley that she considered inappropriate.

From mid-July 2001 to late August 2001, Presley alleges that Arocho committed the following acts which she argues amounts to sexual harassment.  In mid-July 2001, Arocho touched Presley's hand and told her that she was attractive and that she had "pretty hair."  At the time, however, Presley admits that she did not find this incident to be offensive.  On August 2, 2001, Arocho told Presley that she had nice legs.  Presley told Arocho that she was uncomfortable with that comment, and that she would pursue a complaint if this conduct persisted.  Arocho responded by telling Presley that she was not in good standing with the company because she had previously filed a worker's compensation claim.  On August 3, 2001, Arocho told Presley that her friendship with several of the men at the plant could bring her financial gain due to her attractive physical attributes.  Presley felt this statement insinuated that she was a prostitute of some sort.  Later that same day, Arocho summoned Presley to his office, grabbed his crotch area, and asked Presley if she "wanted any of this."  Between August 3, 2001 and August 15, 2001, Arocho would gaze at Presley in a leering manner.  On August 15, 2001, Arocho warned her that fifty-three people could complain to human resources about him and nothing would ever happen to him.  Later that same date, Arocho touched Presley on her shoulder and smiled.

There is a dispute between the parties as to whether Presley told Donald Miller, a supervisor, about Arocho's alleged sexual harassment.  On August 3, 2001, Presley spoke with

Miller.  Presley contends that she told Miller about Arocho's alleged conduct that had occurred

earlier that day.  Specifically, Presley testified during a deposition to the following:

> [Question] - And then on the 3rd when this thing happened with Mr. Arocho
> grabbing his genitals, did you tell anybody else on August 3rd about what
> happened?
> [Answer] - I didn't tell no one that day except Donald Miller what was going on.
> [Question] - And then you went back to him later in the day, did you tell him what
> Mr. Arocho had done on the 3rd?
> [Answer] - That's correct, yes.

In contrast to Presley's contentions, Paul Macionus, Pepperidge Farm's human resources

manager, testified during a deposition that when he interviewed Miller during the investigation,

Miller stated that Presley told him only that she was "uncomfortable" around Arocho.  Miller

also allegedly told him that Presley did not specify what made her uncomfortable, nor did she

make any allegations of sexual harassment.

Despite the dispute as to details of this conversation, it is undisputed that Miller told

Presley to report any harassment to the human resource department, and that Presley told Miller

that she had handled the situation.  It is also undisputed that Miller did not report Presley's

statements to human resource officials.

It is not clear from the facts before the court what Miller's duty was if Presley did tell

him about Arocho's alleged sexual harassment.  Presley contends that Miller had an obligation to

report inappropriate conduct to the human resources department in accordance with the

company's anti-harassment policies.  Pepperidge Farm's anti-harassment policies do state that

employees can report allegations of harassment to a supervisor, but they do not state what a

supervisor's duty is once he or she receives such a report.

C.    <u>Promotion Opportunity</u>

In August 2001, there was an opening for a quality assurance technician position.  All

applicants were initially interviewed by Vanessa Diggs, a supervisor in quality assurance and friend to Presley.  Diggs selected the top three candidates to interview with Steven White, a manager in the quality assurance department.  The top candidates were Presley, Andy Saltourides, and Nick Savopoulos.  Saltourides and Savopoulos also participated in a "day-in-the-life" exercise where they performed certain functions associated with the position, so that White could evaluate their performances.  Presley did not engage in the "day-in-the-life" exercise because she had previously performed the same functions while on a modified/light duty assignment in the quality assurance department.

On or about August 31, 2001, Presley interviewed with White for the position.  Prior to the interview, Presley spoke with Diggs.  Diggs secretly provided Presley with the interview questions in advance and told Presley that she was a "shoe in" for the position.  Despite Presley's advance knowledge of the questions, White chose Saltourides for the position.  According to White, Saltourides had some college education and well developed technical computer skills.  White testified during a deposition that he chose Saltourides because his level of motivation and overall performance in the quality assurance department far surpassed that of the other two candidates.  Specifically, White testified that Saltourides entered data into the computers with much more efficiency and ease than the other candidates, and he also discussed ideas with White on how to improve the process to make it even more efficient for the company.   White further testified that he was not confident that Presley would be able to perform all the duties that the position required because of her prior performance in the quality assurance department, as well as her lack of higher education, including a lack of math and computer skills.

Presley alleges that Arocho sent a negative recommendation to the quality assurance department that caused White to decline to hire her for the position.   Specifically, Presley alleges

that, after the interview with White, Diggs told her that her application to quality assurance

contained a negative recommendation from Arocho.  White gave deposition testimony, however,

that he did not consult Arocho regarding any of the candidates, including Presley.

_____During the same conversation with Diggs, Presley told Diggs about Arocho's alleged

harassment.  Diggs then shared Presley's allegations with White.  White then called Macionus to

discuss the allegations.  That same day, August 31, 2001, White and Diggs met with Macionus,

whereby Diggs recounted her conversation with Presley.

     D.    <u>Internal Investigation</u>

      On Tuesday, September 4, 2001, the first day back at the plant after the Labor Day

holiday weekend, Macionus and Maritza Allende, an employee relations manager, commenced

an investigation of Presley's allegations.  In connection with their investigation, Macionus and

Allende interviewed Presley.  During the interview, Macionus told Presley that Pepperidge Farm

had no tolerance for sexual harassment, explained the anti-harassment policy to her, and assured

her that Allende and he would conduct a full investigation and then inform her of their findings.

The officials also removed Presley from Arocho's day-to-day supervision during the

investigation.  On September 5, 2001, Macionus and Allende interviewed Arocho.  During that

meeting, Macionus and Allende reviewed with Arocho the anti-harassment policy, as well as the

Equal Employment Opportunity policy and the violence in the workplace policy.  They also

reviewed each of Presley's allegations with Arocho and told him that under no circumstances

would Pepperidge Farm tolerate any type of harassing behavior.  They also informed Arocho that

Pepperidge Farm would not tolerate any type of retaliation.  Macionus told Arocho that if

Pepperidge Farm found him to have violated any of these policies, the consequences would be

severe, up to and including termination of his employment.  According to the defendants, Arocho

affirmatively and credibly denied all of Presley's allegations.  Macionus and Allende also

interviewed other witnesses that Presley identified, namely, Donald Miller, Juan Martinez, and

Spencer Peeples.  Based on the information from their investigation, Macionus and Allende were

unable to corroborate any of Presley's allegations and arrived at an inconclusive result.

On Friday, September 7, 2001, Macionus and Allende reported the results of the

investigation to Presley.  When Macionus and Allende reported the results of the investigation to

Presley, they told her that if she had any further concerns, she should contact them immediately.

They also told her that Pepperidge Farm would not tolerate any kind of retaliation against her.

While Presley alleges that Pepperidge Farm officials directed her to work with Arocho two

weeks later, Presley admits that the officials intervened soon after and provided her with re-

assignment elsewhere in the company's plant as she requested.  On September 24, 2001,

Macionus and Allende met with Presley again to discuss the results of the investigation.  Presley

admits that, after the investigation, Arocho did not do anything sexual towards her again.

E.    Promptness of the Presley Investigation

The prompt nature of Pepperidge Farm's investigation is in dispute.  Specifically, there is

a dispute as to when Presley notified Macionus and Allende that two other employees, Sofia

Tsharides and Maria Giannakova, were potential witnesses in her case.  Initially, Presley testified

at her deposition that she did not notify Allende about Tsharides and Giannakova until at least

the week after one of the meetings where Macionus and Allende discussed the results of their

investigation.  It is unclear from the record whether Presley was referring to the meeting which

took place on September 7, 2001 or September 24, 2001.  Nevertheless, Presley has more

recently submitted a transcript of a tape recording of Allende, stating that she received a voice

mail from Presley on September 5, 2001 which notified her of Tsharides and Giannakova.  When

confronted with the tape recording during a deposition hearing, however, Allende testified that

Presley did not tell her about Tsharides and Giannakova until September 25, 2001.  It is also

unclear when Macionus and Allende then interviewed Tsharides and Giannakova.  Allende gave

deposition testimony that she interviewed both Tsharides and Giannakova on September 25,

2001, which is the same day Allende alleges that Presley notified her.  Tsharides testified during

her deposition that Macionus and Allende interviewed her in early September 2001.  It is

undisputed that, however, when Macionus and Allende did interview Tsharides and Giannakova,

neither employee offered any information regarding Presley's allegations.  Instead, both

employees had their own allegations against Arocho which the officials investigated and found to

be unsubstantiated.

       Presley alleges that the following incidents of harassment occurred after human resources

conducted the investigation.  On December 7, 2001, Arocho marked Presley tardy when Presley

contends that she was not late.  Arocho then told Presley that if she were marked tardy again, he

would suspend her.  As a result, Arocho required Presley to fill out a time sheet which accounted

for her whereabouts in the company plant at all times for one week.  Presley contends that this

was unfair because no other employee was required to do so.  Presley admits that when another

employee informed an official that Arocho was requiring Presley to fill out a timesheet, the

official immediately relieved her of that requirement.  In March 2002, Presley received

information that Arocho's wife, who was also an employee at the plant, was making physical

threats towards her for pursuing a sexual harassment complaint.  Presley did not report any of

these incidents to any higher level official in the company.  Instead, in March 2002, Presley

resigned from her employment with Pepperidge Farm.

       F.    Tsharides' Claim

In May 1999, Pepperidge Farm hired Tsharides. From the end of July 2001 to late August 2001, Tsharides alleges that Arocho committed the following acts which she argues amounts to sexual harassment. In or about the end of July 2001, Tsharides visited Arocho's office one day. During this visit, Arocho rubbed both of her hands and told her that she "made him nervous." Proximate to this time period, Arocho attempted to touch her knees and told her that he had the authority to do so because he was her supervisor. In early August 2001, Arocho approached Tsharides from behind, rubbed his foot against her calf, and uttered unintelligible comments. In August 2001, Arocho asked Tsharides if she wanted "to mess around" with him. Lastly, in late August 2001, Arocho approached Tsharides and told her that he wanted to have a "threesome" with her and one of her co-workers.

G.    Promptness of the Tsharides' Investigation

There is a dispute as to whether Pepperidge Farm investigated Tsharides allegations of sexual harassment in a prompt manner. Specifically, Presley has submitted a transcript of a tape recording of Allende, stating that she received a voice mail from Presley on September 5, 2001 which notified her of Tsharides. When confronted with the tape recording during a deposition hearing, however, Allende testified that Presley did not tell her about Tsharides until September 25, 2001. It is unclear when Macionus and Allende interviewed Tsharides. Allende gave deposition testimony that she interviewed both Tsharides on September 25, 2001, which is the same day Presley notified her. Tsharides testified during her deposition that Macionus and Allende interviewed her in early September 2001.

It is undisputed that, however, when Macionus and Allende did conduct an investigation of Tsharides's allegations, Tsharides refused to name any witnesses to her allegations. As a result Macionus and Allende were able to interview only Tsharides and Arocho. During their

interview with Arocho, Macionus and Allende reviewed the company's anti-harassment policy with Arocho and stressed that Pepperidge Farm would not tolerate sexual harassment of any kind. Ultimately, the officials found no corroborating evidence of Tsharides's allegations and arrived at an inconclusive result.

Allende then reported the results of the investigation to Tsharides. At that time, Allende explained to her that no retaliation would be taken against her for making the complaints. Allende also told Tsharides that she should come back if she had any further concerns. It is undisputed that Tsharides did not report any further alleged harassment or make any complaints of retaliation. Instead, in March 2003, Tsharides resigned from her employment with Pepperidge Farm.

## **STANDARD**

Summary judgment is appropriately granted when the evidentiary record shows that there are no genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable the non-moving party. See Bryant v. Maffacci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991). A plaintiff raises a genuine issue of material fact if "the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rule 56 "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is not genuine issue of material fact." Id. at 247-8.

In opposing a motion for summary judgment, the "adverse party may not rest upon the mere allegations or denials of [its] pleading," but must "set forth specific facts showing that there

is a genuine issue for trial." Fed. R. Civ. P. 56; see D'Amico v. City of New York, 132 F.3d 145,

149 (2d Cir. 1998). "If the adverse party does not so respond, summary judgment, if appropriate,

shall be entered against the adverse party." Fed. R. Civ. P. 56 (d). "The mere verification by

affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary

judgment." Zigmund v. Foster, 106 F. Supp. 2d 352, 356 (D. Conn. 2000). Furthermore, "the

mere existence of a scintilla of evidence in support of the [non-moving party's] position will be

insufficient [to avoid the entry of judgment against the non-moving party]; there must be

evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477

U.S. at 248.

## DISCUSSION

1. Hostile Work Environment

    A. Pervasive and Severe

The defendants argue that, "[i]n this circuit, . . . courts have routinely held that conduct

analogous to or more egregious than that alleged in this case was not sufficiently severe or

pervasive to violate Title VII as a matter of law, even when engaged in by a supervisor." The

plaintiffs respond that "[i]n viewing the allegations set forth in [the] complaint in their totality

and in a light most favorable to them, coupled with the evidence as set forth in this objection, this

[c]ourt cannot conclude as a matter of law that Arocho's conduct was not so severe and pervasive

as to alter the terms and conditions of [the] plaintiffs' employment for the worse."

"The Supreme Court has held that Title VII is violated '[w]hen the workplace is

permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment." Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004) (citing Harris

v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); Quinn v. Green Tree Credit Corp., 159 F.3d 759,

767 (2d Cir. 1998) (same).  "The test for 'hostile work environment' has both an objective and a

subjective component: 'A work environment will be considered hostile if a reasonable person

would have found it to be so, and if the plaintiff subjectively so perceived it.'"  Mormol, 364

F.3d at 58 .  "Whether a reasonable person would find a given work environment to be hostile

depends on the totality of the circumstances; '[c]onsiderations include: (1) the frequency of the

conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or

humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes

with the employee's work performance."  Id.

    a.  Pervasiveness

    The Second Circuit has held that, "[a]s a general rule, incidents must be more than

episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."

Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002); see also Mormol, 364 F.3d at 59 (relying

on Alfano in deciding pervasiveness).  In Mormol, the Second Circuit held that six incidents

occurring within the timespan of one month were "far from being pervasive," stating that the

incidents "were few and occurred within a short span of time."  Id. at 59-60.

    Similar to Mormol, the alleged harassment in the present case consists of several isolated

incidents which took place over the timespan of about one month.  Presley alleges that seven

incidents occurred during August 2001, and two incidents occurred during the first week of

December 2001.  Tsharides alleges that five incidents occurred from the end of July 2001 to the

end of August 2001.  Furthermore, even though Presley worked for Pepperidge Farm from 1996

to 2002, and Tsharides worked for Pepperidge Farm from 1999 to 2003, both plaintiffs admit that

Arocho did not harass them at any other time during their periods of employment.  Consequently,

because the alleged incidents in the present case are similar in frequency and duration to those in

Mormol, the court concludes that neither plaintiffs' allegations of sexual harassment are

pervasive.

    b. <u>Severity</u>

Where there is a lack of pervasiveness, the allegations of sexual harassment must be

"extraordinarily severe" for a plaintiff to prove a hostile work environment.  <u>Mormol</u>, 364 F.3d at

59; <u>see</u> <u>also</u> <u>Quinn</u>,159 F.3d 759, 768 (2d Cir. 1998) (stating "where the conduct is sufficiently

severe, it may alter the plaintiff's conditions of employment without repetition").  In <u>Mormol</u>, the

plaintiff, Mormol, brought a hostile work environment claim against her supervisor, Ziermann,

based on the following alleged incidents which occurred within the timespan of about one month.

364 F.3d at 56.  On December 27, 1999, Ziermann told Mormol that he would not approve her

vacation request if she did not have sex with him.  <u>Id.</u> at 55.  On or about the same day, Ziermann

also offered to pay her for hours that she had not worked if she agreed to have sex with him.  <u>Id.</u>

Mormol rebuffed all such advances from Ziermann.  <u>Id.</u>  Later in the month, Ziermann forced

Mormol to return prematurely from her vacation for no apparent reason.  <u>Id.</u>  Specifically,

Ziermann telephoned Mormol during her vacation, telling her that, if she did not return early

from her vacation, she would be transferred or fired.  <u>Id.</u>  On January 22, 2000, the day she

returned from work, Ziermann gave Mormol a note which stated that, if she agreed to have sex

with him, he would give her money, make her a full-time employee while permitting her to work

part-time and simply punch her card as if she were working full time, and take her on vacations

and to a fitness club.  <u>Id.</u>  Mormol once again decline his offers.  <u>Id.</u>  The next week, Ziermann

allowed Mormol to work only on three days when Mormol claimed that he previously promised

that she could work on seven days.  Id.  On January 23, 2000, Ziermann also "wrote up" Mormol

for being five minutes late from a break and added a hand written statement on the disciplinary

notice which stated that the next "writeup" would result in suspension or termination.  Id. at 55-

56.  On January 24, 2000, Mormol reported Ziermann's conduct to warehouse management and

an investigation began.  Id. at 56.  On January 26, 2000, Costco suspended Ziermann and

ultimately fired him on February 3, 2000.  Id.  The Second Circuit concluded that these incidents

were "far from being pervasive" because the incidents "were few and occurred within a short

span of time."  Id. at 59.  The court also concluded that the harassment alleged in this case was

not sufficiently severe to overcome its lack of pervasiveness.  Id. at 59-60.  As a result, the

Second Circuit affirmed summary judgment in favor of the defendants.  Id.  at 60.

Likewise, in Quinn, the Second Circuit affirmed summary judgment in favor of the

defendants based on similar reasoning to the court's decision in Mormol.  See Quinn, 159 F.3d

759, 768 (2d Cir. 1998).  In Quinn, the plaintiff's hostile work environment claim rested on two

allegations against her supervisor: "(1) that he told Quinn she had been voted the 'sleekest ass' in

the office and (2) that, on another occasion, he 'deliberately touched [Quinn's] breasts with some

papers that he was holding in his hand.'"  Id.  The Second Circuit held that "[t]hough the two

incidents in question . . . are obviously offensive and inappropriate, they are sufficiently isolated

and discrete that a trier of fact could not reasonably conclude that they pervaded Quinn's work

environment."  Id.  The court also held that "[n]or are these incidents, together or separately, of

sufficient severity to alter the conditions of Quinn's employment without regard to frequency or

regularity."  Id.

    i.  Tsharides' claim

Tsharides's hostile work environment claim against Arocho consists of the following

allegations.  In July 2001, Arocho rubbed her hands and told her that she made him nervous.

During this same period of time, Arocho attempted to touch her knee and told her that he had the

authority to do so because he was her supervisor.  In early August 2001, Arocho briefly rubbed

his foot against her calf and made unintelligible comments.  During the middle of August 2001,

Arocho asked Tsharides if she wanted to "mess around."  At the end of August 2001, Arocho

told her that he wanted to "have a threesome" with her and one of her co-workers.

Arocho's statements of his desire to "mess around" and "have a threesome" with

Tsharides and his statements that she "made him nervous" and that he had the authority to

attempt to touch her knee because he was her supervisor are not more severe than the sexual

offers in Mormol.  In Mormol, the supervisor made several direct sexual offers to the plaintiff

and conditioned such offers with threats of negative employment actions if she refused and

beneficial employment actions if she agreed.  Mormol, 364 F.3d at 55.  Arocho's sexual

statements are not more severe than Ziermann's sexual offers because they were not conditioned

with work-related threats or rewards.

Additionally, Arocho's actions of touching and attempting to touch Tsharides are not

more severe than the touching alleged in Quinn.  In Quinn, Quinn's supervisor, Fahey,

deliberately touched Quinn's breasts with some papers that he was holding in his hand.  Quinn,

159 F.3d at 762-763.   In the present case, Arocho rubbed Tsharides's hands, attempted to touch

her knee, and briefly rubbed his foot against her calf.  A woman's breasts are a more private and

intimate area than her hands, knee, or calf; consequently, an unwanted deliberate touching of that

area is more offensive and, therefore, more severe.

Arocho's alleged conduct toward Tsharides is not more severe than the alleged conduct of

the defendant-supervisors in Quinn and Mormol, where the Second Circuit affirmed summary

judgment in favor of the defendants.  Consequently, the court likewise grants summary judgment in favor of the defendants as to Tsharides's hostile work environment claim because Arocho's conduct is not sufficiently severe as a matter of law to overcome its lack of pervasiveness.

   ii.  Presley's claim

       Presley's hostile work environment claim against Arocho consists of the following allegations.  In July 2001, Arocho touched Presley's hands and told her that she was attractive.[1] On August 2, 2001, Arocho summoned Presley to his office and told her that she had nice legs and other attractive attributes.  At the time, Presley told Arocho that she was uncomfortable with those comments, and that she would file a complaint if this type of behavior persisted.  Arocho responded by telling her that she was not in good standing with the human resources department or the company because of her previous worker's compensation claim.  On August 3, 2001, Arocho told Presley that her friendship with men at the plant could get her money because she was pretty.  Presley felt this statement insinuated that she was a prostitute of some sort.  That same day, while Presley was in Arocho's office, Arocho grabbed his genital area and asked Presley if she wanted "any."  On August 15, 2001, Arocho told Presley that fifty-three people could complain to the human resource department, and nothing would ever happen to him. Presley claims this comment made her feel humiliated and denigrated.  Later that day, Arocho briefly put his hand on her shoulder and smiled, which Presley states she found taunting.  On or about August 31, 2001, Presley learned from Diggs that Arocho had given a negative

---

[1] The court will not consider this incident in its analysis because Presley admits that, at the time, she did not subjectively perceive this incident to be offensive.  See Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004) (stating that a plaintiff must subjectively perceive the conduct as hostile in order to prove a hostile work environment claim).

recommendation to the quality assurance department concerning Presley while she was applying for a position in that department.  Steven White, the manager of the quality assurance department, however, testified that he made his hiring decision based on his own objective criteria and did not consider Arocho's alleged negative recommendation.  On December 7, 2001, Arocho marked Presley tardy when Presley contends that she was not late.  Arocho then told Presley that if he marked her tardy again, he would suspend her.  As a result, Arocho required Presley to fill out a time sheet which accounted for her whereabouts in the company plant at all times for one week.  Presley contends that this was unfair because the company did not require other employees to do so.  In March 2002, Presley received information that Arocho's wife, who was also an employee at the plant, was making physical threats towards her for pursuing a sexual harassment complaint.[2]

Presley's allegations of Arocho's conduct are arguably more severe than the plaintiff's allegations of her supervisor's conduct in Mormol.  First, while the supervisor in Mormol made several work-related threats, Presley alleges that Arocho sent a negative recommendation to the quality assurance department while she was applying for a position there.  Although White testified that he did not consider this recommendation when he chose another candidate for the position, Presley contends that Diggs, a supervisor in the quality assurance department, told her that Arocho's negative recommendation was in a file with the rest of the information for White to consider.  Consequently, there are issues of fact that are either in dispute or unresolved as to

---

[2]  The court will not consider this incident in its analysis because Presley has not introduced any facts from which a reasonable juror could infer that these threats were made because of Presley's gender.  See Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (stating that "it is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex.").

Arocho's motivation and grounds for sending the negative recommendation, and as to the effect the negative recommendation had on Steven White's decision not to hire Presley for the position. Viewing the evidence in a light most favorable to Presley, the court holds that a reasonable juror could find, in light of Arocho's other conduct toward Presley, that Arocho sent a negative recommendation about Presley because of her gender, and not based on merit. A reasonable juror could further find that Arocho's negative recommendation caused White not to hire her for the position. If the jury were to make such findings, Arocho's negative recommendation would be arguably more severe than the work-related threats in Mormol because Arocho did more than threaten by taking action which may have cost Presley the position in the quality assurance department.

Presley's other allegations are also arguably more severe than the plaintiff's allegations in Mormol. Even though Ziermann's sexual offers in Mormol were conditioned with work-related threats and benefits, Arocho's sexual offer where he grabbed his crotch in front of Presley is more lewd and obscene and, consequently, is arguably more severe.

Arocho's responses to Presley that she was not in good standing with the company because she filed a worker's compensation claim and that fifty-three people could complain to human resources about his actions and nothing would happen to him are arguably more severe than Ziermann's actions of not allowing Mormol to work extra hours for one week. A reasonable juror could find that Arocho was lying when he made those statements in an attempt to discourage Presley from complaining about his behavior to the proper authorities within the company. Accordingly, Arocho's statements are arguably more severe than Ziermann's actions because they were directly intended to prevent the remedy of the kind of behavior Title VII is designed to protect against in the employment context.

Both Presley and the plaintiff in Mormol complained about being marked tardy on one occasion. While Ziermann's subsequent actions of threatening to suspend or fire Mormol if he marked her tardy again may be more severe than Arocho's subsequent actions of requiring Presley to fill out a time sheet of her whereabouts in the plant for a week's time, Presley alleges that Arocho marked her tardy for no reason while Mormol admitted to being late. Consequently, Arocho's actions are more unjustified and arguably more severe than Ziermann's actions.

Because many of Presley's allegations are arguably more severe than the plaintiff's allegations in Mormol, a genuine issue of material fact exists as to whether Arocho's conduct toward Presley, taken together, was severe enough to overcome its lack of pervasiveness. As a result, the court denies the defendants' summary judgment motion as to Presley's hostile environment claim.

### iii. Employer Liability

To succeed in her hostile work environment claim against Pepperidge Farm, Presley must show not only that she experienced severe and pervasive harassment, but also that "a specific basis exists for imputing the objectionable conduct to [Pepperidge Farm]." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002). Under Title VII, an employer is strictly liable for a supervisor's sexual harassment of an employee where the harassment culminates in a tangible employment action. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761-763 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 790, 807 (1998).

### A.    Presley--Tangible Employment Action

Pepperidge Farm argues that "[a]s a matter of law, none of [Presley's] allegations are sufficient to establish a tangible employment action." Presley responds that each of the following allegations can qualify as tangible employment actions: 1) Arocho's negative

evaluation sent to the quality assurance department, which caused Steven White, the manager of the department, to deny her the promotion/reassignment; 2) Arocho marking her tardy without cause; 3) Arocho making her fill out a time sheet for one week; 4) Arocho threatening to suspend her if he marked her tardy again; and 5) Pepperidge Farm constructively discharging her.

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."    Burlington Industries, Inc. v. Ellerth, 524 U.S. at 761 (1998).  "Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates."  Id. at 762. "A tangible employment decision requires an official act of the enterprise, a company act."  Id. "The decision in most cases is documented in official company records and may be subject to review by higher level supervisors."  Id.  "A tangible employment action in most cases inflicts direct economic harm, but there is no requirement that it must always do so."  Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004) (internal quotations and citations omitted). "For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer."  Ellerth, 524 U.S. at 762.

Viewing the evidence in a light most favorable to Presley, the court concludes that there is a genuine issue of material fact as to whether Arocho's negative evaluation is a tangible employment action.  Presley alleges that Arocho sent a negative written evaluation concerning her, which was untrue, to the quality assurance department while she was applying for a position in that department.  Presley further alleges that Arocho's negative evaluation caused White, the manager of the department, not to hire her for the position.  White testified, however,  that he made his decision based on his own objective criteria and did not consider Arocho's alleged

negative evaluation.  In response, Presley contends that Diggs, a supervisor in the department, told her that she saw Arocho's negative evaluation in a file with the rest of the information to be reviewed by White before her interview.

The court holds that Arocho's negative recommendation can qualify, as a matter of law, as a tangible employment action because a reasonable juror could find that it satisfies all the criteria that the law requires.  First, a reasonable juror could choose to believe the testimony of Diggs that Arocho's negative recommendation was in Presley's file for White to consider.  Based on that finding, a reasonable juror could then infer that White did consider the recommendation and that it caused him to decline to hire Presley.  If a reasonable juror found that Arocho's recommendation caused White to decline to hire Presley, it would constitute a significant change in Presley's employment status.  Cf. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 789 (6th Cir. 2000) (holding that a supervisor's downgraded evaluation of the plaintiff did not constitute a tangible employment action because the plaintiff did not allege that her employer unfairly denied her a promotion as a result of the evaluation).  Second, a reasonable juror could find that Arocho was using his supervisory power that Pepperidge Farm gave him in order to evaluate Presley, a subordinate, when he sent the negative recommendation.  If a reasonable juror were to find make these findings then Arocho's negative recommendation would be an official act of Pepperidge Farm.  Lastly, a reasonable juror could believe the testimony of Diggs that Arocho documented the negative recommendation and placed it into official company records.  A reasonable juror could then draw the inference that White, a higher level official in the company, reviewed it.  Because a reasonable juror could find that Arocho's alleged negative recommendation satisfied all these criteria, there is a genuine issue of material fact as to whether it is a tangible employment action.

Presley's other allegations, however, do not qualify as tangible employment actions. Specifically, Arocho's actions of marking Presley tardy and requiring her to fill out a time sheet for one week, by themselves, do not constitute a significant change in employment status, and, consequently, neither qualifies as a tangible employment action.  See Mormol, 364 F.3d at 58 (holding that a supervisor's disciplinary notice did not constitute a significant change in employment status, in part, because it did not result in any further consequences to her). Additionally, Arocho's action of threatening to suspend Presley if he marked her tardy again is not a tangible employment action because the threat was not conditioned upon Presley submitting to further sexual harassment, and an unfulfilled threat, by itself, is not enough.  See Jin v. Metropolitan Life Ins. Co., 310 F.3d 84, 93 (2d Cir. 2002) (stating that a threat is not a tangible employment action if the plaintiff is not subjected to further sexual harassment and the supervisor does not follow through with his threat).

Presley also alleges that Pepperidge Farm constructively discharged her.  Constructive discharge can qualify as a tangible employment action, if the plaintiff can prove: 1) the elements of constructive discharge, and 2) that an "official act" of the employer underlies the constructive discharge.  Pennsylvania State Police v.  Suders, 124 S.Ct.  2342, 2355 (2004).  Presley's allegation that Pepperidge Farm constructively discharged her does not qualify as a tangible employment action because Presley cannot prove the requisite elements of constructive discharge as set forth infra.

Constructive Discharge

The defendants argue that Presley "has failed to establish any of the elements of a constructive discharge claim."  Presley responds that the totality of the circumstances creates a genuine issue of material fact as to whether Pepperidge Farm constructively discharged her.

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 73 (2000). "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Id. To prevail on a claim of constructive discharge, a plaintiff must also show "deliberate action on the part of the employer." Id. at 74. [S]omething beyond mere negligence or ineffectiveness is required." Id.

In Whidbee, the Second Circuit affirmed a district court order granting summary judgment for an employer on the issue of constructive discharge because the plaintiff-employees failed to prove a deliberate action on the part of their employer. Id. at 74. In this case, a co-worker, Richard Corliss, allegedly harassed two plaintiff employees on many occasions. Id. On June 8, 1998, the plaintiffs told their general manager, Patrick Grable, about the alleged harassment. Id. Grable responded by telling the plaintiffs that he would speak to Corliss, but the plaintiffs would have to handle the problem themselves. Id. at 67. Grable did not speak with Corliss that day. Id. The next day, June 9, Corliss allegedly harassed the plaintiffs again, and the plaintiffs immediately reported it to Grable. Id. Grable assured the plaintiffs that he would speak with Corliss, but, in fact, he did not speak with Corliss. Id. On June 11, Corliss continued to harass the plaintiffs, so they immediately reported the incident to their supervisor, Tina Hanley. Id. On June 12, Hanley reported the incident to Grable. Id. That day, one of the plaintiffs asked Grable to meet with her, but Grable denied her request, stating that he was too busy. Id. Later that day, Grable did meet with Corliss and gave him a verbal warning. Id. On June 16, the plaintiffs had a meeting with Grable to report additional harassment. Id. Grable responded by

telling the plaintiffs that "he can't control Corliss's mouth," the plaintiffs should approach

Corliss themselves, "he does not know how to deal with the problem and does not want to deal

with it because it is too much for him",  and if talking to Corliss does not solve the problem, then

the plaintiffs have to leave.  Id. (internal quotations omitted).  During the meeting, however,

Grable also said that he and the plaintiffs should meet with Corliss, and that Corliss either has to

stop the harassment or he has to quit.  Id.  Grable also stated that he needed to do some research

to find out how to stop this.  Id.  After the meeting, Grable issued Corliss a written warning

which stated that any further offensive conduct would result in disciplinary measures, up to and

including termination.  Id. at 68.  Despite the warning, Corliss continued to harass the plaintiffs.

Id.  On June 26, one of the plaintiffs met with Grable, Corliss, and another member of

management.  Id.  Corliss apologized to the plaintiff.  Id.  Grable told Corliss that if he continued

to harass the plaintiffs, Grable would fire him.  Id.  On June 26, 1998, both of the plaintiffs

resigned.

   In affirming summary judgment for the defendant-employer, the Second Circuit held that

even if "[c]ertain statements by Grable . . . might be seen as evincing a lack of concern about the

plaintiffs' situation[,]" the "evidence did not support an inference that her employer intended to

create intolerable working conditions."  Id. at 74.  Further, the court explained that an employer's

"demonstrated interest in retaining the plaintiffs" militated against a finding of constructive

discharge.  Id.

   Following the logic of the Second Circuit's decision in Whidbee, the court concludes that

there is no evidence to support an inference that Pepperidge Farm intended to create intolerable

working conditions for Presley.  It is undisputed that Pepperidge Farm: 1) investigated Presley's

allegations; 2) conferred with Arocho concerning the anti-harassment policies; 3) admonished

Arocho that if he was found to have engaged in harassment, he could be punished with job termination; 4) removed Presley from Arocho's day to day supervision; and 5) based on Presley's request, transferred her to a different work site in the plant.  There is no evidence that Pepperidge Farm intended to create intolerable working conditions for Presley and, quite to the contrary, the above cited evidence points to a finding that Pepperidge Farm exhibited an interest in retaining her.  See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2000);[3] see also Mack v. Otis Elevator Co., 326 F.3d 116, 128 (2d Cir. 2003) (concluding that the plaintiff failed to provide evidence of deliberate action by her employer because her employer immediately began investigating the plaintiff's allegations of her supervisor's harassment once the plaintiff notified them, and her employer offered to transfer the plaintiff to a position beyond the defendant-supervisor's power).

To summarize, the court concludes that there is a genuine issue of material fact as to whether Arocho's negative recommendation is a tangible employment action, however, Presley's other allegations do not qualify, as a matter of law, as tangible employment actions.

B.  Affirmative Defense

Employers are presumptively liable for a supervisor's harassment of an employee. Ellerth, 524 U.S. at 765.  In the absence of a tangible employment action, however, an employer can avoid liability for a supervisor's alleged harassment of a subordinate if it can prove, as an affirmative defense, "(a) that the employer exercised reasonable care to prevent and correct

---

[3] Accepting Presley's allegations as true, the court concludes that Pepperidge Farm, through its actions, demonstrated a greater interest in retaining Presley as an employee, than Grable demonstrated towards the plaintiffs in Whidbee.  Specifically, Macionus and Allende conducted an investigation, removed Presley from Arocho's day-to-day supervision during the investigation, and later provided her with a transfer to another department when she requested one, while the employer in Whidbee took no such actions.  Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2000).

promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm other wise." Id.

### Pepperidge Farm and Reasonable Care

Pepperidge Farm argues that they have satisfied the first prong of the affirmative defense because "no reasonable trier of fact could find that Pepperidge Farm failed to exercise reasonable care to prevent and correct sexually harassing behavior." In support of this argument, Pepperidge Farm contends that "Pepperidge Farm not only had an anti-sexual harassment policy in place at all times during [Presley's] employment, but [that] Pepperidge Farm fully complied with that policy by conducting a prompt and thorough investigation of [Presley's] complaints, after which [Presley] conceded that the alleged harassment ceased."

Presley responds that the following allegations prove that Pepperidge Farm failed to exercise reasonable care to prevent and correct Arocho's sexually harassing behavior: 1) Pepperidge Farm's anti-harassment policy was unclear to employees because there were multiple versions of the policy in circulation at the time of Arocho's conduct; 2) Donald Miller, a supervisor, failed to report Presley's sexual harassment allegations to the human resource department which shows that Pepperidge Farm's response was inadequate; and 3) Pepperidge Farm's investigation was not done promptly because Macionus and Allende did not interview Tsaharides and Giannakova until twenty days after Presley notified Allende that they were potential witnesses.

In order to satisfy the first prong the affirmative defense, Pepperidge Farm must prove that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." Ellerth, 524 U.S. at 765. Under this analysis, the court will first consider whether

Pepperidge Farm had an anti-harassment policy with complaint procedures in existence at the time of the alleged harassment.  Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2d Cir. 1999).  It is undisputed that, throughout the time that Presley worked at Pepperidge Farm, the company had an anti-harassment policy with complaint procedures in existence.  Pepperidge Farm posted written copies of the policy in multiple locations in the plant where Presley worked. The company also informed newly hired employees of the policy during their orientation. Additionally, human resource officials walked around the floor of the plant to make themselves more accessible to employees.

Presley argues that Pepperidge Farm's anti-harassment policy was unclear to employees because there were multiple versions of the policy in circulation at the time of Arocho's conduct. The court is not persuaded by this argument because all versions of the policy before the court prohibit any kind of sexual harassment, instruct employees to whom they can complain, assure that the company will take prompt and appropriate action, promise confidentiality, and ensure that employees will not be penalized or retaliated against for filing a complaint.  In fact, Presley testified at a deposition hearing that she knew she could report allegations of sexual harassment to officials in the human resource department.

The court will also examine the actions the company took in response to the complaints that its employees reported.  Id. at 295; Distacio v.  Perkin Elmer Corp., 157 F.3d 55, 64-65 (2d Cir.  1998).

The Second Circuit has held that a supervisor's failure to comply with the company's reporting requirements is evidence tending to show that the company's response was inadequate. Id. at 65.  In Distacio, the plaintiff informed her supervisor on several occasions that one of her co-workers was sexually harassing her.  Id. at 59.  The company's policy directed supervisors

who receive a harassment complaint to: "inform the Human Resources Department of allegation of sexual harassment by employees or non-employees within 24 hours or reporting of the incident, and assist, as requested, with investigation of such allegations." <u>Id.</u> at 64. The supervisor refused to inform company management of her allegations. <u>Id.</u> at 60. Consequently, the Second Circuit held that there was a genuine issue of material fact as whether the employer's response was reasonable. <u>Id.</u>

In the present case, there is a dispute between parties as to whether Presley told Donald Miller, a supervisor, about Arocho's alleged sexual harassment. On August 3, 2001, it is undisputed Presley spoke with Miller about Arocho. Presley contends that she told Miller about Arocho's alleged sexual harassment. Specifically, Presley testified during a deposition to the following:

> [Question] - And then on the 3rd when this thing happened with Mr. Arocho grabbing his genitals, did you tell anybody else on August 3rd about what happened?
> [Answer] - I didn't tell no one that day except Donald Miller what was going on.
> [Question] - And then you went back to him later in the day, did you tell him what Mr. Arocho had done on the 3rd?
> [Answer] - That's correct, yes.

In contrast to Presley's contentions, Paul Macionus, Pepperidge Farm's human resources manager, testified during a deposition that when he interviewed Miller during the investigation, Miller stated that Presley told him only that she was "uncomfortable" around Arocho. Miller also allegedly told him that Presley did not specify what made her uncomfortable, nor did she make any allegations of sexual harassment.

Despite the dispute as to details of this conversation, it is undisputed that Miller told Presley to report any harassment to the human resource department, and that Presley told Miller that she had handled the situation. It is also undisputed, however, that Miller did not report

Presley's statements to human resource officials.

It is not clear from the facts before the court what Miller's duty was if Presley did tell him about Arocho's alleged sexual harassment. Presley contends that Miller had an obligation to report inappropriate conduct to the human resources department in accordance with the company's anti-harassment policies. Pepperidge Farm's anti-harassment policies do state that employees can report allegations of harassment to a supervisor, but they do not state what a supervisor's duty is once he or she receives a report.

Viewing the evidence in a light most favorable to Presley, the court holds that a reasonable juror could find that Presley did tell Miller about Arocho's sexual harassment, and that Miller, as a supervisor, had a duty to relay those allegations to the human resource department. Following the Second Circuit's decision in Distacio, the court concludes that Miller's failure to comply with the company's reporting requirements is evidence tending to show that the company's response was inadequate.

The prompt nature of Pepperidge Farm's investigation is also in dispute. The following facts are not in dispute. On Friday, August 31, 2001, Diggs and White notified Macionus and Allende of Presley's sexual harassment allegations. On Tuesday, September 4, 2001, the first day back at the plant after the Labor Day holiday weekend, Macionus and Allende commenced an investigation of Presley's allegations. On September 4, 2001, Macionus and Allende interviewed Presley. The officials also removed Presley from Arocho's day-to-day supervision during the investigation. On September 5, 2001, Macionus and Allende interviewed Arocho. During that week, Macionus and Allende also interviewed other witnesses that Presley identified, namely, Donald Miller, Juan Martinez, and Spencer Peeples. Based on the information from their investigation, Macionus and Allende were unable to corroborate any of Presley's allegations

and arrived at an inconclusive result.  On Friday, September 7, 2001, Macionus and Allende reported the results of the investigation thus far to Presley.  On September 24, 2001, Macionus and Allende met with Presley again to discuss the results of the investigation.

There is a dispute as to when Presley notified Macionus and Allende that two other employees, Tsharides and Giannakova, were potential witnesses in her case.  Presley has submitted a transcript of a tape recording of Allende, stating that Allende received a voice mail from Presley on September 5, 2001 which notified Allende of Tsharides and Giannakova.  When confronted with the tape recording during a deposition hearing, however, Allende testified that Presley did not tell her about Tsharides and Giannakova until September 25, 2001.

It is also unclear when Macionus and Allende interviewed Tsharides and Giannakova.  Allende gave deposition testimony that she interviewed both Tsharides and Giannakova on September 25, 2001, the same day she claims that Presley notified her.  Tsharides testified during her deposition that Macionus and Allende interviewed her in early September 2001.

It is undisputed, however, that when the officials did interview Tsharides and Giannakova, they questioned them about Presley, and neither employee offered any information regarding Presley's allegations.  Instead, both employees had their own allegations against Arocho which the officials investigated and found to be unsubstantiated.

Viewing the evidence in a light most favorable to Presley, the court concludes that a reasonable juror could find that Presley notified Allende about Tsharides and Giannakova on September 5, 2001, and that Macionus and Allende did not interview them until September 25, 2001.  Whether a twenty day delay in interviewing these witnesses means that Pepperidge Farm's investigation was no longer prompt is a question for the jury.  In sum, the court concludes that Miller's failure to comply with the company's reporting requirements and Pepperidge Farm

officials' delayed investigation create a genuine issue of material fact as to whether Pepperidge

Farm exercised reasonable care to prevent and correct promptly any sexually harassing behavior.

<u>Presley and Preventive/Corrective Opportunities</u>

Under the second prong of the affirmative defense, Pepperidge Farm must prove that

Presley "unreasonably failed to take advantage of any preventive or corrective opportunities

provided by [Pepperidge Farm] or to avoid harm other wise." <u>Ellerth</u>, 524 U.S. at 765; <u>Mack</u>,

326 F.3d at 127-128.

In <u>Mack</u>, the plaintiff's supervisor, Connolly, was allegedly harassing her at work. <u>Id.</u> at

120-121. The company's anti-harassment policy provided employees with several avenues to

make a complaint. <u>Id.</u> at 121. As one option, the policy instructed employees to report any

allegations of harassment to a supervisor, unless the supervisor was the alleged harasser. <u>Id.</u> The

plaintiff testified at her deposition that she reported Connolly's alleged harassment to Gallina,

Connolly's supervisor, and that she asked Gallina to transfer her to another department. <u>Id.</u> at

128. The plaintiff conceded that she knew there were other avenues available for her to

complain. <u>Id.</u> at 121. Even though she did not take advantage of the other avenues that the

company provided, the Second Circuit held there was "evidence in the record from which a

reasonable trier of fact could conclude that [the plaintiff] did not fail to take advantage of [the

company's] harassment complaint procedures." <u>Id.</u> at 128 (internal quotations omitted).

In the present case, there is a dispute between the parties as to whether Presley told

Donald Miller, a supervisor, about Arocho's alleged sexual harassment. Presley contends that

she told Miller about Arocho's alleged sexual harassment. Specifically, Presley testified during a

deposition to the following:

[Question] - And then on the 3rd when this thing happened with Mr. Arocho

> grabbing his genitals, did you tell anybody else on August 3rd about what
> happened?
> [Answer] - I didn't tell no one that day except Donald Miller what was going on.
> [Question] - And then you went back to him later in the day, did you tell him what
> Mr. Arocho had done on the 3rd?
> [Answer] - That's correct, yes.

In contrast to Presley's contentions, Paul Macionus, Pepperidge Farm's human resources

manager, testified during a deposition that when he interviewed Miller during the investigation,

Miller stated that Presley told him only that she was "uncomfortable" around Arocho.  Miller

also allegedly told him that Presley did not specify what made her uncomfortable, nor did she

make any allegations of sexual harassment.

Viewing the evidence in a light most favorable to Presley, the court concludes that a

reasonable juror could find that Presley, like the plaintiff in <u>Mack</u>, did tell a supervisor about

Arocho's sexual harassment.  Additionally, it is undisputed Pepperidge Farm's anti-harassment

policies, like the policy in <u>Mack</u>, instructed employees to report allegations of harassment to a

supervisor.  Consequently, as was the case in <u>Mack</u>, there is evidence in the present case from

which a reasonable trier of fact could conclude that Presley did not fail to take advantage of

Pepperidge Farm's harassment complaint procedures.

For all the above reasons, the court concludes that a genuine issue of material fact exists

as to whether Pepperidge Farm is entitled to claim the affirmative defense.

2.  <u>Retaliation</u>

Title VII provides that

> [i]t shall be an unlawful employment practice for an employer to discriminate
> against any of his employees . . . because [she] has opposed any practice made an
> unlawful employment practice . . . or because [she] has made a charge, testified,
> assisted, or participated in any manner in an investigation, proceeding or hearing
> under Title VII.

42 U.S.C. § 2000e-3(a), Title VII § 704(a). Retaliation claims under Title VII are analyzed under the McDonnell Douglas three-step burden shifting analysis. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998). "First, the plaintiff must make out a prima facie case of retaliation." Id. "Second, the defendant then has the burden of articulating a legitimate, non-retaliatory reason for the complained of action." Id. "Third, if the defendant meets its burden, [the] plaintiff must adduce evidence sufficient to raise a fact issue as to whether the employer's reason was merely a pretext for retaliation." Id. (internal quotations omitted).

A.  The Prima Facie Case

To establish a prima facie case of retaliation, an employee must show: 1) participation in a protected activity known to the defendant; 2) an adverse employment action; and 3) a causal connection between the protected activity and the adverse employment action. Id. at 769.

1.  Adverse Employment Action

Pepperidge Farm argues that Presley has failed to establish a prima facie claim of retaliation because she cannot prove that Pepperidge Farm took any adverse employment action against her.

Presley responds that Pepperidge Farm took adverse employment action against her when: 1) Arocho marked Presley tardy when Presley contends that she was not late, and 2) Arocho required Presley to fill out a time sheet which accounted for her whereabouts in the company plant at all times for one week.

The Second Circuit has defined "adverse employment action" as a "materially adverse change in the terms and conditions of employment." Weeks v. New York State (Div. of Parole), 273 F.3d 76, 85 (2d Cir. 2001), *abrogated on other grounds by* Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108-114 (2002). "To be materially adverse, a change in working

conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Id.  "Examples of such a change include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Id.

In Weeks, the plaintiff argued that a "notice of discipline" she received was an adverse employment action because non-minority, non-female officers did not receive such a notice under similar circumstances.  Id. at 86.  The Second Circuit held that the notice of discipline was not an adverse employment action because the plaintiff alleged "no facts from which one could infer that it created a materially adverse change in her working conditions." Id.  The court noted that "she [did] not describe its effect or ramifications, how or why the effect would be serious, whether it went into any file, or even whether it was in writing."

Presley argues that Pepperidge Farm took adverse employment action against her when: 1) Arocho marked Presley tardy when Presley contends that she was not late; and 2) Arocho required Presley to fill out a time sheet which accounted for her whereabouts in the company plant at all times for one week.   Like the plaintiff in Weeks, Presley has not described the effect or ramifications of either incident, how or why the effect would be serious, whether either incident was noted in her file, or even whether they were put in writing.  Without this information, the court is unable to determine how marking her tardy and requiring her to fill out a time sheet for one week could cause an adverse change in her working conditions.  In the absence of this information, the court concludes that Presley's allegations do not qualify as adverse employment actions.  As a result, Presley's retaliation claim fails.

3. Gender Based Discrimination

Pepperidge Farm argues that the plaintiffs claim of gender discrimination is nothing more than a reiteration of their hostile work environment claim, and that the court should grant summary judgment on these claims for the same reasons as their hostile work environment claim. The plaintiffs respond that Pepperidge Farm subjected them to "sex discrimination by virtue of a hostile work environment."

Title VII prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has held that the phrase "terms, conditions, or privileges of employment" is broad enough to encompass the definition of a hostile work environment. Harris v. Forklift Systems, 510 U.S. 17, 21 (1993). Consequently, to prove sex discrimination by virtue of a hostile work environment, the plaintiffs must show: 1) that the alleged conduct amounts to a hostile work environment; and 2) that the alleged conduct created such an environment because of their sex. Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001).

A. Tsharides's claim

Because the court has already held that a genuine issue of material fact does not exist with respect to Tsharides's hostile work environment claim, her claim of sexual discrimination by virtue of a hostile work environment fails as a matter of law.

B. Presley's claim

Because the court has already held that a genuine issue of material fact does exist with respect to Presley's hostile work environment claim, the court will now analyze whether the alleged conduct created such an environment because of her sex.

"In determining whether an employee has been discriminated against because of [her] . . .

sex, courts have consistently emphasized that the ultimate issue is the reasons for the individual plaintiff's treatment, not the relative treatment of different groups within the workplace." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (internal citations and quotations omitted).

The Second Circuit "has found workplace situations discriminatory under a hostile work environment theory where the conduct at issue, though lacking any sexual component or any reference to the victim's sex, could, in context, reasonably be interpreted as having been taken on the basis of the plaintiff's sex." Gregory, 243 F.3d at 695. In Gregory, a female plaintiff, Gregory, alleged that her supervisor, Daly, subjected her to a hostile work environment because of her sex. Id at 689. In support of her claim, Gregory alleged that Daly made "demeaning comments of a sexual nature, engaged in behavioral displays of a sexual nature, and made unwelcome physical contact . . . of a sexual nature with Gregory." Id. at 690 (internal quotations omitted). Gregory's claim also contained other allegations of Daly's discrimination. Specifically, after Gregory complained about Daly's behavior, "Gregory's new supervisor, acting on Daly's instructions, imposed novel restrictions on her work activities, including the requirement that she, unlike other employees, provide a 'minute by minute' record of her movements." Id. Daly also allegedly "made hostile comments concerning the lawsuit Gregory had filed, started to threaten her job, and subjected her to baseless disciplinary actions." Id. The defendant argued that the court "must exclude from consideration . . . Gregory's allegations that do not, on their face, contain any connection to sexual behavior or to a person's sex." Id. at 694. The court responded, holding that "the sex-based character of much of Daly's behavior permits the inference that the remainder of his harassing conduct was also due to Gregory's sex." Id. at 695. The court further held that "this remains so even though the discriminatory character of some individual incidents might not be evident were they considered in isolation only." Id. As a

result, the court concluded that "[b]ecause Gregory's allegations support the notion that she was subjected to abusive working conditions because of her sex, we vacate the district court's judgment dismissing plaintiff's claim of hostile work environment discrimination."  Id.

The court considered the following allegations in deciding Presley's hostile work environment claim.  On August 2, 2001, Arocho told Presley that she had nice legs.  Presley told Arocho that she was uncomfortable with that comment, and that she would pursue a complaint if this conduct persisted.  Arocho responded by telling Presley that she was not in good standing with the company because she had previously filed a worker's compensation claim.  On August 3, 2001, Arocho told Presley that her friendship with several of the men at the plant could bring her financial gain due to her attractive physical attributes. Later that same day, Arocho summoned Presley to his office, grabbed his crotch area, and asked Presley if she "wanted any of this."  On August 15, 2001, Presley contends that Arocho warned her that fifty-three people could complain to human resources about him and nothing would ever happen to him.  Later that same date, Arocho allegedly touched Presley on her shoulder and smiled.  On August 31, 2001, Presley learned from Diggs that Arocho sent a negative recommendation to quality assurance while she was applying for a position in the department.  Presley alleges that the negative recommendation was untrue and that it caused White to decline to hire her for the position.  On December 7, 2001, Arocho marked Presley tardy when Presley contends that she was not late.  Arocho then told Presley that, if she were marked tardy again, she would be suspended from her employment.  As a result, Arocho required Presley to fill out a time sheet which accounted for her whereabouts in the company plant at all times for one week.

Several of Presley's allegations show that her sex played a substantial role in Arocho's behavior.  Specifically, a reasonable juror could find that Arocho's comment that Presley's

friendship with several of the men at the plant could bring her financial gain due to her attractive physical attributes insinuated that Presley was a prostitute of some sort, which is a demeaning activity primarily associated with women.  Additionally, a reasonable juror could also find that Arocho's action of grabbing his crotch in front of Presley and asking her if she "wanted any of this" is a behavioral display of a sexual nature or some type of vulgar sexual offering.  By making such a display or offering, a reasonable juror could find that Arocho has demonstrated a sexual interest toward Presley as a woman.  These inferences are also supported by the Supreme Court's observation that  "[c]ourts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situation, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex." Oncale v. Sundowner Offshore Services, Inc., 510 U.S. 75, 80 (1998) (discussing different forms of evidence that can show sex discrimination).

The remainder of Arocho's conduct is factually similar to the remainder of Daly's conduct in Gregory v. Daly, 243 F.3d 687 (2d Cir. 2001).  For instance, both Daly and Arocho required the plaintiffs to fill out a time sheet accounting for their whereabouts at all times.  Both Daly and Arocho subjected the plaintiffs to baseless disciplinary actions and threatened their jobs.  Because this factual similarity exists, it is no great stretch for the court similarly to hold that the sex-based character of some of Arocho's conduct permits the inference that the remainder of his conduct was also due to Presley's sex.  Consequently, the court concludes that a genuine issue of material fact exists as to whether Arocho's alleged conduct created a hostile work environment because of her sex.

In sum, Presley has raised a genuine issue of material facts as to both elements of her

gender discrimination claim, which are: 1) that the alleged conduct amounts to a hostile work

environment, and 2) that the alleged conduct created such an environment because of her sex.

C.  Employer Liability

    The court may not hold individual supervisory employees liable under Title VII.  Tomka

v. Seiler Corp., 66 F.3d 1295, 1314 (2d Cir. 1995), *abrogated on other grounds by* Burlington

Indus., Inc. v. Ellerth, 524 U.S. 724 (1998).  "For liability to attach [under Title VII], the

employer must also be responsible for the conduct at issue."  Gregory, 243 F.3d at 692 fn.3.

Pepperidge Farm's liability for Arocho's alleged sexual discrimination is determined by the same

standards as their liability for a hostile work environment.  Id.  Furthermore, because Presley's

claim of sexual discrimination is based on the same conduct as her hostile work environment

claim, the court's earlier ruling as to Pepperidge Farm's vicarious liability applies here.

Consequently, there are genuine issues of material fact as to whether Pepperidge Farm is liable

for Arocho's alleged sexual discrimination.

4.  Negligent Misrepresentation

    The defendants move for judgment as a matter of law on the plaintiffs' claim of negligent

misrepresentation, arguing that the plaintiffs have failed to raise a genuine issue of material fact

with respect to two essential elements of that claim.  Specifically, the defendants argue that the

"[p]laintiffs cannot . . . adduce any evidence that Pepperidge Farm made any false statement with

regard to the sexual harassment prevention policy nor that they reasonably relied on any such

statement."

    The plaintiffs respond that Pepperidge Farm knew or should have reasonably known that

some of the representations that they made in their company handbook or their anti-harassment

policy were false.   The plaintiffs further respond that they justifiably relied on those

representations by working for the defendants and participating in the company's complaint procedures.   Finally, the plaintiffs respond that the inadequacy of Pepperidge Farm's complaint procedures exposed them to further harassment by Arocho.

The governing principles of negligent misrepresentation are set forth in § 552 of the Restatement Second of Torts (1979), which states:

> One who, in the course of business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Barry v. Posi-Seal Intern., Inc., 36 Conn. App. 1, 20 (1994) (alterations in original) (emphasis added).

In Barry, the plaintiff claimed that his employer, Posi-Seal, negligently misrepresented the terms and conditions of his employment.   Id. at 3.   Specifically, Posi-Seal distributed a personnel policy manual to its employees describing company policy on disciplinary procedures. Id. at 4.   It states that "[i]t is the policy of the [c]ompany that any employee who violates any of the rules or procedures of the [c]ompany shall be subject to disciplinary action as set forth below."   Id.   The manual then sets forth procedures to respond to first, second and third violations by employees of the company rules and regulations.   Id.   Additionally, on one occasion, the plaintiff asked Eugene Bisbee, the vice president and general manager of Posi-Seal, about the plaintiff's job security.   Id.   Bisbee responded that "if you do your job, you do your work, you're going to have a job here.   If we can make this place run and minimize the money loss - I mean, you do your job, you're going to have a job here."   Id.   On August 4, 1988, the plaintiff made a disparaging remark about a company made valve in the presence of a customer representative.   Id. at 3.   The next day, Posi-Seal terminated his employment because of the

comment.  Id.  Posi-Seal did not give the plaintiff prior notice of his termination and did not afford him any other disciplinary measures in accordance with their personnel manual.  Id  On appeal, the plaintiff contended that the defendant failed to exercise reasonable care and thus supplied false information to the plaintiff which the plaintiff justifiably relied on to his detriment."  Id. at 21.  The court rejected the plaintiff's argument, stating that "the plaintiff . . . has failed to apprise us of anything in the record, and our search of the record has revealed nothing to support his contention.  Id.  The court held that there was no evidence from which the jury reasonably could have found that the defendant's representations were untrue when made or that the defendant should have known to be untrue when made.  Id.  As a result, the court affirmed the trial court's decision to grant the defendant's motion to set aside the verdict as to the plaintiff's negligent misrepresentation claim.  Id.

_____In the present case, neither plaintiff has alleged any facts indicating that Pepperidge Farm failed to exercise reasonable care or competence in obtaining or communicating any information in their company handbook or anti-harassment policy.  Specifically, like the plaintiff in Barry, neither plaintiff has introduced any evidence from which a reasonable juror could find that Pepperidge Farm's representations in their company handbook or anti-harassment policy were untrue when they made them or that they should have known they were untrue at that time. Consequently, the court concludes that the claim of negligent misrepresentation fails as a matter of law.

5. Civil Conspiracy  _____

_____The defendants argue that they are entitled to summary judgment on the plaintiffs' claims of civil conspiracy.  Specifically, the defendants argue that "[a]n essential element of a civil action for conspiracy is that the alleged conspirators have combined 'to do a criminal act or an

unlawful act or a lawful act by criminal or unlawful means.'"   The defendants further argue that

the plaintiffs cannot raise a genuine issue of material fact that the defendants have committed

such an act.  The plaintiffs respond that their civil conspiracy claim is based upon their earlier

claim of negligent misrepresentation.

"An essential element of a civil action for conspiracy is that the alleged conspirators have

combined 'to do a criminal act or an unlawful act or a lawful act by criminal or unlawful means."

Jones v. O'Connell, 189 Conn. 648, 662 (1983).

In Jones, the court stated that "[t]he illegal act upon which the plaintiffs rely to establish a

civil conspiracy are the very acts which we have already found not to be improper."  Id.

Consequently, the court held that "[i]n the absence of any independent basis for this claim, our

discussion of the merits of the underlying claims is dispositive of this claim as well."  Id.

In the present case, the plaintiffs rely on their earlier claim of negligent misrepresentation

to establish a civil conspiracy.  Because the court has already granted summary judgment in favor

of the defendants on the plaintiffs' underlying claim of negligent misrepresentation, the

plaintiffs' claim of civil conspiracy also fails as a matter of law.

6.  Intentional Infliction of Emotional Distress

The defendants argue that a genuine issue of material fact does not exist as to the

plaintiff's claims of intentional infliction of emotional distress against Arocho or Pepperidge

Farm.  Specifically, the defendants argue that the plaintiffs have not alleged that Arocho or

Pepperidge Farm engaged in any conduct that a reasonable juror could find to be "extreme and

outrageous."

The plaintiffs respond that the question of whether the conduct of Arocho or Pepperidge

Farm was sufficiently extreme and outrageous should be decided by a jury because, at this stage,

reasonable minds could differ.

In order for the plaintiff to establish a claim of intentional infliction of emotional distress, the plaintiff must prove

> 1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; 2) that the conduct was extreme and outrageous; 3) that the defendant's conduct was the cause of the plaintiff's distress; and 4) that the emotional distress suffered by the plaintiff was severe.

Appleton v. Bd. of Educ. of Town of Southington, 254 Conn. 205, 210 (2000). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." Id. "Only where reasonable minds disagree does it become an issue for the jury." Id.

A. Extreme and Outrageous

"Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by society . . . ." Id. (internal quotations omitted). Courts have found liability "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 211. "Generally, the case is one in which the recitation of facts to an average member of the community would arose his resentment against the actor, and lead him to exclaim, 'Outrageous!.'" Id. (quoting the Restatement (Second), Torts § 46, comment (d), p. 73 (1965)). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Id.; Kilduff v. Cosential, Inc., 289 F.Supp.2d 12, 21 (D. Conn. 2003).

In Appleton v. Bd. of Educ. of Town of Southington, 254 Conn. 205 (2000),

the plaintiff, a teacher, claimed that the principal, assistant principal, and board of education intentionally inflicted emotional distress on her.  Id.  Specifically, Appleton complained that the principal "made condescending comments to her in front of her fellow colleagues questioning her vision and ability read; telephoned the plaintiff's daughter, representing that the plaintiff had been acting differently and should take a few days off from work; and telephoned the police, who came to the school and escorted the plaintiff out of the building to her car."  Id. at 211 (internal quotations omitted).  "The plaintiff also asserted in her affidavit that she was subjected to two psychiatric examinations at the request of the board, and that she was forced to take a suspension and a leave of absence and, ultimately, forced to resign."  Id.  The court held that while these occurrences may have been distressing and hurtful to the plaintiff, they did not constitute extreme and outrageous conduct.  Id.  As a result, the court held that the defendants' conduct was insufficient to form the basis of an action for intentional infliction of emotional distress.  Id. at 212.

Further, in Kilduff v. Cosential, Inc., 289 F.Supp.2d 12 (D. Conn. 2003), the plaintiff alleged that her supervisor used sexual analogies to describe her employment duties for the duration of her employment, which lasted five months, subjected her to sexist language over an extended period of time, engaged in inappropriate touching.  Id. at 22.  The plaintiff also alleged that her supervisors harassing conduct increased in intensity in retaliation for her complaining of his conduct.  Id.  Finally, the plaintiff alleged that her supervisor threatened to fire her if she cut her hair.  Id.  The court held that her supervisor's conduct was "sufficiently objectionable that the response of reasonable people may differ thus precluding dismissal of [this claim]."  Id.  The court stated that the retaliatory nature of the supervisor's conduct was entitled to some weight. Id.    a. Presley's Claim Against Arocho

Presley's claim of intentional infliction of emotional distress against Arocho includes the following allegations. On August 2, 2001, Arocho told Presley that she had nice legs. Presley told Arocho that she was uncomfortable with that comment, and that she would pursue a complaint if this conduct persisted. Arocho responded by telling Presley that she was not in good standing with the company because she had previously filed a worker's compensation claim. On August 3, 2001, Arocho told Presley that her friendship with several of the men at the plant could bring her financial gain due to her attractive physical attributes. Presley felt this statement insinuated that she was a prostitute of some sort. Later that same day, Arocho summoned Presley to his office, grabbed his crotch area, and asked Presley if she "wanted any of this." On August 15, 2001, Arocho warned her that fifty-three people could complain to human resources about him and nothing would ever happen to him. On December 7, 2001, Arocho marked Presley tardy when Presley contends that she was not late. Arocho then told Presley that if she were marked tardy again, she would be suspended from her employment. As a result, Arocho required Presley to fill out a time sheet which accounted for her whereabouts in the company plant at all times for one week. Presley also alleges that Arocho sent a negative recommendation to the quality assurance department that caused White to decline to hire her for the position.

Accepting Presley's allegations as true, they are not more extreme and outrageous than the plaintiff's allegations in Appleton. While the principal in Appleton made condescending remarks towards Appleton, Arocho made comments that were insulting and intimidating. The principal's comments in Appleton were more outrageous than Arocho's comments, however, because he made them in front of several of the Appleton's colleagues while Arocho said them only to Presley. Insulting an employee in front of her colleagues is more outrageous because it could pervade the employee's entire working environment and ruin the employee's credibility

and reputation.

Additionally, while Arocho marked Presley tardy and required her to fill out a time sheet, Appleton's employer forced her to take two psychiatric examinations. Forcing an employee to submit to two psychiatric examinations is more extreme than marking them tardy or requiring them to fill out a time sheet because it is much more burdensome and objectionable for an employee.

Furthermore, Arocho's negative recommendation is not more outrageous than the school official's actions of calling the police to escort Appleton out of the building and calling Appleton's daughter to tell her that Appleton was behaving differently and needed to stay home. While Presley may have lost a promotion as a result of Arocho's negative recommendation, being escorted away from your job by the police is extremely embarrassing and involving someone's close family members is extremely violative. Cf. Bombalacki v. Pastore, 71 Conn. App. 835, 841-841 (2002) (holding that a police chief's action of failing to recommend the plaintiff for a promotion that he deserved was not extreme and outrageous). Finally, Arocho only threatened to suspend Presley, while Appleton's employer did suspend her and forced her to take a leave of absence.

Because Presley's allegations are not more extreme and outrageous than the plaintiff's allegations in Appleton, where the court granted summary judgment against the plaintiff, Presley's claim of intentional infliction of emotional distress against Arocho also fails as a matter of law.

b. Tsharides's claim against Arocho

Tsharides's claim of intentional infliction of emotional distress against Arocho includes the following allegations. In or about the end of July 2001, Arocho rubbed Tsharides hands and

told her that she "made him nervous."  Proximate to this time period, Arocho attempted to touch

her knees and told her that he had the authority to do so because he was her supervisor.  In early

August 2001, Arocho approached Tsharides from behind, rubbed his foot against her calf, and

uttered unintelligible comments.  In August 2001, Arocho asked Tsharides if she wanted "to

mess around" with him.  Finally, in late August 2001, Arocho approached Tsharides and told her

that he wanted to have a "threesome" with her and one of her co-workers.

Tsharides's allegations are far less severe than the plaintiff's allegations in Kilduff.  First,

unlike the plaintiff's supervisor in Kilduff, Arocho never threatened to fire Tsharides.  Second,

any inappropriate or sexual comments in the present case occurred far less frequently and over a

shorter period of time than in Kilduff.  Specifically, in Kilduff, the plaintiff alleged that her

supervisor made sexual comments to her for the duration of employment which lasted five

months.  By constrast, Tsharides worked at Pepperidge Farm for almost four years and alleges

that, during that time, Arocho made only three sexual comments to her over a period of one

month.  Third, while the supervisor's harassment in Kilduff intensified in retaliation for the

plaintiff complaining about his conduct, Tsharides testified at deposition that Arocho's

inappropriate conduct ceased even before Tsharides participated in Pepperidge Farm's complaint

procedure.  Because the court in Kilduff indicated that it would give some weight on the

retaliatory nature the supervisor's conduct in making its decision, this court will also weight the

lack any retaliation in the present case.  Consequently, because Tsharides's allegations are far

less severe than the plaintiff's allegations in Kilduff, Tsharides's claim of intentional infliction of

emotional distress against Arocho fails as a matter of law.

B.  Both Plaintiffs claims against Arocho

In Morrissey v. Yale University, 268 Conn. 426, 427-428 (2004) the plaintiff alleged that

her employer intentionally inflicted emotional distress on her by failing to take any action in response to the plaintiff's complaints of harassment. In response, the Connecticut Supreme Court held that "no reasonable jury could conclude that an average member of the community would find the defendant's conduct to have been extreme and outrageous." Id. at 428; accord Pascal v. Storage Technology Corp., 152 F.Supp.2d 191, 214 (D. Conn. 2001) (holding that an employer's failure to adequately protect the plaintiff from an arguably hostile work environment was not extreme and outrageous); Miner v. Town of Chesire, 126 F.Supp.2d 184, 195 (D. Conn. 2000) (holding that an employer's refusal to protect the plaintiff from sexual harassment was not sufficiently extreme or outrageous to state a claim for intentional infliction of emotional distress); Dobrich v. General Dynamics Corp., Elec. Boat Div., 40 F.Supp.2d 90, 105 (D. Conn. 1999) (holding that an employer's negligent failure to prevent sexual harassment of female employee was not extreme and outrageous).

In the present case, both plaintiffs claim that Pepperidge Farm intentionally inflicted emotional harm on them by providing an inadequate response to the plaintiffs' allegations of sexual harassment. Even accepting the plaintiffs' allegations as true, the court concludes that after Morrissey, Pascal, Miner, and Dobrich, no reasonably jury could conclude that an employer's inadequate response to an employees's allegations of sexual harassment, even it was negligent, is extreme and outrageous. Consequently, the plaintiffs' claims of intentional infliction of emotional distress against Pepperidge Farm fails as a matter of law.

7. Negligent Infliction of Emotional Distress

The defendants next argue that the plaintiffs have failed to raise a genuine issue of material fact on the claim of negligent infliction of emotional distress. Specifically, the defendants argue that the plaintiffs have failed to alleged any unreasonable conduct of the

defendant that occurred during their resignation processes.

The plaintiffs do not offer any response.

To establish a claim of negligent infliction of emotional distress, "the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that the distress, if it were caused, might result in illness or bodily harm." Carrol v. Allstate Ins. Co., 262 Conn. 433, 446 (2003). The Connecticut Supreme Court has held, however, that "an individual . . . employee may not be found liable for negligent infliction of emotional distress arising out conduct occurring within a continuing employment context, as distinguished from conduct occurring in the termination of employment." Perodeau v. City of Hartford, 259 Conn. 729, 763 (2002). Although Perodeau concerned the liability of an individual defendant, the courts have repeatedly held that the reasoning applies equally to corporate defendants. See Brunson v. Bayer Corp., 237 F.Supp.2d 192, 208 (D. Conn. 2002) (citing cases). Courts have also held that allegations of constructive discharge may qualify as termination under Perodeau. Pecoraro v. New Haven Register, 344 F.Supp.2d 840, 846 (D. Conn. 2004); Grey v. City of Norwalk Bd. of Ed., 304 F.Supp.2d 314, 332 (D. Conn. 2004). In a case of constructive discharge, courts will consider only the incidents which occurred during the plaintiff's resignation process or thereafter in evaluating a negligent infliction of emotional distress claim. Pecoraro, 344 F.Supp.2d at 846-847.

In the present case, it is undisputed that Pepperidge Farm did not terminate either plaintiff's employment. To the extent that either plaintiff claims constructive discharge, the court will consider only allegations of inappropriate conduct by Arocho or Pepperidge Farm which occurred during the plaintiffs' resignation processes or thereafter.

Tsharides's claim

It is undisputed that neither Arocho nor Pepperidge Farm engaged in any inappropriate conduct during Tsharides's resignation process or thereafter.  Specifically, in March 2003, Tsharides resigned from her employment, and she has made no allegations of inappropriate conduct by either defendant occurring during that process or thereafter.  In fact, Tsharides testified in a deposition hearing that any alleged inappropriate conduct by the defendants had stopped in 2001.  Consequently, because the defendants did not engage in any inappropriate conduct during Tsharides's resignation process or thereafter, Tsharides's claim of negligent infliction of emotional distress fails as a matter of law.

Presley's claim

It is also undisputed that neither defendant engaged in any inappropriate conduct during Presley's resignation process or thereafter.  At some point in March 2002, Presley resigned.  Presley does not allege that either defendant engaged in any inappropriate conduct during her resignation or thereafter.  Earlier that same month, Presley does allege, however, that she received information that Arocho's wife, who was also an employee at the plant, was making physical threats towards her for pursuing a sexual harassment complaint.  Even if the court were to strain in order to consider this incident in deciding Presley's claim, any allegation that Pepperidge Farm failed to take adequate remedial measures is insufficient, as a matter of law, to state a claim of negligent infliction of emotional distress.  See Miner v. Town of Chesire, 126 F.Supp.2d 184, 199 (D. Conn. 2000) (holding that the plaintiff's allegations did not rise to the required level of unreasonableness to state a claim of negligent infliction of emotional distress where the "employer was well aware of [the] harassment, but failed to take adequate remedial measures or provide adequate training; and failed to provide an appropriate mechanism for the reporting incidents of sexual harassment in the workplace.")  All other allegations by Presley

took place in 2001, which are far too remote in time from Presley's resignation for the court to

consider.  Consequently, because it is undisputed that neither defendant engaged in any

inappropriate conduct during Presley's resignation process or thereafter, Presley's claim of

negligent infliction of emotional distress fails as a matter of law.

## <u>CONCLUSION</u>

For the foregoing reasons, the defendants' motion for summary judgment is granted in

part and denied in part.

It is so ordered this _____ day of January, 2005 at Hartford, Connecticut.


/s/ AVC_____
Alfred V. Covello
United States District Judge